Christopher L. Lebsock (SBN 184546)
Michael P. Lehmann (SBN 77152)
Samuel Maida (SBN 333835)
HAUSFELD LLP
580 California Street
12th Floor
San Francisco, CA 94111
Telephone: (415) 633-1908
Facsimile: (415) 358-4980
clebsock@hausfeld.com
mlehmann@hausfeld.com
smaida@hausfeld.com

YoungKi Rhee (*Pro Hac Vice forthcoming*)
WE THE PEOPLE LAW GROUP
Chinyang Building, 7/F
47 Kyonggidae-ro, Seodaemun-gu
Seoul, South Korea 03752
Telephone: 82-2-2285-0062
ykrhee@wethepeople.co.kr

Byung-Joo Lee (SBN 225384)
JIHYANG LAW FIRM
Seohee Tower, 7/F
2583 Nambusunhwan-ro
Seoul, Korea 06735
Telephone: 82-2-3476-6002
Facsimile: 82-2-3476-6607
bjlee@jihyanglaw.com

*Additional Counsel Listed In Signature Block*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Korean Publishers Association, Korea Electronic Publishing Association, Dan Scalise, and PangSky Co., Ltd., *on behalf of themselves and all others similarly situated,*<br><br>Plaintiffs<br><br>v.<br><br>APPLE, INC.,<br><br>Defendant | Case No. 3:25-cv-4438<br><br>**JURY TRIAL DEMANDED**<br><br>**CLASS ACTION COMPLAINT** |

## **TABLE OF CONTENTS**

I.    INTRODUCTION .......................................................................................... - 1 -

II.   JURISDICTION AND VENUE ................................................................... - 4 -

III.  PARTIES ..................................................................................................... - 5 -

   A.   PLAINTIFFS ............................................................................................... - 5 -
   B.   DEFENDANT ............................................................................................... - 7 -

IV.   CLASS ALLEGATIONS ........................................................................... - 7 -

V.    RELEVANT FACTS ................................................................................ - 10 -

   A.   PROTECTING THE APPLE "ECOSYSTEM" AND iOS APP DISTRIBUTION AND PAYMENT
PROCESSING SERVICES. .................................................................................... - 10 -
   B.   APPLE'S LONG-RUNNING ANTICOMPETITIVE CONDUCT INSULATED ITS "ECOSYSTEM" FROM
LAWFUL COMPETITION. ...................................................................................... - 10 -
      1.   *Apple Used Distribution, Payment Processing and Anti-Steering Restrictions to
Implement and Maintain its Monopoly.* ........................................................... - 11 -
      2.   *Apple's Anticompetitive "Commissions" for its iOS App Distribution and Payment
Processing Services.* ........................................................................................ - 13 -
   C.   THE FIRST *EPIC GAMES* INJUNCTION ........................................................ - 14 -
   D.   APPLE'S VIOLATIONS OF THE FIRST INJUNCTION AND CONTINUED ANTICOMPETITIVE
CONDUCT. ......................................................................................................... - 15 -
      1.   *Apple's Anticompetitive 27% Commission on Linked Purchases.* ................ - 16 -
      2.   *Apple's Anticompetitive Link Design & Placement Requirements.* ............... - 17 -
      3.   *Apple's Anticompetitive Flow Friction Policies.* .......................................... - 19 -
      4.   *Apple's Anticompetitive Limitations on Calls to Action.* .............................. - 21 -
      5.   *Apple's Anticompetitive Program Exclusions.* .............................................. - 22 -
   E.   THE SECOND INJUNCTION ......................................................................... - 22 -

VI.   THE SMALL APP DEVELOPER SETTLEMENT ................................ - 23 -

VII.  THE RELEVANT MARKET .................................................................. - 24 -

   A.   RELEVANT PRODUCT MARKET .................................................................. - 24 -
   B.   RELEVANT GEOGRAPHIC MARKET ............................................................ - 24 -
   C.   APPLE MONOPOLIZES THE RELEVANT MARKET, WITH CONSUMERS FACING LOCK-IN. ...... - 25 -

VIII. STANDING ............................................................................................... - 27 -

IX.   APPLE HAS CONTINUOUSLY VIOLATED THE ANTITRUST LAWS ................ - 29 -

X.    CLAIMS FOR RELIEF ........................................................................... - 29 -

COUNT ONE: MONOPOLIZATION ............................................................... - 29 -

COUNT TWO: CALIFORNIA UNFAIR COMPETITION LAW ...................... - 31 -

COUNT THREE: KOREAN MONOPOLY REGULATION & FAIR TRADE ACT ........ - 33 -

XI.   PRAYER FOR RELIEF ............................................................................ - 36 -

XII.  JURY TRIAL DEMANDED .................................................................... - 37 -

Plaintiffs Korean Publishers Association, Korea Electronic Publishing Association, Dan Scalise, and PangSky Co., Ltd., (collectively "Plaintiffs"), on behalf of themselves and Classes of similarly situated developers of Apple iOS and Apple iPadOS application(s) and/or in-app digital goods or services, including subscriptions offered for sale at a non-zero price ("iOS Apps"), bring this Class Action Complaint for damages and equitable relief against Defendant Apple, Inc. ("Defendant" or "Apple") for violations of Sections 2 and 3 of the Sherman Act (15 U.S.C. §§ 2, 3), California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq*.) ("UCL"), and Korea's Monopoly Regulation & Fair Trade Act (Act No. 20239) ("MRFTA"). All allegations herein, other than those concerning Plaintiffs, are based on information and belief.

## I.    INTRODUCTION

1.    For more than a decade, Apple has been engaged in anticompetitive practices aimed at protecting its supra-competitive profits on iOS Apps. Specifically, until very recently, Apple has: (a) charged (and continues to charge) monopoly rents to iOS App developers, such as Plaintiffs and members of the putative Classes, in the form of commissions that have reached as high as thirty percent (30%) on in-app payments ("IAPs"), which are payments made either in Apple's App Store or within iOS Apps themselves; (b) enacted policies and engaged in practices that have effectively prevented iOS App developers, such as Plaintiffs and members of the putative Classes, from distributing or selling iOS Apps on competing iOS App platforms; and (c) enacted policies and engaged in practices that have effectively prevented iOS App developers, such as Plaintiffs and members of the putative Classes, from steering consumers of iOS Apps toward competing iOS App distribution or payment processing services. As a result of Apple's anticompetitive policies and practices, Apple has successfully monopolized iOS App distribution and sales for more than a decade, thus reaping supra-competitive profits at the expense of both consumers and iOS App developers, such as Plaintiffs and members of the putative Classes.

2.    Apple's anticompetitive scheme has been perpetuated and reinforced by Apple's "lock in" of consumers into the Apple "ecosystem." As the U.S. Department of Justice ("DOJ") and sixteen Attorneys General ("AGs") recently noted in their own antitrust complaint against Apple, Apple has designed its products, software, and policies to make it exceedingly difficult for consumers and iOS

App developers to divorce themselves from Apple's "ecosystem" once they are in it. As the DOJ and AGs, quoting internal Apple documents, wrote, "as early as 2010, then-CEO Steve Jobs discussed how to 'further lock customers into our ecosystem' and 'make Apple['s] ecosystem even more sticky. Three years later, Apple executives were still strategizing how to "get people hooked to the ecosystem."

3.    There are no countervailing procompetitive benefits that would justify Apple's monopolistic restraints. Indeed, Apple's public-facing justifications for its restrictive practices—to protect user privacy or security—are pretextual. Internally, Apple has repeatedly acknowledged that its real goal in enacting these restrictive practices was to benefit its bottom line by thwarting direct and disruptive competition that would threaten its monopoly rents. For example, since at least 2017, Apple has imposed requirements that have excluded "super apps"—apps that work the same way across devices and web browsers—not due to privacy and security concerns, but because they are "fundamentally disruptive" to Apple's "existing app distribution and development paradigm[]." "As one Apple manager put it, allowing super apps to become 'the main gateway where people play games, book a car, make payments, etc.' would 'let the barbarians in at the gate.' Why? Because when a super app offers popular mini programs, 'iOS stickiness goes down.'" Apple's anticompetitive practices resulted in class action litigation by "small" iOS App developers (*i.e.*, those with under $1 million in iOS App sales in a calendar year), as well as Epic Games. While these "small" iOS App developers reached a $100 million settlement with Apple on August 24, 2021 (the "Small App Developer Settlement"), Epic Games litigated its case through trial. Evaluating Apple's monopolist playbook, the Court—following a 16-day bench trial—concluded that Apple had engaged in anticompetitive and illegal conduct with regard to sales of iOS Apps sold on its App Store, and that its policies and practices "'threaten[ed] an incipient violation of an antitrust law' by preventing informed choice among users of the iOS platform" in violation of California's UCL.

4.    In order to remedy Apple's illegal, anticompetitive conduct, the Court issued an injunction (the "First Injunction") that, *inter alia*, barred Apple from preventing iOS App developers, such as Plaintiffs and members of the putative Classes, from communicating alternative methods of purchasing iOS Apps that would have permitted consumers to purchase iOS Apps outside the App

Store, thus allowing Plaintiffs and members of the putative Classes from having to pay the supra-competitive "commissions" charged by Apple. The First Injunction became effective on January 16, 2025; the same day the Supreme Court denied Apple's writ of *certiorari*. On that day, Apple represented to the Court that it had taken certain actions to comply with the First Injunction. However, Apple had decided to engage in further anticompetitive conduct to perpetuate its illegal monopoly, thus continuing to reap supra-competitive profits at the expense of Plaintiffs and members of the putative Classes, rather than comply with the Injunction. Specifically, Apple imposed: (a) a 27% commission on non-IAP iOS App purchases made within seven days of a consumer linking out of the Apple "ecosystem," and (b) new anticompetitive barriers that were intended to—and did in fact—dissuade consumers from making non-IAP iOS App purchases, including, for example, full page "scare" screens. These policies dissuaded customers from using alternatives to IAPs, thus maintaining Apple's decade-long anticompetitive revenue stream on iOS Apps through the present.

5.      In an effort to uncover Apple's subterfuge, Epic challenged these practices, and following discovery and nine days of evidentiary hearings, the Court concluded that "contemporaneous business documents reveal that Apple knew exactly what it was doing and at every turn chose the most anticompetitive option," that the decision to willfully violate the Injunction was made by Apple's CEO, Tim Cook, and that Apple attempted at every turn to conceal their subversion.

6.      In order to remedy Apple's illegal maintenance of its long-standing monopoly (in violation of the First Injunction), the Court entered a further injunctive order (the "Second Injunction") that barred Apple from engaging in conduct that maintained its illegal monopoly, including *inter alia*, "[i]nterfering with consumers' choice to proceed in or out of an app by using anything other than a neutral message apprising users that they are going to a third-party site." The Court further ordered that Apple immediately come into compliance with the Injunction and referred it, as well as Alex Roman, Apple's Vice-President of Finance, to the DOJ for potential criminal prosecution.

7.      Apple has since modified its policies to comply with the Court's Second Injunction.

8.      The remedies issued by the Court in the Second Injunction, however, have not made Plaintiffs and members of the Classes whole. Through this action, Plaintiffs, on behalf of themselves

1    and the putative Classes defined herein, seek to recover the supra-competitive commissions they paid

2    Apple for iOS Apps, as well as an injunction permanently barring Apple from engaging in further

3    illegal, monopolistic conduct with regard to iOS App distribution and payment processing services.

4    **II.    JURISDICTION AND VENUE**

5         9.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§

6    1331, 1332(a)(2), 1337(a), and 1367.

7         10.    This Court has supplemental jurisdiction over the claims arising under foreign law in

8    this action pursuant to 28 U.S.C. § 1367.

9         11.    This Court has general personal jurisdiction over Apple because its principal place of

10   business is in Cupertino, California, resulting in continuous and systematic contacts with California.

11        12.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1)-(2) and (d) because

12   a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District,

13   because Apple resides in this District, and because of Apple's contacts with this District.

14        13.    With regard to Plaintiffs' claims arising from sales of iOS Apps to U.S.-based

15   consumers, California and U.S. Federal law apply by virtue of the choice-of-law provision in Apple's

16   Developer Program License Agreement, which states, "[t]his agreement will be governed by and

17   construed in accordance with the laws of the United States and the State of California, except that

18   body of California law concerning conflicts of law." Furthermore, a substantial part of the conduct at

19   issue took place in California—where Apple maintains its U.S. headquarters—including meetings

20   and communications through which Apple developed, implemented, and enforced its anticompetitive

21   scheme. California has a clear, substantial, legitimate, and compelling interest in applying its law to

22   corporate citizen Apple's unlawful conduct that emanated from within California's borders.

23        14.    With regard to Korean Publishers Association ("KPA"), Korea Electronic Publishing

24   Association's ("KEPA"), and PangSky Co., Ltd. ("PangSky"), claims arising from Korean-based iOS

25   App developers' sales of iOS Apps to consumers anywhere in the world other than China, this Court

26   may properly apply Korean law because numerous Korean courts have held that they cannot resolve

27   disputes between a Korean domiciliary and U.S. domiciliary where the parties contractually agreed

28   to resolve their disputes in California pursuant to forum selection and choice of law clauses that

designate this District and California law as the forum and law to be applied.[1] That is, KPA, KEPA, PangSky, and members of the Korean App Developer Class have no forum in which to bring their Korean law claims other than this Court.

## III.    PARTIES

### A.    Plaintiffs

15.    KPA is an association that represents Korean publishers. KPA was established on March 15, 1947 and joined the International Publishers Association in 1957. Among its members are app developers that distribute iOS apps through Apple's App Store, including paid apps, and apps offering in-app purchases. These members have been injured by Apple's conduct as alleged herein and will continue to be so injured until such time as Apple ceases its anticompetitive conduct. KPA's iOS-developer members are parties to Apple's Developer Program License Agreement and other associated agreements, schedules, exhibits, and guidelines.

16.    KPA is Korea's oldest and largest private-sector organization and covers all facets of the publishing industry. It was established to protect the freedom of publication and promote the public interest through projects, research, and education for the promotion of the publishing industry. It aims to contribute to the sustainable development of the publishing industry and to advancements of knowledge and culture. It conducts business necessary to promote the publishing industry, improve publishing ethics and establish sound distribution order, promote international exchange of the publishing industry, and expand the overseas publishing market.

17.    KPA is active in the various sectors of education, research, policy development, festivals, copyright exchange, and more to advance the publishing industry and defend the freedom to publish. It also conducts mail order business, education services, stationery retail, market research and public opinion research for the publishing industry, and other projects necessary to accomplish its goals.

---

[1]    *See, e.g.*, Seoul Central District Court decision 2018gahab506082, September 18, 2019; Korean Supreme Court decision 2020da238424, October 15, 2020; Seoul Central District Court decision 2019gadan5162753, October 20, 2020; Korean Supreme Court decision m2017da219232, April 13, 2023; Apple Inc., *Agreements and Guidelines for Apple Developers*, available at: https://developer.apple.com/support/terms/. Upon information and belief, Apple's Developer Program License Agreement may previously have been denominated the iPhone Developer Program License Agreement.

18.     KPA has been at the forefront of entities urging legislative action against Google and Apple's unlawful restraints in Korea.

19.     KEPA is an association composed of electronic publishing businesses. It was founded in 1992 and consists of 55 members. Since 1992, KEPA has been supporting the country's e-content publishing activities through education, publishing support, and certification programs. Among its members are app developers that distribute iOS apps through Apple's App Store, including paid apps, and apps offering in-app purchases. These members have been injured by Apple's conduct as alleged herein and will continue to be so injured until such time as Apple ceases its anticompetitive conduct. KEPA's iOS-developer members are parties to Apple's Developer Program License Agreement and associated schedules, exhibits, and guidelines.

20.     KEPA's purpose is to promote and further contribute to the development of the information society. Its mission is to actively support the production and active distribution of diverse and abundant electronic publishing content to further consolidate the foundation of cooperation between publishers, distributors, and technology companies.

21.     To pursue its goals, KEPA collects information, conducts research, holds presentations, and promotes joint development and high-tech dissemination. It also promotes standardization, hosts exhibitions, offers training and education, promotes industry-academic cooperation, enhances distribution, proposes public policy changes, and conducts other projects necessary to achieve its goals.

22.     KEPA has been at the forefront of entities urging legislative action against Google and Apple's unlawful restraints in Korea.

23.     Plaintiff Dan Scalise ("Scalise") is an iOS app developer domiciled in the United States. Scalise develops two iOS mobile gaming apps: (1) Rescue Pets, Save REAL Animals, which allows players to manage and improve virtual animal shelters; and (2) Rock Miner: Pro Stone Mining, in which players mine virtual ore to help rescue animals trapped on islands in the game's setting. Both apps are distributed through the iOS App Store, and Scalise is a party to Apple's Developer Program License Agreement and guidelines referenced in this Complaint.

24.     During the Class Periods, Plaintiff Scalise sold iOS Apps to U.S.-based customers.

25. Scalise brings claims only to the extent those claims have not been released by the Small App Developer Settlement.

26. Plaintiff PangSky is a Korean company with its principal place of business in Seoul, Korea. PangSky develops apps that it offers for distribution on the iOS App Store, such as role-playing games and massively multiplayer online role-playing games. Gaming apps PangSky has developed include, but are not limited to, Dragon Raja Origin, Vestria Story, and Fortress Battle Royal.

27. During the Class Periods, Plaintiff PangSky sold iOS Apps to customers in the United States and elsewhere around the world. PangSky is a party to Apple's Developer Program License Agreement and guidelines referenced in this Complaint and has not released any of its claims in connection with the Small App Developer Settlement.

### B. <u>Defendant</u>

28. Apple is the designer, manufacturer, and vendor of, *inter alia*, iPhones, iPads, and the Apple Watch; the designer and author of iOS and iOS updates, as well as of iPad OS and Watch OS; and the owner and operator of the App Store. Apple maintains its headquarters and principal place of business in Cupertino, California.

29. Upon information and belief, and as alleged, Apple made all decisions and took the actions complained of herein at or near its corporate headquarters in Cupertino, California, or elsewhere in the State of California. It is believed, and therefore alleged, that substantially all of the misconduct alleged in this Complaint occurred in, or emanated from, California

## IV. CLASS ALLEGATIONS

30. Plaintiffs bring this action for equitable relief and damages on behalf of themselves and classes of similarly situated persons and entities pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3).

### <u>App Developer Class</u>

31. Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), Plaintiffs KEPA, KPA, Scalise and PangSky bring this action seeking damages on behalf of themselves and a putative Class of iOS App Developers (the "App Developer Class") defined as follows:

1
2
3
4

> All persons or entities that sold iOS Apps (including subscriptions and in-app products) inside of Apple's App Store to purchasers located in the United States from May 23, 2021 and until such time as the effects of Apple's anticompetitive conduct ends to the extent that the person has not released their claims in connection with the Small App Developer Settlement.

5

**Korean App Developer Class**

6    32.    Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3),

7    Plaintiffs KPA, KEPA, and PangSky bring this action on behalf of themselves and iOS App

8    Developers domiciled in Korea ("Korean App Developer Class") defined as follows:

9
10
11

> All persons or entities domiciled in Korea that sold iOS Apps (including subscriptions and in-app products) inside of Apple's App Store to purchasers located anywhere in the world except China between May 23, 2015 and until such time as the effects of Apple's anticompetitive conduct ends.

12    33.    Excluded from the Classes are the following persons or entities: (a) Defendant; (b)

13    Defendant's parent companies, subsidiaries, and affiliates; (c) Defendant's officers, directors,

14    management, employees, subsidiaries, affiliates or agents; (d) the judge and chambers staff assigned

15    to this case, as well as the members of their immediate families; and (e) all jurors assigned to this

16    case.

17    34.    Plaintiffs KPA and KEPA bring their claims pursuant to Federal Rule of Civil

18    Procedure 23(a) and 23(b)(2) only.

19    35.    Plaintiffs reserve the right to expand, change, or modify the class definitions based

20    upon discovery and further investigation.

21    36.    **Numerosity.** Plaintiffs do not know the exact number of Class members. Plaintiffs are

22    informed and believe that, due to the nature of the trade and commerce involved, the Classes are so

23    numerous and geographically dispersed that joinder of all members of each of the Classes in the

24    prosecution of this action is impracticable.

25    37.    **Typicality.** Plaintiffs' claims are typical of the claims of their fellow Class members

26    because Plaintiffs sold iOS Apps through Apple's App Store during the Class Periods. Plaintiffs and

27    all members of the Classes were damaged in the same manner by the same wrongful conduct of

28    Defendant as alleged herein, and the relief sought herein is common to all members of the Classes.

38.    ***Commonality.*** Defendant has acted on grounds generally applicable to the Classes, thereby making final damages and equitable relief appropriate with respect to the Class as a whole. Moreover, numerous questions of law or fact common to the Classes—including, but not limited to, those identified below—arise from Defendant's anticompetitive and unlawful conduct:

    (a)    Whether there is a global market (excluding China) for iOS Apps;

    (b)    Whether Apple has unlawfully monopolized the global market (excluding China) for iOS Apps;

    (c)    Whether Apple's conduct, as alleged herein, violated California's UCL;

    (d)    Whether Apple's conduct, as alleged herein, violated Korea's Monopoly Regulation & Fair Trade Act;

    (e)    Whether Apple's conduct, as alleged herein, violated the Injunction;

    (f)    The duration of Apple's anticompetitive or illegal conduct;

    (g)    Whether Apple's alleged anticompetitive conduct violated the Sherman Act;

    (h)    Whether Plaintiffs and the other members of the Classes were injured by Apple's conduct and, if so, the determination of the appropriate measure of damages for each of the Classes; and

    (i)    Whether Plaintiff and other members of the Classes are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief.

39.    ***Predominance.*** These and other questions of law and fact are common to the Classes and predominate over any questions affecting the members of each Class individually.

40.    ***Adequacy.*** Plaintiffs will fairly and adequately represent the interests of each of the respective Classes because they sold iOS Apps through Apple's App Store during the relevant class periods and have no conflicts with any other members of the Classes. Furthermore, Plaintiffs have retained sophisticated and competent counsel who are experienced in prosecuting antitrust class actions, as well as other complex litigation.

41.    ***Superiority.*** This class action is superior to other alternatives for the fair and efficient adjudication of this controversy. Prosecuting the claims pleaded herein as class actions will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this

action as a class action. Moreover, the prosecution of separate actions by individual members of the Classes would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

## V.    RELEVANT FACTS

42.    As set forth below, Apple has been continuously engaged in anticompetitive conduct directed at illegally maintaining its monopolistic revenue stream from the sale of iOS Apps.

### A.    Protecting the Apple "Ecosystem" and iOS App Distribution and Payment Processing Services.

43.    Beginning at least as early as 2010, Apple executives expressed concern about lawful competition. That year, Apple's former-CEO, Steve Jobs, wrote to another executive that Apple would "force" developers to use its payment system to lock in both iOS App developers and Apple users. That same year, Jobs discussed how to "further lock customers into our ecosystem" and "make Apple['s] ecosystem even more sticky." Three years later, Apple executives were still strategizing how to "get people hooked to the ecosystem."

44.    Since then, Apple has repeatedly responded to potential lawful competition by making it harder and more expensive for users of Apple products and iOS App developers to leave the Apple "ecosystem," by, for example, imposing rules and restrictions in its developer agreements (the "Developer Program License Agreement," or "DPLA") and its App Store guidelines (the "*App Guidelines*"). All iOS App developers, including Plaintiffs and members of the Classes, must contract with Apple's U.S. entity and enter into the DPLA (and its associated attachments, schedules, and exhibits, as applicable)[2] and agree to the *App Guidelines* in order to make their iOS Apps available to Apple device users (*i.e.*, consumers), which has allowed Apple to extract higher, supra-competitive fees, thwart innovation, offer a less secure or degraded user experience, and throttle would-be competitors.

### B.    Apple's Long-Running Anticompetitive Conduct Insulated its "Ecosystem" from Lawful Competition.

45.    As is relevant here, and as set forth in greater detail herein, Apple had implemented

---

[2]    Apple Inc., *Agreements and Guidelines for Apple Developers*, available at: https://developer.apple.com/support/terms/. Upon information and belief, Apple's DPLA may previously have been denominated the iPhone Developer Program License Agreement.

numerous anticompetitive policies and practices aimed at protecting its "ecosystem"—including its iOS App distribution and payment processing services—from lawful competition.

46.    Apple's long-running anticompetitive strategy has paid Apple executives and shareholders handsomely, at the expense of iOS App developers, such as Plaintiffs and members of the Classes, and consumers.

47.    Apple's long-standing anticompetitive policies and practices that are at issue in this action are further described below.

> ### 1.    *Apple Used Distribution, Payment Processing and Anti-Steering Restrictions to Implement and Maintain its Monopoly.*

48.    Long before the First Injunction issued, Apple crafted its DPLA—characterized as a "contract of adhesion" by this Court—and *App Guidelines* to restrict iOS App developers, such as Plaintiffs and members of the Classes, from using distribution and payment processing services outside of the Apple's ecosystem to distribute and sell their iOS Apps.

49.    Apple's DPLA required all iOS App developers, such as Plaintiffs and members of the Classes, to agree, *inter alia*, to create iOS Apps that could ***only*** be distributed through Apple's App Store.

50.    Apple's DPLA and applicable Schedules also required all iOS App developers, such as Plaintiffs and members of the Classes, to configure their iOS Apps to use ***only*** Apple's in-house iOS App payment processing services (if the developer wished to charge for its iOS Apps), and to pay a "commission" (*i.e.*, a processing or transaction fee) to Apple for each payment processed through Apple's in-house iOS App payment processing services.

51.    Apple's *App Guidelines*, to which all iOS App developers, such as Plaintiffs and members of the Classes, agreed to abide, required iOS App developers to use Apple's in-house iOS App payment processing services in order to "unlock features or functionality" within their iOS Apps. Specifically, these *App Guidelines* provide as follows:

> ***If you want to unlock features or functionality within your app…you must use in-app purchase.***  Apps may not use their own mechanisms to unlock content or functionality . . . .

52.    Apple thus forced iOS App developers (such as Plaintiffs and members of the Classes)

that used Apple's iOS App distribution services to also use Apple's iOS App payment processing services to the exclusion of other potential iOS App payment processing services, thereby linking the two services and locking iOS App developers into Apple's ecosystem. Although the Second Injunction effectively directs Apple to disconnect these two services, Apple has requested that the Ninth Circuit stay any changes from taking effect pending appeal.

53.     Also, before the First Injunction issued, Apple used anti-steering restrictions to block the ability of iOS App developers, such as Plaintiffs and members of the Classes, to communicate with Apple device users—both within and outside the developer's iOS App—about alternatives to Apple's iOS App distribution and payment processing services. In so doing, Apple "enforced silence to control information and actively impeded users from obtaining the knowledge to obtain digital goods on other platforms."

54.     Specifically, Apple's *App Guidelines* provided, "Apps and their metadata may not include buttons, external links, or other calls to action that direct customers to purchasing mechanisms other than in-app purchase."

55.     Apple's *App Guidelines* also provided that iOS App developers, such as Plaintiffs and members of the Classes, could not, "either through communications sent to points of contact obtained from account registration within the app (like email or text)[,] encourage users to use a purchasing method other than an in-app purchase."

56.     Remarking on Apple's interference with the relationship between iOS App developers and Apple device users, one iOS App developer noted as follows:

> Most people don't know what happens to your customer relationship when you're forced to accept In App Payments or offer subscriptions in Apple's App Store.
>
> 1. When someone signs up for your product in the App Store, they aren't technically your customer anymore - they are essentially Apple's customer. They pay Apple, and Apple then pays you. So that customer you've spent years of time, treasure, and reputation earning, is handed over to Apple. And you have to pay Apple 30% for the privilege of doing so!
>
> 2. You can no longer help the customer who's buying your product with the following requests: Refunds, credit card changes, discounts, trial extensions, hardship exceptions, comps, partial payments, non-profit discounts, educational discounts, downtime credits, tax exceptions, etc.

57.    This Court has already concluded that in implementing and enforcing these anti-steering restrictions, Apple had (a) "act[ed] anticompetitively" and for its own "unrestrained gain," (b) "violate[d] the 'policy [and] spirit' of the[] laws because anti-steering has the effect of preventing substitution among platforms for transactions," and (c) "'threaten[ed] an incipient violation of an antitrust law' by preventing informed choice among users of the iOS platform" in violation of California's UCL.

58.    This Court has already concluded that Apple's anti-steering provisions extended to all iOS Apps. Again, however, Apple has asked the Ninth Circuit to stay the effectiveness of this determination pending appeal.

### 2.    Apple's Anticompetitive "Commissions" for its iOS App Distribution and Payment Processing Services.

59.    Also, before the First Injunction was issued, Apple imposed anticompetitive "commissions" (*i.e.*, transaction or processing fees) on iOS App developers, such as Plaintiffs and members of the Classes, for iOS Apps sold through Apple's App Store.

60.    Section 3.4 of Schedule 2 of the DPLA provided that Apple earned a "commission" of 30% on every iOS App purchased using Apple's iOS App distribution and payment processing services (which, again, iOS App developers had no choice but to use).

61.    Apple instituted this 30% commission decades ago with the launch of the App Store.

62.    Apple determined to charge a 30% "commission" "without regard to or analysis of the costs to run the App Store," untethered from any economic or competitive factors that might normally drive commission rates.

63.    Apple's 30% commission created an "extraordinarily high" operating margin for Apple of more than 75%.

64.    This Court has already concluded that Apple's 30% "commission" was supra-competitive, and that "Apple's maintenance of its [supra-competitive] commission rate stem[med] from market power, ***not competition***." Only recently has Apple changed its commission rate, applicable only to a subset of iOS App developers. Specifically, Apple dropped the "commission" rate from 30% to 15% in just three circumstances: (a) for participants in its Video Partner Program

1    and News Partner Program; (b) with respect to subscriptions sold in-App, via Apple's IAP payment

2    processing service, and that are in place for longer than a year; and (c) for sales by developers who

3    qualify for its Small Business Program. Otherwise, the higher, supra-competitive "commission" rates

4    apply.

5        65.    Notably, Apple CEO, Tim Cook, confirmed in testimony in *Epic Games* that these

6    "commission" changes were not due to competition because Apple had none:

| | |
|---|---|
| **The Court**: | The issue with the $1 million Small Business Program, at least from what I've seen thus far: that really wasn't the result of competition. That seemed to be a result of the pressure that you're feeling from investigations, from lawsuits, not competition. |
| **Mr. Cook**: | It was the result of feeling like we should do something from a COVID point of view, and then electing to instead of doing something very temporary, to do something permanent. And of course we had the lawsuits and all the rest of the stuff in the back of our head, but the thing that triggered it was, we were very worried about small business. |
| **The Court**: | Okay, but it wasn't competition. |
| **Mr. Cook**: | It was competition after we did ours to 15, it was competition that made Google drop theirs to 15. |
| **The Court**: | I understand perhaps that when Google changed its price, but your action wasn't the result of competition. |
| **Mr. Cook**: | It was the result of feeling like we should do something for small business, which in our . . . vernacular is small developer. |

66.    Indeed, the *Epic Games* court put it succinctly: "[T]he 30 percent number has been there since the inception . . . [a]nd if there was real competition, that number would move, and it hasn't."

### C.    The First *Epic Games* Injunction

67.    As noted above, following the bench trial in *Epic Games*, the Court found that Apple violated California's UCL via its anti-steering provisions and entered an injunction enjoining Apple from enforcing its anti-steering restrictions against developers.

68.     Specifically, on September 10, 2021, the Court issued the Injunction, which barred Apple from "prohibiting developers from (i) including in their apps and their metadata buttons, external links, or other calls to action that direct customers to purchasing mechanisms, in addition to In-App Purchasing and (ii) communicating with customers through points of contact obtained voluntarily from customers through account registration within the app."

69.     The Court rejected Apple's argument that the Injunction should only apply to Epic and its affiliates, reasoning that the Injunction prohibits "Apple's [anti-]steering provision as to all iOS developers because doing so was necessary to fully remedy the harm *that Epic suffers* in its role as a competing games distributor."

70.     On April 24, 2023, the Ninth Circuit affirmed the Court's First Injunction, and on January 16, 2024, the United States Supreme Court denied Apple's appeal.

71.     That same day, Apple issued its notice of compliance with the injunction with this Court. In relevant part, that notice states that Apple's changes apply to "developers with apps on the iOS or iPadOS App Store U.S. storefronts" and refers to the new program as the "Link Entitlement" program and associate use of "External Purchase Links."

72.     As set forth in greater detail below, however, Apple's purported compliance program was anything but. It introduced entirely new anti-competitive practices, such as a 27% commission fee, link design and placement restrictions, and new warning screens to deter user utilization of linked purchases. These new anticompetitive restrictions, in addition to violating the Injunction, violated the Sherman Act, California's UCL, and Korean law.

**D.     Apple's Violations of the First Injunction and Continued Anticompetitive Conduct**

73.     On March 13, 2024, Epic Games moved to hold Apple in contempt and to enforce the Injunction, arguing that Apple violated the Injunction by, *inter alia*: (1) imposing new fees when using alternative in-app payment methods; (2) enacting design restrictions on the format of the links and where links can be provided in the app; and (3) Apple's introduction of scare screens informing users of security concerns with link use and noting that users are responsible for any resulting damage.

74.     On April 23, 2024, the Court scheduled an evidentiary hearing, noting that Epic had

made a preliminary showing that "Apple's practice changes undermine the spirit of the injunction by limiting competition, impeding the free flow of information, and constraining user choice."

75.     On April 30, 2025, following an evidentiary hearing that spanned multiple days in May 2024 and February 2025 as described above, the Court issued its Second Injunction, held Apple in civil contempt, and referred Apple and its Vice-President of Finance to the United States Attorney for the Northern District of California for evaluation of criminal contempt.

76.     The Court found Apple chose to "comply" with the Injunction with a new suite of anticompetitive conduct. Apple imposed "(A) a 27% commission on link-out purchases, (B) new external purchase link placement and design restrictions, (C) requirements that induce purchase-flow friction, (D) limitations on developers' ability to use calls to action, and (E) exclusion[s] of certain programs utilized by large developers from the Link Entitlement."

77.     As set forth in greater detail below, the evidence adduced in the evidentiary hearing showcased Apple's unlawful maintenance of its monopoly in iOS App distribution and iOS App payment processing services.

### 1.     Apple's Anticompetitive 27% Commission on Linked Purchases.

78.     In response to the First Injunction, Apple instituted a policy of demanding 27% commission on both (a) iOS App transactions taking place via an external website immediately after exiting the iOS ecosystem, and (b) iOS App transactions taking place on the external website within seven days of the iOS user exiting Apple's "ecosystem."

79.     For example, in a May 18, 2023 meeting, Apple's executives discussed at least two options for compliance with the Injunction: (1) including no commissions, but restricting the placement and appearance of links in the purchase flow, or (2) allowing placement of links anywhere, but imposing a 27% commission on linked purchases.

80.     In considering these proposals, Carson Oliver, Apple's Senior Director of Business Management for the App Store, recognized that a no-commission model would "be very attractive to developers," "cause a lot of developers to adopt the link[-]out options," and "would create competitive pressure on IAP," which "would drive . . . spend outside of the app."

81.     Thus, under a no-commission model, Apple believed "most large developers and

potentially many medium and small developers would offer link-out purchases to their users," causing an estimated revenue impact of hundreds of millions to billions. In contrast, Apple anticipated that implementing a 27% commission on linked purchases "at most, may only be attractive to the largest developers" with a potential revenue impact of tens of millions.

82.    The evidence shows that Apple ultimately chose "the most anticompetitive option: a link entitlement program that included both the placement restrictions of Proposal 1 and the 27% commission . . . ." As the Court noted, "Apple estimated...that as of May 2023 the revenue impact of a no-commission option with placement restrictions (Proposal 1) posed a significantly larger hit to Apple than the impact of a 27% commission option without placement restrictions (Proposal 2)."

83.    As a further example, Apple's internal studies recognized that the external cost of payment processing for linked purchases would exceed the 3% discount from its standard 30% rate. One Apple presentation noted that "we believe there would be very little developer adoption of link-out, assuming a scenario where we would give a cost of payments discount at 3%." Another presentation explained that "[d]evelopers will claim that a small discount will not provide enough margin to compete on price."

84.    Kunnal Vij, Apple's Senior Manager of Finance at Apple Services, testified that based on Apple's analysis, the 27% fee rendered every linked transaction more expensive than if a developer were to use Apple's payment system and pay its standard 30% rate, a rate the Ninth Circuit previously determined to be anticompetitive.

85.    This new, post-Injunction practice illegally restrained competition for iOS App distribution services and iOS App payment processing services. As the Court concluded, Apple had the "knowledge and expectation that the restrictions would effectively dissuade any real developer participation, to Apple's economic advantage."

2.    ***Apple's Anticompetitive Link Design & Placement Requirements.***

86.    Also in response to the Injunction, Apple instituted new policies that limited iOS App developers' placement and design of links that would direct would-be consumers to non-Apple distribution and payment processing services.

87.    Specifically, Apple implemented a "Link Entitlement" program that dictated that an

external link may "[n]ot be displayed on any page that is part of an in-app flow to merchandise or initiate a purchase using in-app purchase."

88.     Despite Apple's knowledge that the Injunction required it to provide iOS App developers with the ability to use prompts (*e.g.*, buttons or other calls to action), Apple's "Link Entitlement" program prohibited such buttons and calls to action. Instead, Apple's guidelines only allowed "Plain Button style," which "may not be enclosed in a shape that uses a contrasting background fill," but rather the "background surrounding text must match the background of [the] app's page."

89.     A button, on the other hand, is more visually prominent. Apple's own witness testified that he could not think of a reason to require developers to use plain-link-style other than to stifle competition.

90.     The purpose and effect of Apple's new "Link Entitlement" program was to restrain competition for iOS App distribution and payment processing services. Specifically, the evidence shows that Apple implemented this policy for the purpose of dissuading users from linked purchases. As Apple put it, "[i]f you want to charge a commission, you have to give them better placement," but "[i]f you don't charge a commission, you need to lock it down to a plain URL link and internet style 'button'."

91.     Indeed, Epic's witness, App developer Ben Simon, testified that the inability to place a link on the same page as Apple's payment method "very much inhibit[ed] our ability to give users a choice in how to subscribe," and was "also likely to lead to user confusion, as it suggest[ed] that the two options are unrelated offerings."

92.     Put differently, Apple recognized that if it did not implement a commission on linked purchases, it needed to implement placement restrictions that would curb competition and protect Apple's supra-competitive profits on iOS Apps. Apple's Philip Schiller, an Apple "Fellow," acknowledged that the more restrictions Apple places on the placement, format, and language of the links, the less likely the links would be seen and used. Similarly, the evidence shows that the more restrictions on the format of the links, the lower the revenue impact on Apple would be.

93.     This new, post-First Injunction practice illegally restrained competition for iOS App

distribution services and iOS App payment processing services. As the Court concluded, this "restriction presents serious problems for developers' ability to compete with Apple's IAP and Apple knew it."

94.    As of the May 2024 hearing in *Epic Games*, only 34 out of the 136,000 iOS App developers had applied for the Link Entitlement program.

### 3.    Apple's Anticompetitive Flow Friction Policies.

95.    Also in response to the First Injunction, Apple instituted a new scare screen and a policy to only allow iOS App developers to use static links. Both were done to create "flow friction" for consumers engaged in the iOS App purchase process using a third-party iOS App distribution and/or payment processing service.

96.    As to the warning screen requirement, Apple, for the first time, demanded that iOS App developers attempting to sell iOS Apps outside the Apple ecosystem display an "[i]n-app system disclosure sheet" when a user linked to a third-party payment provider. This "disclosure sheet" is shown in the below graphic:

97.    The purpose and effect of Apple's new warning screen policy was to restrain competition for iOS App distribution and payment processing services.

98.    The evidence introduced at the *Epic Games* evidentiary hearings shows that Apple knew that the more friction it could create in the iOS App purchase flow, the more breakage it would create (*i.e.*, the more likely a user would abandon the linked purchases buy-flow due to it being a less seamless experience as compared to Apple's payment method).

99.    To accomplish its high breakage objective, Apple modeled the specific tipping points at which external links would cease to be advantageous because of friction in the purchase flow, and evaluated whether to implement: (1) a link that simply takes a user to the external site; (2) a dialogue screen that generates a small pop-up communicating that the user is leaving the app; and (3) a full sheet screen taking over the entire screen after the user clicks on the external link. Apple chose the most anticompetitive option: the third (full screen) warning.

100.    Apple also fine-tuned the language in the scare screen to ensure it would sound "scary." This "scary" language Apple chose included: (a) using the developer's name rather than the App name in the warning screen; (b) using language stating that the user was no longer transacting with Apple; and (c) stating, "Apple is not responsible for the privacy or security of purchases made on the web." Remarking on Apple's use of the "privacy and security" language, Apple's Schiller wrote that it was included because it "tells ppl its dangerous and they are leaving the app store."

101.    And as to the static link requirement, Apple instituted a policy requiring iOS App developers to use only "static" URLs when linking outside of the Apple ecosystem.

102.    The purpose and effect of Apple's new warning screen policy was to restrain competition for iOS App distribution and payment processing services.

103.    Apple recognized that a static URL introduced friction in the purchase flow (whereas dynamic URLs did not) because, for example, whereas a dynamic URL can identify the user and log that user into their account automatically after clicking the link, a static URL requires a user to log into their account before making the purchase. In addition, static URLs can create user confusion and could cause users to log into, and purchase the product for, a wrong account.

104.    As one Apple User Experience employee explained, "I think personally that is why i

1    wouldnt bother"—"more steps, have to find my card, type it all out. and then giving another company

2    my details."

3       105.    This new, post-First Injunction practice illegally restrained competition for iOS App

4    distribution services and iOS App payment processing services. As the Court put it, "Increased

5    friction decreases competition," and "Apple understood well that breakage increases with additional

6    friction in the purchase flow . . . and capitalized on that option."

7                   ***4.    Apple's Anticompetitive Limitations on Calls to Action.***

8       106.    Also, in response to the Injunction—and notwithstanding the Injunction unequivocally

9    allowing iOS App developers to do so—Apple instituted a call to action "template" that dictated the

10   precise language iOS App developers could use when advertising cheaper prices for iOS Apps outside

11   the Apple ecosystem.

12      107.    Specifically, Apple instituted a policy dictating that iOS App developers "must match

13   the [below] template language" in any calls to action:

14

15   **Templates**

     Use the templates that best fits your use case. Aside from the price, percentage off, and your website
16   URL, the language used in your app must match the template language. Don't modify or use the template
     in a manner that misleads customers.
17
     **Purchase template:**
18   Purchase from the website at www.example.com ↗

19   **Special offer template:**
     For special offers, go to www.example.com ↗
20   For a special offer, go to www.example.com ↗

21   **Lower price template:**
     Lower prices offered on www.example.com ↗
22   Lower price offered on www.example.com ↗

23   **Percent off template:**
     To get XX% off, go to www.example.com ↗
24
     **Specific price template:**
25   Buy for $X.XX at www.example.com ↗

26      108.    The purpose and effect of Apple's new call to action template language was to restrain

27   competition for iOS App distribution and payment processing services. The evidence introduced at

28   the *Epic Games* evidentiary hearings established Apple knew "that unlinked and unrestricted calls to

1  action could foster competition against Apple's IAP by causing customer migration to developer

2  websites."

3    109.    This new, post-First Injunction practice illegally restrained competition for iOS App

4  distribution services and iOS App payment processing services. As the Court explained, "If a

5  developer wanted to compete on price not by offering lower prices but by offering other products or

6  benefits on the web, there is no way to communicate that to a user in-app."

7        *5.    Apple's Anticompetitive Program Exclusions.*

8    110.    Finally, and also in response to the First Injunction, Apple made the reduced

9  commission charged to its Video Partner Program ("VPP") and News Partner Program ("NPP") (15%

10  instead of Apple's usual 30% commission) contingent on these iOS and App developers opting not

11  to use Apple's "Link Entitlement" program. That is, iOS App developers who were participants in

12  VPP or NPP and opted to use external purchase links were subject to Apple's standard (supra-

13  competitive) 30% commission.

14    111.    The purpose and effect of this new exception to the VPP and NPP programs was to

15  restrain competition for iOS App distribution and payment processing services.

16    112.    Indeed, internally Apple projected that it would lose more revenue if iOS App

17  developers participating in VPP and NNP were eligible for the Link Entitlement program, and that

18  these programs "serve[d] as a tool for retaining developers exclusively on Apple IAP" because losing

19  the programs' benefits and the lower commission rate makes providing external purchase links more

20  costly.

21    113.    This new, post-First Injunction practice illegally restrained competition for iOS App

22  distribution services and iOS App payment processing services. As the Court explained, "Apple knew

23  it was choosing a course which would fail to stimulate any meaningful competition to Apple's IAP

24  and thereby maintain its revenue stream."

25    **E.    The Second Injunction**

26    114.    Finding that Apple's new policies were anticompetitive, the Court, prohibited Apple

27  from (1) "[i]mposing any commission or any fee on purchases that consumers make outside an app,

28  and as a consequence thereof, no reason exists to audit, monitor, track or require developers to report

purchases or any other activity that consumers make outside an app;" (2) "[r]estricting or conditioning developers' style, language, formatting, quantity, flow or placement of links for purchases outside an app;" (3) "[p]rohibiting or limiting the use of buttons or other calls to action, or otherwise conditioning the content, style, language, formatting, flow or placement of these devices for purchases outside an app;" (4) "[e]xcluding certain categories of apps and developers from obtaining link access;" (5) "[i]nterfering with consumers' choice to proceed in or out of an app by using anything other than a neutral message apprising users that they are going to a third-party site;" and (6) "[r]estricting a developer's use of dynamic links that bring consumers to a specific product page in a logged-in state rather than to a statically defined page, including restricting apps from passing on product details, user details or other information that refers to the user intending to make a purchase."

115.    This order became effective on April 30, 2025.

## VI.    THE SMALL APP DEVELOPER SETTLEMENT

116.    On June 4, 2019, a putative class action lawsuit was filed in this Court seeking to recover damages arising from Apple's anticompetitive conduct related to iOS on behalf of "[a]ll U.S. developers of any Apple iOS application or in-app product (including subscriptions) sold for a non-zero price via Apple's iOS App Store."

117.    A consolidated complaint was filed in that action on behalf of the same proposed class on September 30, 2019.

118.    On August 24, 2021, the Small App Developer Settlement was reached in that class action on behalf of a class defined, in relevant part, as follows:

> All former or current U.S. developers of any Apple IOS application or in-app product (including subscriptions) sold for a non-zero price via Apple's IOS App Store that earned, through all Associated Developer Accounts, proceeds equal to or less than $1,000,000 through the App Store U.S. storefront in every calendar year in which the U.S. developer had a developer account between June 4, 2015 to the date of the Agreement (August 24, 2021).

119.    Pursuant to that Small App Developer Settlement, members of the settlement class who did not opt-out agreed to release, in relevant part, Apple from the following:

> [A]ny and all past, present, and future claims, actions demands, causes of action, suits debts, obligations, damages, rights and liabilities that were brought, could have been brought, or arise from the same facts

1      underlying the claims asserted in the Action, known or unknown,
    recognized now or hereafter, existing or preexisting, expected or
2      unexpected, pursuant to any theory of recovery . . . for any type of relief
    that can be released as a matter of law . . . .

3      120.    By its plain language, the Small App Developer Settlement does not release (a) U.S.-

4  based App developers who had App Store proceeds of $1,000,000.01 or more in a calendar year; (b)

5  non-U.S. based App developers who received any App Store proceeds; (c) U.S.-based App developers

6  and non-U.S. based App developers' sales through non-U.S. App Store storefronts; and (d) claims

7  based on events that occurred after August 24, 2021.

8      121.    None of Plaintiffs' claims or those of the Classes here are precluded or released by the

9  Small App Developer Settlement.

10  **VII.    THE RELEVANT MARKET**

11      **A.    Relevant Product Market**

12      122.    The Relevant Product Market is the market for iOS Apps.

13      123.    Apple's iOS is unique and specific to Apple's devices: there are no substitutes for iOS

14  Apps, and non-iOS Apps are incompatible with Apple's iOS. Put differently, non-iOS Apps are

15  useless to owners of Apple devices (which run exclusively on Apple iOS).

16      124.    Because owners of Apple devices can only run iOS Apps, Plaintiffs and members of

17  the Classes must develop iOS-specific Apps in order to reach the downstream mobile iOS App

18  market.

19      125.    Apple has effectively mandated that the only way iOS App developers can reach iOS

20  device owners is by distributing and selling their iOS Apps exclusively through Apple's App Store,

21  and only processing payments for iOS Apps through Apple's in-house payment processing services

22  (which are subject to "commissions" of up to 30%).

23      126.    Apple's restrictions on the distribution and sale of iOS Apps are anticompetitive by

24  design because they exclude all effective competition for mobile iOS Apps.

25      127.    As a result, at all relevant times, Apple has been the only (or the overwhelmingly

26  dominant) provider of iOS Apps.

27      **B.    Relevant Geographic Market**

28      128.    The relevant geographic market of the relevant product markets is the world, excluding

China.

129.    China is excluded from the relevant market because legal and regulatory barriers prevent the operation of many global app stores, including Apple's App Store, within China. Additionally, app stores prevalent in China are not available, or have little presence, outside of China.

130.    As the Court in *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 990 (N.D. Cal. 2021) found, in China, "the operating systems are, in fact, different because they are installed by original equipment manufacturers in China." There, "[t]he parties agree[d] that China is different."

131.    And as Epic Games's economic expert explained:

> China has erected barriers that limit the ability of users in China to use various non-Chinese apps, limit the ability of OEMs to choose the Google version of the Android OS, and limit developers outside of China from providing apps to Chinese users. Smartphones with the version of Android used in China are generally not sold outside of China, and smartphones that have the Google version of Android are generally not sold in China. That has resulted in a separate smartphone app ecosystem in China. Many of the most popular non-Chinese apps are not available in China, and the most popular Chinese apps have generally not been successful outside of China.

**C.    Apple Monopolizes the Relevant Market, With Consumers Facing Lock-In.**

132.    Apple monopolizes the relevant market *and* ensures that consumers are locked into iOS Apps.

133.    The lock-in factors delineated by the Ninth Circuit in *Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946, 977 (9th Cir. 2023) only apply if Apple is found to face competition that may discipline its anticompetitive restraints in the market for iOS Apps. The lock-in factors are not relevant to this case if Plaintiffs prove that Apple has monopoly power. Nonetheless, Plaintiffs aver that the lock-in factors are satisfied.

134.    The Ninth Circuit held that an antitrust plaintiff alleging a single brand market must show that consumers are "locked-in" to that market by proving: "(1) the challenged aftermarket restrictions are 'not generally known' when consumers make their foremarket purchase; (2) 'significant' information costs prevent accurate life-cycle pricing; (3) 'significant' monetary or non-monetary switching costs exist; and (4) general market-definition principles regarding cross-elasticity of demand do not undermine the proposed single-brand market." *Id.* at 977.

135. _First_, consumers are generally unaware of Apple's iOS App distribution restrictions and iOS App payment processing restrictions when they purchase iOS devices.

136. _Second_, Apple's restraints have limited the flow of information to users, creating significant information costs that prevent users from determining accurate life-cycle pricing of Apple's ecosystem. Users also lack the ability to attribute costs to the platform versus the developer. Further, consumers lack information regarding device repair costs and possible future needs of iOS Apps.

137. _Third_, there are significant monetary and non-monetary switching costs associated with moving from the Apple ecosystem to another platform, including loss of data such as contacts, pictures, and apps; financial costs; opportunity costs of using iOS; social costs, particularly with young adults; procedural costs; and psychological costs. For example, today, Apple charges as much as $1,599 for an iPhone.

138. _Fourth_, general market principles regarding cross-price elasticity of demand support the existence of the relevant market.

139. Specifically, there is no simple or cost-effective way to abandon Apple's iOS environment and migrate to another with the hope of cheaper Apps. This is because, as noted above, iOS Apps only work on iOS devices, and any effort to convert iOS Apps for use on other devices and operating systems involves significant effort, risk, and financial investment by App developers. For example, differences in device configurations and screen sizes must be taken into account for compatibility analysis.

140. Similarly, although App developers may be able to learn how to code in the Objective C or Swift programming languages, they and their employees may nonetheless not know how to code in languages compatible with other operating systems and devices. They may also not be familiar with other requirements, such as hardware, and they cannot simply convert their applications to code compatible for use in operating systems other than iOS.

141. Furthermore, the adoption rates of iOS as compared with other operating systems must be a part of the iOS App developers' conversion evaluation. A move away from the iOS "ecosystem" means that App developers will not be able to offer their iOS Apps to hundreds of millions of iOS

end-users who have been forced—through Apple's anticompetitive conduct described herein—to download iOS Apps through Apple's App Store and pay for those Apps through Apple's payment processing services.

142.    In any event, an App developer willing and able to convert its products to Android OS for the sale in the Google Play Store will not fare better as it would face the same supra-competitive commission rates, thanks to Google's similar anticompetitive behavior in its own closed system. Moreover, Google (and Android OS) provide services to a distinct set of device purchasers that are unable to purchase iOS Apps that are useable on their Android OS compatible devices. Therefore, Google offers no competitive pressure on iOS App distribution and payment processing services. Google's distribution and payment processing services do not cover iOS Apps (they only cover Android OS products) and are tied to its Google Play store.

143.    The same is true for Amazon's distribution services, which are tied to its Appstore—these too are Android OS products and do not cover iOS products.

144.    Neither Google nor Amazon's distribution services are substitutes for Apple's distribution services for iOS App developers.

## VIII.    STANDING

145.    Apple has compared its App Store to a mall, writing in a brief submitted to the Ninth Circuit Court of Appeals: "***Apple sells software distribution services to developers***, much in the way that a shopping mall leases physical space to various stores."

146.    This distribution chain is shown in the below graphic, which was included in a brief Apple submitted to the United States Supreme Court:



147.    Thus, Plaintiffs and members of the Classes are direct purchasers of Apple's iOS App distribution services and payment processing services. Apple agrees.

148.    For example, in a briefing to the Ninth Circuit, Apple stated: (a) "The software developers who are directly impacted by Apple's 30% commission absolutely would have antitrust standing to bring a monopolization case, if they wanted to . . ." and (b) "App developers have standing under *Illinois Brick* to argue whatever they want because they are direct purchasers of distribution services from Apple, and if they want to argue, for example, that their consent [to Apple's fees] was coerced by Apple's market power, they can."

149.    Similarly, in briefing to the United States Supreme Court, Apple stated: (a) "The developer is also the first person to bear the alleged overcharge on the allegedly monopolized service, and by that definition also the 'direct purchaser,'" and (b) "[I]t is plainly the iOS developers—the direct purchasers and 'consumers' of the allegedly monopolized distribution services, and the group that meets all of the relevant 'efficient enforcer' criteria."

150.    KPA and KEPA have associational standing to sue on behalf of their iOS-developer members. As noted above, KPA and KEPA's iOS-developer members would undoubtedly have

standing, the interests KPA and KEPA seek to protect are germane to their purpose, and their claims and relief sought does not require participation of their individual members. KPA and KEPA's iOS App developer members have suffered harm due to Apple's unlawful conduct as alleged herein. KPA and KEPA can therefore pursue their claims under Federal Rule of Civil Procedure 23(a) and 23(b)(2).

## IX.     APPLE HAS CONTINUOUSLY VIOLATED THE ANTITRUST LAWS

151.    Plaintiffs allege a continuing course of anticompetitive conduct by Defendant Because of Defendant's continuous conduct to maintain its market power to charge supra-competitive monopoly rents, requiring app developers to pay a fee and renew their DPLAs every year, imposing contractual anti-steering provisions on App developers and implementing scare screens in user devices, willfully evading court orders to open the market to competition, continuously enforcing its anticompetitive restrictions; and by utilizing other means to monopolize the relevant market and maintain its monopolistic revenue stream, and as a direct and proximate result of Apple's overt, anticompetitive actions as described in this Complaint, Plaintiffs and members of the Classes have suffered actual or threatened injury in a manner and amount to be proven at trial.

152.    In the last four years, Apple has continuously enforced its anticompetitive policies with every initial app review and review of app updates.

153.    Apple requires all iOS app developers to renew the restrictive DPLAs every year and pay a $99 fee.

154.    In January 2022, Apple's purported compliance with the Telecommunications Business Act introduced new anticompetitive 26% commissions in Korea.

155.    Apple implemented a suite of anticompetitive restrictions in order to circumvent the Court's First Injunction.

## X.    CLAIMS FOR RELIEF

### COUNT ONE: MONOPOLIZATION
**Plaintiffs, on behalf of themselves and the**
**App Developer Class**
**(15 U.S.C. §§ 2 and 3)**

156.    Plaintiffs incorporate by reference the allegations set forth above, in full, as if set forth fully herein.

157.    Plaintiffs Scalise and PangSky bring this claim on behalf of themselves and the App Developer Class as defined above.

158.    Plaintiffs KPA and KEPA bring this claim for injunctive relief on behalf of their iOS-developer members that have sold and/or intend to sell iOS Apps and in-app products to customers located in the U.S. and its territories.

159.    The relevant market is iOS Apps sold worldwide, except China.

160.    Apple has gained and maintains monopoly power in the relevant market by improper and unlawful means.

161.    More specifically, Apple has willfully acquired and maintained such power by its patently exclusionary conduct as set forth above.

162.    For the reasons stated herein, substantial barriers to entry and expansion exist in the relevant market.

163.    Apple has the power to exclude competition in the relevant market, and it has used that power, including by way of its unlawful practices in restraint of trade as described herein, in order to attain, maintain, and expand its monopoly power in that market.

164.    Apple's conduct as described herein, including its unlawful practices in restraint of trade, is exclusionary vis-à-vis its potential rivals in the relevant market (which Apple has, in fact, excluded from the relevant market through its exclusionary conduct described herein).

165.    Apple has behaved as alleged herein to maintain and grow its monopoly in the relevant market, with the effect being that competition is foreclosed and consumer choice is gravely diminished. So is innovation.

166.    Additionally, Apple has abused its market power by charging supracompetitive transaction fees on Plaintiffs and members of the Classes.

167.    There is no business necessity or other pro-competitive justification for Apple's conduct.

168.    Plaintiffs and the members of the Classes have been injured, and will continue to be injured, in their businesses and property as a result of Apple's conduct.

**COUNT TWO: CALIFORNIA UNFAIR COMPETITION LAW**
**Plaintiffs Scalise and PangSky, on behalf of themselves and the**
**App Developer Class**
**(Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**

169.    Plaintiffs Scalise and PangSky incorporate by reference the allegations set forth above, in full, as if set forth fully herein.

170.    Plaintiffs Scalise and PangSky bring this claim on behalf of themselves and the App Developer Class as defined above.

171.    California's UCL sets up three prongs—the unlawful, unfair, and fraudulent prongs—the violation of any of which constitutes a violation of the UCL.

172.    Apple has engaged in, and continues to engage in, acts of unfair competition as defined in California's UCL. More specifically, Apple, based upon the conduct alleged herein, has violated the unlawful and unfair prongs of the UCL.

173.    Not only is there a California choice-of-law provision in the pertinent developer contracts, but also, at all pertinent times, the conduct complained of took place in, and has emanated from, California, as alleged herein.

174.    iOS App developers are consumers of Apple's App Store services, including distribution and payment services, and are negatively impacted by Apple's supracompetitive fees.

175.    In sum, Apple's behavior affects consumers of iOS Apps, including App developers such as Plaintiffs and members of the Classes herein.

**Unlawful prong**

176.    Apple's acts of unfair competition include its violations of the Sherman Act as alleged herein. Therefore, Apple has violated the unlawful prong of the UCL.

177.    Apple's conduct has harmed developers, competition, and even consumers of iOS Apps as alleged herein.

178.    iOS App developers have been overcharged by Apple for their distribution and sale of iOS Apps due to Apple's actions as alleged herein.

179.    iOS App developers, like Plaintiffs and members of the Classes herein, have no alternative but to distribute their Apps through the App Store and to pay Apple's supracompetitive

fees.

**Unfair prong**

180.    Apple's acts of unfair competition include its violations of the Sherman Act and the policies underlying it, as alleged herein.

181.    More specifically, the acts or practices alleged in this complaint violate the unfair prong of the UCL because the injuries complained of herein are substantial, including in their financial impact on developers as consumers of Apple's iOS Apps.

182.    There are no countervailing benefits to consumers or competition from Apple's unjustified, supra-competitive pricing. Neither App developers (as consumers of Apple's iOS Apps) nor other consumers of iOS Apps could reasonably avoid the injuries inflicted upon them by Apple.

183.    Apple mandates these harmful practices, which it is able to do thanks to its market power, as alleged herein.

184.    Apple's behavior is also unfair because it offends the nation's antitrust policies as alleged herein.

185.    Additionally, Apple's supracompetitive pricing for iOS App distribution and payment processing services is substantially injurious to iOS App developers and other consumers as alleged herein. Apple's pricing is immoral, unethical, oppressive, and unscrupulous because it is a function of the abuse of Apple's market power as alleged herein.

186.    Apple's behavior is also unfair because it violates public policy that is tethered to this country's statutory antitrust regulation, as expressed in part in the Sherman Act.

187.    In sum, for all or any of these reasons, Apple has violated the unfair prong of the UCL.

188.    Apple's conduct has harmed iOS App developers, competition, and other consumers of iOS Apps as alleged herein. iOS App developers have been overcharged due to Apple's actions as alleged herein. iOS App developers have no alternative but to distribute their wares through the App Store and to pay Apple's supracompetitive payment fees. Apple exploits its monopolistic position to the detriment of iOS App developers, as well as iOS consumers (which include App developers).

**UCL relief**

189.    Plaintiffs and members of the putative Class are entitled to recover restitution in at

1    least the amount of the difference between the supracompetitive iOS App fees they have paid Apple

2    on the one hand and what the fees would have been and should be but for Apple's unlawful,

3    inequitable, and unjustified behavior, including abuses of its market power, on the other. *See, e.g.*,

4    Cal. Bus. & Prof. Code § 17203.

5        **COUNT THREE: KOREAN MONOPOLY REGULATION & FAIR TRADE ACT**
         **Plaintiffs PangSky, KPA, and KEPA, on behalf of themselves and the**

6        **the Korean App Developer Class**

7        190.    Plaintiffs PangSky, KPA, and KEPA incorporate by reference the allegations set forth

8    above, in full, as if set forth fully herein.

9        191.    Plaintiff PangSky brings this claim on behalf of itself and the Korean App Developer

10   Class defined above. Plaintiffs KPA and KEPA bring this claim on behalf of their iOS-developer

11   members that have sold and/or intend to sell iOS Apps and the Korean App Developer Class defined

12   above.

13       192.    The MRFTA is Korea's primary antitrust statute.

14       193.    The MRFTA states, in relevant part, as follows: "The purpose of this Act is to prevent

15   the abuse of market dominance by business entities and excessive concentration of economic power

16   and to promote fair and free competition by regulating illegal cartel conduct and unfair trade practices,

17   thereby encouraging creative business activities, protecting consumers, and promoting the balanced

18   development of the national economy."

19       194.    The MRFTA applies to worldwide conduct that injures Korean-based companies.

20       195.    Apple's conduct has injured, and continues to injure, PangSky and members of the

21   Korean App Developer Class, because Apple's conduct deprived them of revenue that they would

22   have received if Apple had not abused its market dominance in violation of the MRFTA.

23       196.    Under the MRFTA, Apple is presumed to be a market-dominant business entity

24   because its annual revenues exceed the statutory minimum and its market share exceeds 50% in the

25   global market, excluding China, for iOS Apps. Alternatively, Apple is presumed to be a market-

26   dominant business entity as Apple and Google have a combined market share of 85% to 90%.

27       197.    Apple's conduct, as alleged herein, violates the MRFTA's prohibition of abuse of

28   market-dominant position and constitutes unfair trade practices in violation of the MRFTA because,

among other things, Apple's conduct violates the spirit and intent of the MRFTA. Additionally, Apple's conduct is abusive and constitutes unfair trade practices; (1) because it allows Apple to unfairly exclude competition, (2) because it unfairly takes advantage of Apple's bargaining position, and (3) because it unfairly restricts the business activities of PangSky and members of the Korean App Developer Class.

198.    For example, Apple abused its market-dominant position by, *inter alia*, unfairly determining, charging, and maintaining high commission rates for iOS App distribution and in-app purchasing services; unfairly controlling the provision of iOS App distribution and in-app purchasing services; unfairly interfering with the business activities of third-party payment providers for iOS in-app purchases; unfairly interfering with the ability of other entities seeking to provide app distribution services and in-app purchasing services to iOS app developers; and mandating restrictive agreements that allow it to maintain control over prices and exclude competition in the mobile iOS App market, to the detriment of app developers, consumers, and competition.

199.    Furthermore, Apple has engaged in unfair trade practices including, *inter alia*, unfairly excluding competitors in the relevant market; unfairly taking advantage of its bargaining position in its agreements with iOS App developers; forcing iOS App developers to enter into restrictive agreements that limit competition and restrict iOS App developers' ability to contract with other entities for the distribution and sale of iOS Apps; abusing its dominant position by requiring restrictive mandates for the distribution and sale of mobile iOS Apps, and demanding supra-competitive commission rates; and demanding supra-competitive commission fees even when it allowed iOS App developers to distribute and sell mobile iOS Apps outside of the Apple "ecosystem."

200.    The product market definition proposed here is consistent with Korean precedent. The Korean Fair Trade Commission ("KFTC") has previously defined an Android-based app market, excluding China, in a corrective order issued to Google as a result of its finding that Google violated the MRFTA. Similarly, there is a separate iOS App market that is relevant to the claims made here.

201.    In 2021, South Korea's legislature amended its Telecommunications Business Act to permit developers of iOS Apps to use alternative payment service providers for in-app products purchased through Apple's South Korea App Store storefront. Apple responded in January 2022 by

imposing upon iOS App developers a "commission" of 26% on the price paid by the user through the alternative payment service provider. Apple's abusive and unfair 2022 Korean policy is substantially the same as its U.S. commission policy that it unlawfully imposed in violation of the Injunction, as set forth in greater detail above.

202.    The Korea Communications Commission ("KCC") noted in 2023 its plan to impose a 20.5 billion won (~$14 million) fine on Apple due to its violation of the Telecommunications Business Act by forcing Korean developers to use Apple's in-app billing system and unfairly postponing evaluation of apps. The KCC found imposing the new 26% fees on Korean developers constitutes a discriminatory act.

203.    On April 11, 2025, the KCC and the Korea Internet and Security Agency ("KISA") announced the "2024 App Market Survey Result" under Article 22, Paragraph 9 (Obligations of App Market Business Operators and Fact-Finding Surveys) of the Telecommunications Business Act.

204.    The KCC and KISA found that the key unfair practices Korean app developers experience from app market operators like Apple are "app review delays and registration rejections, while the biggest problem with in-app purchases they perceive is excessive commission fees."

205.    According to 70.4% of Korean developers, the biggest problem with in-app purchases was excessive commission fees, followed by unclear payments, including refunds and limited payment options.

206.    Other issues cited by developers that occurred during the initial app registration process include unclear review standards and delayed feedback on inquiries.

207.    PangSky, the iOS App developer members of KPA and KEPA, and members of the Korean App Developer Class have been injured, and will continue to be injured, in their businesses and property as a result of Apple's conduct, including because Apple charges a supracompetitive commission for the distribution and sale of mobile iOS Apps that it would not otherwise receive in a competitive market. As such, PangSky and members of the Korean App Developer Class are entitled to damages as well as an injunction to prevent Apple from continuing to engage in abusive and unfair trade practices as alleged herein. KPA and KEPA are similarly entitled to an injunction to prevent Apple from continuing to engage in abusive and unfair trade practices as alleged herein.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter judgment on their behalf and on behalf of the Classes defined herein, by adjudging and decreeing as follows:

A.    This action may proceed as a class action, with Plaintiffs serving as the representatives of the Classes and their counsel serving as Class Counsel for each of the Classes;

B.    Defendant has engaged in anticompetitive conduct in violation of Sections 2 and 3 of the Sherman Act (15 U.S.C. §§ 2, 3), and that Plaintiffs and the members of the Classes have been injured in their business and property as a result of Defendant's violations;

C.    Plaintiffs and the members of the Classes recover damages and/or restitution as provided by the federal antitrust laws, California's UCL, Korea's Monopoly Regulation & Fair Trade Act, and that a judgment in favor of Plaintiff and the Classes be entered against Defendant in an amount to be trebled to the extent such trebling is permitted pursuant to such laws;

D.    Plaintiffs and the members of the Classes recover restitutionary relief to the extent such relief is afforded by any of the aforementioned laws;

E.    Defendant, its subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the anticompetitive conduct alleged herein;

F.    Plaintiff and members of the Classes be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

G.    Plaintiffs and members of the Classes recover their costs of this suit, including reasonable attorneys' fees as provided by law;

H.    Plaintiffs and members of the Classes are entitled to injunctive relief suitable to remedy Defendant's past and ongoing restraint of trade, including the following:

    i.    A judicial determination declaring the rights of Plaintiffs and the Classes,

1            and the corresponding responsibilities of Defendant; and

2        ii.     Issuance of a permanent injunction against Defendant and their parents,

3            subsidiaries, affiliates, successors, transferees, assignees, and the

4            respective officers, directors, partners, agents, and employees thereof, and

5            all other persons acting or claiming to act on their behalf from violations

6            of the law as alleged herein,

7    I.     Defendant is to be responsible financially for the costs and expenses of a Court-

8        approved notice program through post and media designed to give immediate

9        notification of this action and their rights to the Class members;

10    J.     Plaintiffs and members of the Classes receive such other or further relief as may be

11        just and proper.

12 **XII.    JURY TRIAL DEMANDED**

13        Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all

14 claims asserted in this Complaint that are so triable.

DATED: May 23, 2025

Respectfully submitted,

By: /s/ *Christopher L. Lebsock*
Christopher L. Lebsock (SBN 184546)
Michael P. Lehmann (SBN 77152)
Samuel Maida (SBN 333835)
HAUSFELD LLP
580 California Street, 12th Floor
San Francisco, CA 94111
Telephone: (415) 633-1908
Facsimile: (415) 358-4980
clebsock@hausfeld.com
mlehmann@hausfeld.com
smaida@hausfeld.com

*Counsel for plaintiffs and the putative class*

Mindee J. Reuben (*Pro Hac Vice forthcoming*)
Katie R. Beran (*Pro Hac Vice forthcoming*)
HAUSFELD LLP
325 Chestnut Street, Unit 900
Philadelphia, PA 19106
Telephone: (215) 985-3270
Facsimile: (215) 985-3271
mreuben@hausfeld.com
kberan@hausfeld.com

*Counsel for plaintiffs and the putative class*

Scott Martin (*Pro Hac Vice forthcoming*)
Zelly Rosa (*Pro Hac Vice forthcoming*)
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322
smartin@hausfeld.com
zrosa@hausfeld.com

*Counsel for plaintiffs and the putative class*

YoungKi Rhee (*Pro Hac Vice forthcoming*)
WE THE PEOPLE LAW GROUP
Chinyang Building, 7/F
47 Kyonggidae-ro, Seodaemun-gu
Seoul, South Korea 03752
Telephone: 82-2-2285-0062
ykrhee@wethepeople.co.kr

*Counsel for PangSky and the putative class*

Byung-Joo Lee (SBN 225384)
JIHYANG LAW FIRM
Seohee Tower, 7/F
2583 Nambusunhwan-ro
Seoul, Korea 06735
Telephone: 82-2-3476-6002
Facsimile: 82-2-3476-6607
bjlee@jihyanglaw.com

*Counsel for KPA and KEPA and the putative class*