**HAUSFELD LLP**
Christopher L. Lebsock (SBN 184546)
Michael P. Lehmann (SBN 77152)
Samuel Maida (SBN 333835)
580 California Street
12th Floor
San Francisco, CA 94111
Telephone: (415) 633-1908
Facsimile: (415) 358-4980
clebsock@hausfeld.com
mlehmann@hausfeld.com
smaida@hausfeld.com

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Michael B. Eisenkraft (*pro hac vice*)
Benjamin F. Jackson (*pro hac vice*)
88 Pine Street, 14th Floor
New York, New York 10005
Telephone: (212) 838-7797
meisenkraft@cohenmilstein.com
bjackson@cohenmilstein.com

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Adam B. Wolfson
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
adamwolfson@quinnemanuel.com

Steig D. Olson (*pro hac vice*)
295 Fifth Avenue, 9th Floor
New York, New York 10016
Telephone: (212) 849-7000
steigolson@quinnemanuel.com

*Attorneys for Plaintiffs*

[Additional Counsel Listed on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| KOREAN PUBLISHERS ASSOCIATION, KOREA ELECTRONIC PUBLISHING ASSOCIATION, SCALISCO LLC, DAN SCALISE, PANGSKY CO., LTD., and OVERX CO., LTD., *on behalf of themselves and all others similarly situated,*<br><br>Plaintiffs,<br><br>*v.*<br><br>APPLE INC.,<br><br>Defendant. | Case No. 25-cv-04438-YGR<br><br>**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

PROTON AG, *on behalf of itself and all others similarly situated,*

      Plaintiff,

*v.*

APPLE INC.,

      Defendant.

Case No. 25-cv-05450-YGR

1
2

## **TABLE OF CONTENTS**

3    I.    INTRODUCTION ........................................................................................... 1

4    II.   JURISDICTION AND VENUE ..................................................................... 5

5    III.  PARTIES ....................................................................................................... 6

6       A.  PLAINTIFFS ............................................................................................ 6

        B.  DEFENDANT ......................................................................................... 11

7    IV.   CLASS ALLEGATIONS ............................................................................. 12

8    V.    THE RELEVANT MARKETS ..................................................................... 15

9       A.  RELEVANT PRODUCT MARKETS ........................................................ 15

10          1.   Smartphone/Smartphone OS Product Market.................................. 15

11          2.   iOS App Distribution Market.......................................................... 17

            3.   iOS App Payment Processing Market.............................................. 19

12       B.  RELEVANT GEOGRAPHIC MARKETS .................................................. 20

13          1.   Smartphones/Smartphone OSes...................................................... 20

14          2.   iOS App Distribution And iOS App Payment Processing Markets................................... 21

15    VI.   FACTUAL ALLEGATIONS ........................................................................ 23

16       A.  APPLE MONOPOLIZES THE RELEVANT MARKETS FOR IOS APP DISTRIBUTION AND IOS APP

17       PAYMENT PROCESSING. ............................................................................... 24

18          1.   Apple Exercises Control Over Its Commission Prices Unconstrained by Competition.... 25

19          2.   Apple Has Complete Power to Exclude Competition from the iOS App Distribution and

            iOS App Payment Processing Markets. .................................................................. 27

20       B.  APPLE HAS ESTABLISHED AND MAINTAINED ITS MONOPOLIES THROUGH A LONG-RUNNING

21       PATTERN OF ANTICOMPETITIVE CONDUCT. ................................................. 30

22          1.   Apple Uses Anticompetitive Techniques to "Lock In" iPhone Users and to Leverage Its

23          Market Power in the U.S. Smartphone/Smartphone OS Markets................................ 31

24          2.   Apple Imposed Anticompetitive Contracts of Adhesion on Developers to Implement and

            Maintain its Monopoly................................................................................. 41

25          3.   Apple's Intentional Violation of the Epic Games Injunction. ....................... 45

26          4.   The Second Injunction. ......................................................................... 53

27
28

C.  THE SMALL APP DEVELOPER SETTLEMENT. .................................................... 54

VII.    APPLE'S ANTICOMPETITIVE CONDUCT HARMS APP DEVELOPERS ................... 55

VIII.   STANDING ........................................................................................................... 59

IX.   APPLE HAS CONTINUOUSLY VIOLATED THE ANTITRUST LAWS ......................... 61

X.   INTERSTATE TRADE AND COMMERCE ............................................................... 67

XI.   CLAIMS FOR RELIEF ............................................................................................ 67

COUNT ONE: UNREASONABLE RESTRAINTS OF TRADE .......................................... 67

COUNT TWO: MONOPOLIZATION ............................................................................ 69

COUNT THREE: CALIFORNIA UNFAIR COMPETITION LAW ................................... 71

COUNT FOUR: KOREAN MONOPOLY REGULATION & FAIR TRADE ACT ................ 73

COUNT FIVE: ACT ON PROHIBITION OF PRIVATE MONOPOLIZATION AND
MAINTENANCE OF FAIR TRADE (ACT NO. 54 OF APRIL 14, 1947) AND THE MOBILE
SOFTWARE COMPETITION ACT ............................................................................. 76

COUNT SIX: JAPAN CIVIL CODE, ARTICLE 709 (ACT NO. 89 OF APRIL 27, 1896) ........... 80

XII.    REQUESTED INJUNCTIVE RELIEF ...................................................................... 81

XIII.   PRAYER FOR RELIEF ........................................................................................... 83

XIV.   JURY TRIAL DEMANDED .................................................................................... 84

Plaintiffs Proton AG ("Proton"), Korean Publishers Association ("KPA"), Korea Electronic Publishing Association ("KEPA"), PangSky Co., Ltd. ("PangSky"),  Scalisco LLC and Dan Scalise ("Scalisco"), and OverX Co., Ltd. ("OverX") (collectively "Plaintiffs"), on behalf of themselves and Classes of similarly situated developers of Apple iOS application(s) and/or in-app digital goods or services, including subscriptions offered for sale at a non-zero price ("iOS Apps"), bring this Amended Consolidated Class Action Complaint for damages and equitable relief against Defendant Apple Inc. ("Defendant" or "Apple") for violations of Sections 1, 2, and 3 of the Sherman Act (15 U.S.C. §§ 1–3), California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 et seq.) ("UCL"), Korea's Monopoly Regulation & Fair Trade Act (Act No. 20239) ("MRFTA"), Japan's Act on Prohibition of Private Monopolization and Maintenance of Fair Trade (Act No. 54) ("Antimonopoly Act" or "AMA"), and Japan's Civil Code (Act No. 89). All allegations herein, other than those concerning Plaintiffs, are based on information and belief.

## I.    INTRODUCTION

1.     For more than a decade, Apple has maintained a monopoly in the iOS App Distribution Market and iOS App Payment Processing Market by imposing restrictive policies, suppressing competition, and extracting supra-competitive commissions from iOS App developers. Through its tightly controlled ecosystem, Apple has: (a) imposed monopoly rents on iOS App developers by charging commissions as high as thirty percent (30%) on iOS App distribution and the use of Apple's in-app payment processing services ("IAPs"), whether through Apple's App Store or within iOS Apps themselves; (b) implemented policies and practices that have effectively barred app developers from distributing or selling iOS Apps through competing iOS App platforms; and (c) prevented app developers from steering consumers to alternative app distribution or payment processing options. Through these policies and practices, Apple has successfully maintained its monopoly over the markets for iOS App Distribution and iOS App Payment Processing, imposed inflated costs on developers and consumers, and enabled Apple to reap monopoly profits while stifling innovation and consumer choice.

2.      Apple's anticompetitive scheme has been sustained and reinforced by its market power in the U.S. Smartphone/Smartphone OS Market. It has also been enabled by Apple's intentional "lock-in" of consumers into its proprietary "ecosystem." As recently observed by the U.S. Department of Justice ("DOJ") and sixteen state Attorneys General ("AGs") in their own antitrust complaint against Apple, Apple has engineered its products, software, and policies to make it exceedingly difficult for consumers and iOS App developers to leave its ecosystem. Quoting internal Apple documents, the DOJ and AGs noted that "as early as 2010, then-CEO Steve Jobs discussed how to 'further lock customers into our ecosystem' and 'make Apple['s] ecosystem even more sticky.'" Three years later, Apple executives were still strategizing how to "get people hooked to the ecosystem."

3.      Apple's monopolistic restraints lack any legitimate procompetitive justification. Apple's public-facing rationale—that its restrictions protect user privacy or security—is pretextual. Internally, Apple has repeatedly acknowledged that the true purpose of these practices is to safeguard its bottom line by thwarting direct and disruptive competition that could erode its monopoly profits. For example, since at least 2017, Apple has imposed requirements that have excluded "super apps"— apps that work the same way across devices and web browsers—not due to privacy and security concerns but because they are "fundamentally disruptive" to Apple's "existing app distribution and development paradigms." As an Apple manager put it, allowing super apps to become "the main gateway where people play games, book a car, make payments, etc." would "let the barbarians in at the gate." That is because when a super app offers popular mini programs, "iOS stickiness goes down."

4.      Apple's anticompetitive practices have spurred significant litigation already. One class action, brought by "small" iOS App developers (i.e., those with under $1 million in iOS App sales in a calendar year), resulted in a $100 million settlement with Apple on August 24, 2021 (the "Small App Developer Settlement"). Separately, Epic Games litigated its own antitrust action against Apple through trial. After a 16-day bench trial, the Court found that Apple had engaged in anticompetitive and illegal conduct concerning iOS App sales on the App Store. The Court concluded that Apple's

AMENDED CONSOLIDATED
CLASS ACTION COMPLAINT

CASE NO. 3:25-cv-4438-YGR

1  practices "'threaten[ed] an incipient violation of an antitrust law' by preventing informed choice
2  among users of the iOS platform" in violation of California's UCL.

3      5.    To remedy Apple's illegal, anticompetitive conduct, the Court issued an injunction
4  (the "First Injunction") that, *inter alia*, barred Apple from preventing iOS App developers—including
5  Plaintiffs and members of the putative Classes—from communicating alternative purchasing options
6  outside the App Store. This remedy was intended to allow consumers to bypass Apple's platform and
7  avoid paying the supra-competitive "commissions" charged by Apple. The First Injunction took effect
8  on January 16, 2024, the same day the Supreme Court denied Apple's petition for writ of certiorari.
9  That day, Apple represented to the Court that it had taken certain actions to comply with the First
10 Injunction.

11     6.    In reality, Apple continued its anticompetitive conduct to perpetuate its illegal
12 monopoly and supra-competitive profits. Specifically, Apple imposed: (a) a 27% commission on
13 non-IAP iOS App purchases made within seven days of a consumer linking out of the Apple
14 "ecosystem," and (b) new anticompetitive barriers that were intended to—and in fact did—dissuade
15 consumers from making payments through non-IAP methods, including, for example, full-page
16 "scare" screens. These tactics effectively undermined the First Injunction and sustained Apple's
17 decades-long monopolistic revenue stream from iOS App distribution and iOS App payment
18 processing services.

19     7.    In response to Apple's subterfuge, Epic challenged these practices, and following
20 discovery and nine days of evidentiary hearings, the Court concluded that "contemporaneous business
21 documents reveal that Apple knew exactly what it was doing and at every turn chose the most
22 anticompetitive option." The Court further concluded that Apple's willful violation of the First
23 Injunction was directed by Apple's CEO, Tim Cook, and that Apple repeatedly attempted to conceal
24 its subversion of the Court's order at every turn.

25     8.    To remedy Apple's continued illegal maintenance of its longstanding monopoly in
26 violation of the First Injunction, the Court issued a second injunctive order (the "Second Injunction")
27 barring Apple from engaging in conduct that maintained its illegal monopoly, including *inter alia*,

28

AMENDED CONSOLIDATED
CLASS ACTION COMPLAINT
3
CASE NO. 3:25-cv-4438-YGR

1   "[i]nterfering with consumers' choice to proceed in or out of an app by using anything other than a

2   neutral message apprising users that they are going to a third-party site." The Court further ordered

3   Apple to immediately comply with the Injunction and referred Apple, as well as Alex Roman, Apple's

4   Vice President of Finance, to the DOJ for potential criminal prosecution.

5         9.      Regulators worldwide also have recognized Apple's anticompetitive conduct. The

6   U.S. DOJ and sixteen state AGs have sued Apple for antitrust violations, comparing the company to

7   "oil barons and railroad tycoons." The European Commission has fined Apple €1.8 billion for abusing

8   its dominant market position. Additionally, competition authorities in South Korea, the United

9   Kingdom, Germany, France, and India have each initiated enforcement actions targeting Apple's

10  anticompetitive practices.

11        10.     Despite this mounting global regulatory scrutiny, Apple remains an illegal monopolist

12  and continues to extract supra-competitive profits from app developers.

13        11.     The remedies set forth in the Second Injunction have not made Plaintiffs and members

14  of the putative Classes whole. Nor have Apple's recent cosmetic policy changes—such as modestly

15  reducing commission rates for small developers generating less than $1 million annually—that affect

16  only a small fraction of App Store revenues and fail to address the fundamentally anticompetitive

17  structure of Apple's business model.

18        12.     Apple's anticompetitive conduct continues to inflict substantial and ongoing harm.

19  Developers are forced to pay Apple's supra-competitive commission rates. Innovation is stifled as

20  Apple excludes competitors that could offer better services, lower prices, or alternative distribution

21  models. Consumers are deprived of meaningful choice and forced to rely on Apple's inferior services

22  at inflated prices.

23        13.     Through this action, Plaintiffs, on behalf of themselves and the putative Classes

24  defined herein, seek (1) to recover the supra-competitive commissions they paid Apple for iOS App

25  distribution and iOS App payment processing services; and (2) an injunction permanently barring

26  Apple from engaging in further illegal, monopolistic conduct regarding iOS App distribution and iOS

27  App payment processing services.

28

## II.    JURISDICTION AND VENUE

14.    This Court has subject-matter jurisdiction over the claims arising under the Sherman Act in this action pursuant to 28 U.S.C. §§ 1331, 1332(a)(2), and 1337(a).

15.    This Court has supplemental jurisdiction over the claims arising under state law and foreign law in this action pursuant to 28 U.S.C. § 1367.

16.    This Court has general personal jurisdiction over Apple because its principal place of business is in Cupertino, California, resulting in continuous and systematic contacts with California.

17.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) - (2) and (d) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, because Apple resides in this District, and because of Apple's contacts with this District.

18.    With regard to Plaintiffs' claims arising from sales of iOS Apps through the U.S. Apple App Store, California and U.S. federal law apply by virtue of the choice-of-law provision in Apple's Developer Program License Agreement, which states, "[t]his agreement will be governed by and construed in accordance with the laws of the United States and the State of California, except that body of California law concerning conflicts of law." Further, a substantial part of the conduct at issue took place in California—where Apple maintains its U.S. headquarters—including meetings and communications through which Apple developed, implemented, and enforced its anticompetitive scheme. California has a clear, substantial, legitimate, and compelling interest in applying its law to its corporate citizen Apple's unlawful conduct that emanated from within California's borders.

19.    With regard to KPA's, KEPA's, and PangSky's claims arising from Korea-based iOS App developers' sales of iOS Apps through Apple App Stores other than the China Apple App Store storefront, this Court may properly apply Korean law. Numerous Korean courts have held that they cannot resolve disputes between a Korean domiciliary and U.S. domiciliary where the parties contractually agreed to resolve their disputes in California pursuant to forum selection and choice of law clauses that designate this District and California law as the forum and law to be applied.[1] That

---

[1] *See, e.g.*, Seoul Central District Court decision 2018gahab506082, Sept. 18, 2019; Korean Supreme Court decision 2020da238424, Oct. 15, 2020; Seoul Central District Court decision 2019gadan5162753, Oct. 20, 2020; Korean Supreme Court decision m2017da219232, Apr. 13,

AMENDED CONSOLIDATED
CLASS ACTION COMPLAINT

CASE NO. 3:25-cv-4438-YGR

1  is, this Court is the only forum in which KPA, KEPA, PangSky, and members of the Korean App

2  Developer Class can bring their Korean law claims.

3      20.    With regard to OverX's claims on behalf of itself and the Japanese Law Class (defined

4  below), this Court may properly apply Japanese law because Japanese courts have held that they could

5  not resolve disputes between a Japanese domiciliary and Apple or Google where the parties

6  contractually agreed to resolve their disputes in California pursuant to a forum selection clause that

7  designates this District as the appropriate forum.[2]

8  **III.    PARTIES**

9      **A.    Plaintiffs**

10     21.    **Proton AG** is a globally recognized technology company based in Geneva,

11  Switzerland, known for building widely used, privacy-focused alternatives to core digital services.

12  Founded in 2014 by scientists who met at CERN—the birthplace of the World Wide Web—Proton

13  has grown into one of the world's leading independent software providers. Proton offers a suite of

14  secure and transparent digital tools that compete directly with Apple's ecosystem, including Proton

15  Mail (Apple Mail), Proton Calendar (Apple Calendar), Proton Drive (iCloud), and Proton Pass

16  (Keychain). These applications offer users meaningful control over their data, often surpassing

17  Apple's offerings in both privacy protections and transparency. Proton also provides Proton VPN and

18  Proton Wallet. While Apple does not offer a system-wide VPN, and Apple Pay is not comparable to

19  Proton's self-custodial bitcoin wallet, these services further position Proton as a serious and

20  mission-driven competitor to Apple's platform dominance. Proton AG is overseen by the Proton

21  Foundation, a Swiss non-profit which helps ensure that Proton serves the public interest.

22     22.    With more than 100 million user accounts across 180+ countries and a workforce

23  exceeding 500 employees, Proton has emerged as a global leader in privacy-focused technology.

24

25  2023; Apple Inc., *Agreements and Guidelines for Apple Developers*, available at:
    https://developer.apple.com/support/terms/. Upon information and belief, Apple's Developer

26  Program License Agreement may previously have been called the "iPhone Developer Program
    License Agreement."

27  [2] *See, e.g.*, Tokyo District Court September 8, 2015 (東京地判平成 27 年 9 月 8 日，事件番号平
    26（ワ）1590 号，Westlaw JAPAN 文献番号 2015 WLJPCA 09088006, D1-Law.com 判例体系

28  判例 ID 29013863) 東京高等裁判所 2009年6月18日 判決.

Proton's user base spans a wide demographic, from everyday individuals seeking data protection to journalists and human rights defenders operating in high-risk environments. The United Nations has recommended Proton Mail as a secure tool for documenting human rights abuses, reflecting its reputation for providing exceptionally strong privacy guarantees.

23.     In geopolitical contexts where digital repression is acute, Proton has repeatedly demonstrated technological leadership and ethical responsibility. For example, in Myanmar, when users were being arrested for merely having VPN apps installed on their phones, Proton developed and launched a "discreet icon" feature that allowed its VPN to appear as an innocuous weather or notes app, thereby helping users evade authoritarian surveillance. This kind of innovation exemplifies Proton's commitment to user autonomy and security.

24.     In addition to developing secure communications tools, Proton also is a public advocate for internet freedom. The company has donated over $4 million to organizations that promote digital rights and resist censorship. Its transparency practices, including maintaining fully open-source code and publishing independent privacy guides, have made it a standard-bearer in the encrypted communications space.

25.     Proton has been at the forefront of encryption standardization efforts, which are not only technically significant but also competitively relevant, as Apple increasingly markets itself on the strength of its own security infrastructure. Proton's advancements pose a credible and meaningful challenge to Apple's self-characterization as the most secure and private technology provider.

26.     All of Proton's consumer-facing applications—including Proton Mail, Proton Calendar, Proton Drive, Proton Pass, Proton Wallet, and Proton VPN—are distributed to iOS users exclusively through Apple's App Store. As a result, Proton is subject to Apple's control over app distribution, updates, user access, and payment processing on iOS devices. Apple's exclusive distribution channel compels developers like Proton to accept Apple's restrictive terms and conditions as a condition of market entry, with no viable alternative means of reaching iOS users.

27.     Apple's exclusionary App Store policies and anticompetitive restrictions have directly harmed Proton and impeded its ability to compete on the merits. As a privacy-focused alternative to

Apple's ecosystem of apps, Proton is subject to arbitrary delays, opaque guidelines, and exploitative fees that disadvantage its products in the marketplace. The net result is that Apple's dominance suppresses competition, obstructs innovation, and deprives consumers of meaningful choices in privacy-respecting technologies.

28.    Proton has never self-identified as U.S.-based when registering for Apple's Developer Program.

29.    Throughout the App Developer Class Period, Proton paid Apple supra-competitive commissions—up to thirty percent (30%)—on all purchases and payments related to Proton's iOS Apps and was damaged thereby. During the Class Periods, Proton sold iOS Apps to customers in the United States and elsewhere around the world. Proton is a party to Apple's Developer Program License Agreement and guidelines referenced in this Complaint and has not released any of its claims in connection with the Small App Developer Settlement.

30.    **Korean Publishers Association** is an association that represents Korean publishers. KPA was established on March 15, 1947, and joined the International Publishers Association in 1957. Among its members are iOS app developers. KPA's iOS-developer members are parties to Apple's Developer Program License Agreement and other associated agreements, schedules, exhibits, and guidelines. Throughout the relevant Class Periods, KPA's iOS-developer members distributed iOS Apps and processed payments associated with those apps, including for paid apps and apps offering in-app purchases, through the Apple App Store storefront in the United States and elsewhere. KPA's iOS-developer members have paid supra-competitive commissions on purchases and payments related to the distribution of their iOS Apps. KPA's iOS-developer members have been injured by Apple's conduct as alleged herein and will continue to be injured until such time as Apple ceases its anticompetitive conduct.

31.    KPA is Korea's oldest and largest private-sector organization that covers all facets of the publishing industry. It was established to protect the freedom of publication and promote the public interest through projects, research, and education for the promotion of the publishing industry. It aims to contribute to the sustainable development of the publishing industry and advancements of

1    knowledge and culture. It conducts business necessary to promote the publishing industry, improve

2    publishing ethics and establish sound distribution order, promote international exchange of the

3    publishing industry, and expand the overseas publishing market.

4         32.    KPA is active in the various sectors of education, research, policy development,

5    festivals, copyright exchange, and more to advance the publishing industry and defend the freedom

6    to publish. It also conducts mail order business, education services, stationery retail, market research

7    and public opinion research for the publishing industry and other projects necessary to accomplish its

8    goals.

9         33.    KPA has been at the forefront of entities urging legislative action against Google's

10   and Apple's unlawful restraints in Korea.

11        34.    KPA brings this suit for injunctive relief only.

12        35.    **Korea Electronic Publishing Association** is an association composed of electronic

13   publishing businesses. It was founded in 1992 and consists of 55 members. Among KEPA's members

14   are iOS app developers. KEPA's iOS-developer members are parties to Apple's Developer Program

15   License Agreement and other associated agreements, schedules, exhibits, and guidelines. Throughout

16   the relevant Class Periods, KEPA's iOS-developer members distributed iOS Apps and processed

17   payments associated with those apps, including for paid apps and apps offering in-app purchases,

18   through the Apple App Store storefront in the United States and elsewhere. KEPA's iOS-developer

19   members have paid supra-competitive commissions on purchases and payments related to the

20   distribution of their iOS Apps. KEPA's iOS-developer members have been injured by Apple's

21   conduct as alleged herein and will continue to be injured until Apple ceases its anticompetitive

22   conduct.

23        36.    Since 1992, KEPA has been supporting the country's e-content publishing activities

24   through education, publishing support, and certification programs. KEPA's purpose is to promote and

25   further contribute to the development of the information society. Its mission is to actively support the

26   production and active distribution of diverse and abundant electronic publishing content to further

27

28

consolidate the foundation of cooperation between publishers, distributors, and technology companies.

37.    To pursue its goals, KEPA collects information, conducts research, holds presentations, and promotes joint development and high-tech dissemination. It also promotes standardization, hosts exhibitions, offers training and education, promotes industry-academic cooperation, enhances distribution, proposes public policy changes, and conducts other projects necessary to achieve its goals.

38.    KEPA has been at the forefront of entities urging legislative action against Google and Apple's unlawful restraints in Korea.

39.    KEPA brings this suit for injunctive relief only.

40.    **PangSky Co., Ltd.** is a Korean company with its principal place of business in Seoul, Korea. PangSky develops apps that it offers for distribution on the iOS App Store, such as role-playing games and massively multiplayer online role-playing games. Gaming apps PangSky has developed include, but are not limited to, Dragon Raja Origin, Vestria Story, and Fortress Battle Royal.

41.    During the Class Periods, Plaintiff PangSky sold iOS Apps to customers in the United States and elsewhere around the world. PangSky is a party to Apple's Developer Program License Agreement and guidelines referenced in this Complaint and has not released any of its claims in connection with the Small App Developer Settlement.

42.    **Scalisco LLC** is a limited liability company registered in the State of Washington. Scalisco LLC develops iOS mobile gaming apps and distributes them through the iOS App Store, including "Rescue Pets, Save REAL Animals," which allows players to manage and improve virtual animal shelters, and "Rock Miner: Pro Stone Mining," in which players mine virtual ore to help rescue trapped animals.

43.    Scalisco is owned and operated by **Dan Scalise**, an app developer and resident of the State of Washington. Collectively, Scalisco LLC and Dan Scalise are referred to herein as "Scalisco."

44.    Dan Scalise applied for a developer account in his own name for the benefit of Scalisco LLC, and his name continues to appear as the party to Apple's Developer Program License Agreement and guidelines referenced in this Complaint.

45.    During the Class Periods, Plaintiff Scalisco sold iOS Apps to U.S.-based customers.

46.    Scalisco brings claims only to the extent those claims have not been released by the Small App Developer Settlement.

47.    **OverX Co., Ltd.**  is a Japanese company with its principal place of business in Tokyo, Japan. OverX develops multiple iOS mobile gaming apps, including (1) Ice Cream, Now!, which allows players to set up and manage ice cream shops, create ice cream flavors and decorative cakes, and serve their creation to game characters; and (2) Kimchi Mart, in which players run their own kimchi-themed mini-mart where they manage inventory and set prices, serve diverse customers, and unlock new fruits and candy to sell. Although Ice Cream, Now! and Kimchi Mart are free to download, they offer in-app purchases.

48.    During the relevant Class Periods, Plaintiff OverX sold in-app products to customers in the United States, Japan, and elsewhere around the world. OverX is a party to Apple's Developer Program License Agreement and guidelines referenced in this Complaint.

49.    Throughout the relevant Class Periods, Plaintiffs Proton, PangSky, Scalisco, OverX, and individual members of KPA and KEPA paid Apple supra-competitive commissions—up to thirty percent (30%)—on all purchases and payments related to their iOS Apps and were damaged thereby.

**B.    Defendant**

50.    **Apple Inc.** is a California corporation with its principal place of business in Cupertino, California. Apple is one of the world's largest and most valuable companies, with a market capitalization of approximately $3.0 trillion. Apple sells hardware in the form of iPhones, iPads, Apple Watches, and Mac computers, as well as several related services. Apple controls and administers iOS as well as the Apple App Store ("App Store"), which includes setting the policies for the App Store and contracting with app developers and consumers.

51.     Upon information and belief, and as alleged, Apple made all decisions and took the actions complained of herein at or near its corporate headquarters in Cupertino, California, or elsewhere in the State of California. It is believed, and therefore alleged, that substantially all the misconduct alleged in this Complaint occurred in, or emanated from, California.

## IV.    CLASS ALLEGATIONS

52.     Plaintiffs bring this action for equitable relief and damages on behalf of themselves and classes of similarly situated persons and entities pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3).

### App Developer Class

53.     Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), Plaintiffs Proton, KEPA, KPA, PangSky, Scalisco, and OverX bring this action seeking damages and injunctive relief on behalf of themselves and a putative Class of iOS App Developers (the "App Developer Class") defined as follows:

> All persons or entities that sold iOS Apps (including subscriptions and in-app products) through Apple's U.S. App Store storefront from May 23, 2021 and until such time as the effects of Apple's anticompetitive conduct end to the extent that the person or entity has not released their claims in connection with the Small App Developer Settlement.

### Korean App Developer Class

54.     Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), Plaintiffs KPA, KEPA, and PangSky bring this action seeking damages and injunctive relief on behalf of themselves and a putative class of iOS App Developers domiciled in Korea defined as follows:

> All persons or entities domiciled in Korea that sold iOS Apps (including subscriptions and in-app products) through any Apple App Store storefront except the China App Store storefront between May 23, 2015 and until such time as the effects of Apple's anticompetitive conduct end.

**Japanese Law Class**

55.    Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), Plaintiff OverX brings this action seeking damages and injunctive relief on behalf of itself and a putative class of iOS App Developers defined as follows:

> All persons or entities that sold iOS Apps (including subscriptions and in-app products) through Apple's Japanese App Store storefront from July 10, 2008 and until such time as the effects of Apple's anticompetitive conduct end.[3]

56.    Excluded from the Classes are the following persons or entities: (a) Defendant; (b) Defendant's parent companies, subsidiaries, and affiliates; (c) Defendant's officers, directors, management, employees, subsidiaries, affiliates, or agents; (d) the judge and chambers staff assigned to this case, as well as the members of their immediate families; (e) all U.S. government entities; and (f) all jurors assigned to this case.

57.    Plaintiffs KPA and KEPA bring their claims pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2) only.

58.    Plaintiffs reserve the right to expand, change, or modify the definitions of the Classes based on discovery and further investigation.

59.    ***Numerosity***. Plaintiffs do not know the exact number of Class members but are informed and believe there are millions of iOS App developers worldwide. Plaintiffs are informed and believe that, due to the nature of the trade and commerce involved, the Classes are so numerous and geographically dispersed that joinder of all members of each of the Classes in the prosecution of this action is impracticable.

60.    ***Typicality***. Plaintiffs' claims are typical of the claims of their fellow Class members because Plaintiffs sold iOS Apps through Apple's App Store during the Class Periods. Plaintiffs and all members of the Classes were damaged in the same manner by the same wrongful conduct of Defendant as alleged herein, and the relief sought herein is common to all members of the Classes.

---

[3] The Korean App Developer Class, the App Developer Class, and the Japanese Law Class are referred to hereinafter as the "Classes."

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

CASE NO. 3:25-cv-4438-YGR

61. **_Commonality_**. Defendant has acted on grounds generally applicable to the Classes, thereby making final damages and equitable relief appropriate with respect to the Classes as a whole. Moreover, numerous questions of law or fact common to the Classes—including, but not limited to, those identified below—arise from Defendant's anticompetitive and unlawful conduct:

(a)    Whether there exist relevant product markets for Smartphones/Smartphone Operating Systems ("OSes"), iOS App Distribution, and iOS Payment Processing (for the App Developer Class);

(b)    Whether the defined product markets operate within relevant geographic markets (for the App Developer Class);

(c)    Whether Apple's conduct, as alleged herein, violates the Sherman Act (for the App Developer Class);

(d)    Whether Apple's conduct, as alleged herein, violates California's UCL (for the App Developer Class);

(e)    Whether Apple's conduct, as alleged herein, violates Korea's MRFTA (for the Korean App Developer Class);

(f)    Whether Apple's conduct, as alleged herein, violates the First Injunction (for the Classes);

(g)    Whether Apple's conduct, as alleged herein, violates the AMA and Japan's Civil Code (for the Japanese Law Class);

(h)    The duration of Apple's anticompetitive or illegal conduct (for the Classes);

(i)    Whether Plaintiffs and the other members of the Classes were injured by Apple's conduct and, if so, the determination of the appropriate measure of damages for each of the Classes; and

(j)    Whether Plaintiffs and other members of the Classes are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief.

62. **_Predominance._** These and other questions of law and fact are common to the Classes and predominate over any questions affecting the members of each Class individually.

63.    ***Adequacy of Representation.*** Plaintiffs will fairly and adequately represent the interests of each of the respective Classes because they sold iOS Apps through Apple's App Store during the relevant Class Periods and have no conflicts with any other members of the Classes. Further, Plaintiffs have retained sophisticated and competent counsel experienced in prosecuting antitrust class actions as well as other complex litigation.

64.    ***Superiority.*** This class action is superior to other alternatives for the fair and efficient adjudication of this controversy. Prosecuting the claims pleaded herein as class actions will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action. Moreover, the prosecution of separate actions by individual members of the Classes would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

## V.    THE RELEVANT MARKETS

65.    For the purpose of claims arising under the Sherman Act and under California law, the relevant product and geographic markets are as follows:

### A.    Relevant Product Markets

#### 1.    *Smartphone/Smartphone OS Product Market.*

66.    A smartphone is a mobile phone with a connection to a cellular network and/or the internet that performs many of the functions of a computer. Smartphones typically have a touchscreen interface, internet access, and an operating system capable of running downloaded applications.

67.    An important feature of smartphones is their ability to run applications, or "apps." An app is a type of software designed to perform a specific task. For instance, a calculator app can serve the same functionality as a physical calculator (i.e., basic computation). Apps vary greatly in terms of complexity and function. App developers also vary greatly, with some developers generating millions in revenue annually and others generating much less.

68.    Apps must run on an operating system, or "OS." An operating system is a type of software that manages a computer or smartphone's memory, storage, and processes, and connects the computer or smartphone's software to its hardware.

69.     When smartphones are sold, they come pre-loaded with an OS. Apple's smartphone—the iPhone—uses an OS called "iOS." Other smartphone manufacturers—such as Samsung, HTC, and Nokia—sell smartphones loaded with another OS, typically Android. Apple does not license iOS for use on smartphones manufactured by other companies.

70.     Today, smartphones (and the OSes that are pre-loaded onto them) are widely recognized as a distinct, relevant product market ("Smartphone/Smartphone OS Market"). As a category, smartphones are significantly more expensive than "dumb" mobile phones, given their numerous added features and functionality. Consumers looking to purchase a smartphone therefore do not view other types of mobile devices as reasonably interchangeable because of a unique combination of functionality and portability.

71.     For example, although tablet computers (like the iPad) perform some of the same functions as smartphones, they are typically much larger and cannot act as a replacement for smartphones. On the converse, smartwatches are much smaller than smartphones and have limited functionality. And, at least for Apple's smartwatch, the Apple Watch, a user can only set it up if they also have an iPhone. Finally, laptop computers are much larger than a smartphone and are used for more traditional computing needs, whereas smartphones today provide a number of functions a laptop simply cannot because a laptop would be too unwieldy. It is for these reasons that consumers with smartphones will almost always have one or more of these other types of devices but will still separately purchase and use their smartphone due to its unique combination of features.

72.     Smartphones' uniqueness translates into unique pricing. If a hypothetical monopolist of all smartphones/smartphone OSes were to raise prices by a small but significant nontransitory amount (e.g., 5%), it could profitably do so because a sufficient number of consumers would not switch to other types of products as a result.

73.     The economics of a smartphone platform are such that the platform's value to users—and in turn to the platform operator—increase when new apps and new features are added to the platform. To create these economic benefits for itself and its users, Apple has opened its smartphone platform to third-party developers, whose countless inventions and innovations have created

enormous value. Apple has willingly opened the platform to third-party developers to capture this value even though there is no extensive regulatory framework requiring it to do so or overseeing how it interacts with those third parties. In this way, smartphone platforms are very different from other platforms, like landline telephone networks, whose value-adding features were built primarily by the platform operator and which were opened to third-parties only when the platform operator was required to do so by regulation. When a third-party developer for the iPhone creates a valuable new feature, consumers benefit and consumer demand goes up for Apple's products, increasing the economic value of the iPhone to Apple. This has played out hundreds of thousands of times for the iPhone, resulting in an enormously valuable smartphone platform reflecting the combined contributions of millions of developers.

74.    The interplay between apps and smartphones makes smartphones a fundamentally different product from any other consumer electronic device. Because they are designed for a specific smartphone OS, smartphone apps typically work only on smartphones running that same system. Developing the same app for a different type of device may be outright impossible (for example, complex apps developed for "dumb" phones). Additionally, the form factor of smartphones—a pocket-sized computer capable of running apps—makes them unique from the perspective of the consumer. And because 97% of consumers in the United States today own a smartphone, access to those consumers also makes smartphones unique from the perspective of developers selling into the U.S. geographic market. Accordingly, neither consumers nor developers view smartphones as reasonably interchangeable with non-smartphone devices.

### 2.    iOS App Distribution Market.

75.    There is a distinct market for iOS App distribution ("iOS App Distribution Market"), as opposed to apps themselves.

76.    Although some first-party apps come pre-downloaded to a user's smartphone, the vast majority of apps must be downloaded by the user after purchase.

77.    As an app distributor, Apple facilitates a transaction between a buyer (smartphone user) and a seller (app developer). When iPhone users purchase an app through the App Store, they

1   pay the cost of the app to Apple as set by the developer. Apple then remits the purchase price to the

2   developer, minus its commission.

3        78.    Today, users who want apps on their iOS devices must download them from Apple's

4   iOS App Store app—there is no other way to purchase apps on an Apple phone. By means of updates

5   to each new version of iOS (including each version released during the Class Periods alleged in this

6   lawsuit), other exclusionary design choices for each new version of the iPhone and its accompanying

7   iOS versions released since 2008 (including every new model preceding this lawsuit), and the

8   contractual restraints discussed herein, Apple has engaged in a continuous campaign to prevent

9   iPhone users and iOS App developers from using or selecting other third-party services to purchase

10  or distribute iOS Apps.

11       79.    In this way, Apple is significantly different than other companies. For example, in the

12  Android OS, Android users can download Android applications from multiple application

13  marketplaces—including Google's Play Store, Amazon's Appstore, and Samsung's Galaxy Store.

14  Apple takes multiple, active steps to prevent anything similar for iOS devices, including both

15  technologically and contractually preventing users and application developers from circumventing

16  that prohibition.

17       80.    All of this is highly anticompetitive because apps must be designed to run on a specific

18  OS. A device running iOS can run only apps designed for iOS. Thus, once a user selects iOS as their

19  OS by purchasing an Apple device, that user can only run applications designed for iOS on their

20  device. This means that, for iOS users, apps written for other OSes are not interchangeable at all with

21  iOS Apps because they cannot be used on an iOS device.

22       81.    App developers face the same problem. The existence of other mobile device OSes is

23  meaningless to developers whose program apps and in-app products specifically for use on iOS

24  devices.

25       82.    Based on these differences, a move away from the iOS system would mean that a

26  developer could no longer offer its iOS Apps or in-app products to tens of millions of consumers

27  (who would have no other way to buy these products for their devices) and would need to rebuild its

28

18

AMENDED CONSOLIDATED
CLASS ACTION COMPLAINT

CASE NO. 3:25-cv-4438-YGR

iOS Apps and in-app products for different operating systems, incurring substantial switching costs. And, even if one engaged in the time and expense to reprogram an iOS App for Android or Windows, distributing it through an app distribution service geared toward apps written for that other OS would have (and has) no effect on Apple's pricing for iOS App distribution services.

83.    Thus, other app distribution services for other OSes offer no competitive downward pressure on iOS App distribution pricing. For example, Google's distribution services, which are tied to offerings in its Google Play store, do not involve iOS products—only Android OS products distributed via Google Play. The same is true of Amazon.com's distribution services, which are tied to its app distribution service—these, too, are solely for Android OS products and never for iOS items.

84.    General market principles regarding cross-price elasticity of demand support the existence of the relevant markets. Specifically, there is no simple or cost-effective way to abandon Apple's iOS environment and migrate to another with the hope of cheaper apps. This is because, as noted above, iOS Apps work only on iOS devices, and any effort to convert iOS Apps for use on other devices and OSes involves significant effort, risk, and financial investment by app developers. Neither Google nor Amazon's distribution services are substitutes for Apple's distribution services for iOS App developers or iOS App consumers.

85.    Regardless of whether the iOS App Distribution Market is considered a one-sided or a two-sided market, overall prices for both consumers and developers are higher in the actual world than in the but-for world.

### 3.    iOS App Payment Processing Market.

86.    Since they first began offering iOS Apps, many third-party developers have not only sold those apps for a fee up front but also have built subsequent purchase options for their apps, such as upgraded versions of the app, special game options (e.g., tokens, special outfits, extra characters), subscriptions to an app-based service, and other features not offered as part of the initial app download. To effectuate such add-on purchases, the app developer must use a payment processing service. That service takes the user's payment information and runs it through the appropriate credit,

1    debit, or other payment network to complete the sale. These services used to process payments in
2    relation to iOS Apps constitute a distinct market ("iOS App Payment Processing Market").

3    　　　　87.　　To give users the most seamless experience possible, app developers prefer that any
4    payments occur in-app. This is because directing a user out of the app to complete a purchase reduces
5    engagement with the app and increases the chance that the user will not complete the purchase
6    transaction due to the higher "friction" of that experience. Accordingly, as a practical matter,
7    developers must include payment options directly in their apps or else risk losing customers.

8    　　　　88.　　Just as the distribution of software for specific OSes historically has been a robust and
9    separate market from the market for the distribution of devices that run those OSes, so too has the
10   market for payment processing for apps written for different OSes. Application developers on
11   Windows machines, for example, had multiple different options to process payments made through
12   their software, including proprietary systems or third-party options. That practice continues to this
13   day outside of the iOS ecosystem, including in Apple's macOS ecosystem.

14   　　　　89.　　Apple largely keeps a stranglehold on payment processing through its control of the
15   iOS mobile OS. Specifically, in most cases, Apple mandates that the only payment processing service
16   allowed within iOS Apps is Apple's own payment processing service. Although Apple nominally
17   allows steering to alternative payment methods in some cases, it maintains strict control over such
18   uses and, in many cases, charges excessive fees that render those alternatives largely uneconomical.
19   There is no legitimate procompetitive reason for Apple to enforce strict control of payment processing
20   within iOS Apps—Apple does so only to preserve its monopoly rents.

21   　　　　**B.**　　**Relevant Geographic Markets**

22   　　　　　　　**1.**　　***Smartphones/Smartphone OSes.***

23   　　　　90.　　A relevant geographic market for Smartphones/Smartphone OSes is the United States
24   (including its territories and the District of Columbia).

25   　　　　91.　　There are a variety of legal regulations and requirements that require smartphone
26   manufacturers to provide specific U.S. certifications and technological limitations for their
27   smartphones devices to be made, imported, and/or sold in the United States. Further, U.S. consumers

28

typically purchase smartphones either domestically from U.S.-based sellers or by directly importing U.S.-specific devices.

92.    Users in the United States demand services offered by U.S. retailers when they purchase a smartphone. For example, consumers who purchase a smartphone from their mobile carrier can get assistance with activating their new device, setting it up, and transferring important content like apps, messages, photos, and video to their new smartphone.

93.    In the United States, consumers must purchase smartphones through a U.S. retailer if they want to take advantage of valuable promotions offered by their mobile carrier. These same promotions and free financing are unavailable to U.S. consumers who purchase their phones in other countries.

94.    Because of these restrictions, price arbitrage of phones between countries does not work. Consumers in the United States could not avoid or defeat an increase in the price of smartphones by purchasing and importing smartphones from abroad. This allows Apple to set and maintain prices for the same smartphone model in the United States separately from those in other countries. For example, Apple lowered the price of the iPhone 11 in China relative to the United States because Apple faced greater competition in China. This additional competition arises in part because a popular Chinese super app (Weibo) put competitive pressure on Apple and made it easier for users to switch from an iPhone to a rival smartphone. As a result, Apple is unable to command the same prices for the iPhone in China that they do in the United States due to increased competition that does not exist in the United States.

95.    Apple has market power in the U.S. Smartphone/Smartphone OS Market. Apple's share in that market has exceeded 50% for years, with a market share today of at least 54%.

### 2.    iOS App Distribution And iOS App Payment Processing Markets.

96.    A relevant geographic market for both the iOS App Distribution and iOS App Payment Processing Markets is the U.S. Apple App Store storefront.

97. Apple operates its App Store through 175 different "storefronts." When a user purchases an app or makes an in-app purchase, the user must do so through the specific country or regional "storefront" to which their account is registered.

98. Users have access only to a single "storefront" at a time. Typically, users have access to the "storefront" that corresponds to the country or region in which they purchased and registered their device.

99. In theory, a user can change to a different App Store storefront by switching the country or region that is associated with their Apple ID. However, switching to another country or region comes with significant costs and hurdles. Before switching, the user must first: spend down any balance remaining on Apple's account; cancel any subscriptions that block a country or region change and wait until the end of the subscription period; wait for any memberships, pre-orders, movie rentals, or Season Passes to complete; wait for any pending store credit refunds to process; ensure that the user has an acceptable payment method for the new country or region; and redownload apps, music, movies, TV shows and books.

100. App Store transactions are performed in the currency that is specific to the user's App Store storefront. As a result, U.S. customers who switch to another storefront will be unable to use U.S. dollars as their currency to purchase iOS Apps or to make IAPs unless they are switching to a storefront that transacts in U.S. dollars.

101. Switching storefronts will subject the user to the new country or region's policies and restrictions, which may differ from their original country or region's policies and restrictions. That may result in disallowing (or allowing) the use of some apps or other content.

102. Users are generally unaware of the option to switch to another App Store storefront (or even that the App Store has different storefronts for different countries or regions).

103. Because of these and other obstacles, U.S. iPhone users do not view other countries' or regions' App Store storefronts as reasonably substitutable with the U.S. Apple App Store storefront.

104. In the alternative, to the extent the iOS App Distribution and iOS App Payment

Processing Markets are considered to be worldwide in scope, any relevant geographic market would still exclude China.

105.    China would be excluded from any relevant geographic market for iOS App Distribution and iOS App Payment Processing because legal and regulatory barriers prevent the operation of many global app stores within China and Apple's China App Store storefront operates with significant legal and regulatory restrictions mandated by the Chinese government that do not apply in other geographic markets.

106.    As the Court in *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 990 (N.D. Cal. 2021) found, Chinese "operating systems are, in fact, different because they are installed by original equipment manufacturers in China." There, "[t]he parties agree[d] that China is different."

## VI.    FACTUAL ALLEGATIONS

107.    Apple was founded in 1976 to make and market personal computers. From its inception, Apple favored expensive, high-end design relative to its competitors but struggled to compete against rivals that offered lower prices and more programs. By the late 1990s, it was on the brink of bankruptcy.

108.    In 2007, Apple launched the iPhone, a smartphone that offered hardware and software applications, called "apps," built atop a mobile OS. Apple initially offered only a small number of apps that it created for the iPhone. But Apple quickly realized the enormous value that a broader community of entrepreneurial, innovative developers could drive to its users and the iPhone platform more broadly. So Apple invited and capitalized on the work of these third parties while maintaining control over the distribution of their work product and payments for it.

109.    That strategy paid off. Over more than 15 years, Apple has built and sustained a dominant smartphone platform and ecosystem in the United States by attracting third-party developers of all kinds to create apps that users could download on their smartphones through a digital storefront called the App Store. As developers created more and better products, content, apps, and services, more people bought iPhones, which incentivized even more third-parties to develop apps for the iPhone. Today, the iPhone's ecosystem includes products, apps, content, accessories, and

1  services that are offered by content creators, newspaper publishers, banks, advertisers, social media

2  companies, airlines, productivity developers, retailers and other merchants, and others.

3       110.    Beginning at least as early as 2010, Apple executives expressed concern about lawful

4  competition. That year, Apple's then-CEO, Steve Jobs, wrote to another executive that Apple would

5  "force" developers to use its payment system to lock in both iOS App developers and Apple users.

6  That same year, Jobs discussed how to "further lock customers into our ecosystem" and "make

7  Apple['s] ecosystem even more sticky." Three years later, Apple executives were still strategizing

8  how to "get people hooked to the ecosystem."

9       111.    Since then, Apple has repeatedly responded to potential lawful competition by making

10  it harder and more expensive for users of Apple products and iOS App developers to leave the Apple

11  "ecosystem," by, for example, imposing rules and restrictions in its developer agreements (the

12  "Developer Program License Agreement," or "DPLA") and its App Store guidelines (the "App

13  Guidelines"). All iOS App developers, including Plaintiffs and members of the Classes, must contract

14  with Apple's U.S. entity and enter into the DPLA (and its associated attachments, schedules, and

15  exhibits, as applicable)[4] and agree to the App Guidelines in order to make their iOS Apps available

16  to Apple device users (i.e., consumers), which has allowed Apple to extract higher, supra-competitive

17  fees, thwart innovation, offer a less secure or degraded user experience, and throttle would-be

18  competitors.

19      **A.**    **Apple Monopolizes the Relevant Markets for iOS App Distribution and iOS
20  App Payment Processing.**

21       112.    Apple has monopoly power in the iOS App Distribution Market and iOS App Payment

22  Processing Market.

23       113.    Monopoly power is "the power to control prices or exclude competition." *United*

24  *States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) (quotation marks omitted). "[A] firm is a

25  monopolist if it can profitably raise prices substantially above the competitive level," *United States*

26

---

27  [4] Apple Inc., *Agreements and Guidelines for Apple Developers*, available at: https://developer.apple
.com/support/terms/. Upon information and belief, Apple's DPLA may previously have been called
28  the "iPhone Developer Program License Agreement."

*v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 1995), "without inducing so rapid and great an expansion of output from competing firms as to make the supracompetitive price untenable," *Harrison Aire, Inc. v. Aerostar Int'l Inc.*, 423 F.3d 374, 380 (3d Cir. 2005) (internal quotation marks omitted).

114.    Apple has extraordinary power both to control prices and to exclude competition from the iOS App Distribution and iOS App Payment Processing Markets.

### 1. *Apple Exercises Control Over Its Commission Prices Unconstrained by Competition.*

115.    Since the launch of the App Store, Apple has had complete control over the commission it charges developers and can set that commission essentially unconstrained by competition.

116.    In 2008, when Apple first launched the App Store, it set a 30% commission on sales of iOS apps through the App Store. At that time, Steve Jobs stated publicly that the 30% commission was intended to "pay for running the App Store," that Apple "do[es]n't intend to make money off the App Store," and that it would be "giving all the money to the developers." As this Court found, however, Apple had actually set the 30% commission "without regard to or analysis of the costs to run the App Store." *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 947 (N.D. Cal. 2021).

117.    When the App Store was first launched, developers were free to sell digital content and subscriptions within their apps themselves or using payment processors of their own choosing. In 2009, however, Apple imposed the requirement that in-app purchases of digital content be handled through IAP, subject to Apple's 30% commission. And in 2011, Apple imposed the requirement that developers who sold in-app subscriptions would also need to use IAP and pay Apple a 30% commission. Apple imposed these price increases unconstrained by competitive pressure and again without regard to or analysis of any costs Apple incurred.

118.    In 2011, the Apple executive responsible for marketing the iPhone, Phil Schiller, stated that he did not think "that 70/30 will last that unchanged forever" because "someday we will see enough challenge from another platform or web based solutions to want to adjust our model." At that time, App Store profits exceeded $1 billion annually, leading Mr. Schiller to ask, "is that enough to

then think about a model where we rachet down from 70/30 to 75/25 or even 80/20" while preserving the "$1B a year run rate." Apple, however, determined not to "rachet down" its commissions. And in the years since, as a result of its anticompetitive conduct, Apple has not seen "enough challenge" from competition "to want to adjust its model" in any substantial respect.

119.    As a result of its unconstrained pricing power, Apple has enjoyed operating margins tied to the App Store that are extraordinarily high—in excess of 70%. Apple's high profitability in this regard strongly demonstrates market power.

120.    When Apple reduced commissions for small businesses, it did so not as a result of competitive pressure, but instead with potential legal exposure in mind. More specifically, during the COVID-19 pandemic, as part of its "Small Business Program," Apple reduced its commission to 15% for developers making less than $1 million. Apple's CEO Tim Cook acknowledged that Apple did not launch this program as a response to competitive pressure from Google and that "lawsuits and all the rest of the stuff." were "in the back of [his] head" at the time this program was implemented.

121.    Similarly, competition in the sale of mobile devices does not constrain Apple's power in the iOS App Distribution Market—not only because Apple has market power in the U.S. Smartphone/Smartphone OS Market but also because iOS device users face substantial switching costs and are locked into the iOS ecosystem. Further, regardless of competition in the sale of mobile devices, competition at the smartphone level would not constrain Apple's power in the iOS App Distribution Market because consumers cannot adequately account for and therefore constrain Apple's anticompetitive conduct through their purchasing behavior.

122.    App developers cannot constrain Apple's anticompetitive conduct in the iOS App Distribution or iOS App Payment Processing Markets by declining to develop apps for iOS. If a developer does not develop apps for iOS, the developer must forgo all of the one billion plus iOS users. Developing apps for iOS is not reasonably interchangeable with the development of apps for other platforms, like the Android platform.

AMENDED CONSOLIDATED
CLASS ACTION COMPLAINT

CASE NO. 3:25-cv-4438-YGR

### 2. Apple Has Complete Power to Exclude Competition from the iOS App Distribution and iOS App Payment Processing Markets.

123.    Apple enjoys essentially complete power to exclude competition from the iOS App Distribution and iOS App Payment Processing Markets.

124.    Apple's systematic anticompetitive conduct has already successfully excluded numerous actual and potential competitors from both the iOS App Distribution and iOS App Payment Processing Markets. These exclusions demonstrate the effectiveness of Apple's monopolization scheme and the substantial harm to competition that has resulted from Apple's illegal practices.

125.    **Cydia and Alternative App Stores:** Cydia was one of the earliest and most prominent alternative app stores for iOS devices, serving users who had "jailbroken" their devices to circumvent Apple's restrictions. At its peak, Cydia had millions of users and thousands of applications unavailable on Apple's App Store. Apple systematically undermined Cydia through increasingly sophisticated technological restrictions in iOS updates, making jailbreaking more difficult and unstable with each new version. By 2019–2020, Apple's technical countermeasures had effectively eliminated Cydia as a viable competitor.

126.    **AltStore and Direct Distribution:** AltStore represented a novel approach to iOS app distribution that attempted to work within Apple's technical restrictions while providing an alternative to the App Store. Launched in 2019, AltStore allowed users to install apps directly from the internet without jailbreaking their devices. Apple quickly responded by modifying iOS to prevent AltStore from functioning, implementing specific technical countermeasures that rendered the service inoperable within months of its launch.

127.    **Web-Based App Platforms:** Multiple companies attempted to create web-based application platforms that could deliver app-like experiences through Safari and other iOS browsers, effectively bypassing Apple's App Store entirely. These platforms, including efforts by companies like PhoneGap, Sencha, and others, were systematically undermined by Apple's restrictions on browser capabilities, limitations on web app installation, and deliberate degradation of web app performance compared to native apps.

128.    **Streaming Game Platforms as Distribution Channels:** Cloud gaming services like Google Stadia, Microsoft xCloud, Amazon Luna, and others represented potential alternative distribution channels for iOS applications, particularly games. Apple systematically excluded these services by imposing requirements that each individual game be submitted for separate App Store review, making it infeasible for these platforms to operate on iOS. These services continue to thrive on other platforms but remain effectively excluded from iOS.

129.    **Super App Platforms:** WeChat and other potential "super app" platforms could have served as alternative distribution channels for mini-programs and sub-applications. While Apple made a strategic exception for WeChat due to its importance in Asian markets, the company has systematically prevented U.S. companies from developing similar super app platforms through restrictive App Store guidelines that prohibit apps from hosting other apps or executable code.

130.    **Traditional Payment Processors:** Established payment processing companies like Square, Stripe, PayPal, and others have been effectively excluded from processing in-app payments on iOS despite having superior technology, lower fees, and better fraud protection than Apple's IAP system. These companies can process payments only for physical goods or services, not digital content, creating an artificial market division that serves no consumer benefit.

131.    **Cryptocurrency and Digital Payment Platforms:** Companies developing cryptocurrency payment systems, digital wallets, and alternative payment technologies have been systematically excluded from iOS in-app payment processing. Platforms like Coinbase, BitPay, and other cryptocurrency payment processors could offer lower fees and innovative payment features but are prohibited from processing digital content purchases within iOS apps.

132.    **Regional and Specialized Payment Methods:** Payment processors specializing in regional payment methods (like Alipay, WeChat Pay, UPI, and others) or specialized payment types (like installment payments, buy-now-pay-later services, and gift card systems) have been excluded from iOS in-app purchases despite offering services that would benefit both developers and consumers in specific markets or use cases.

133. **Developer-Specific Payment Solutions:** Many large app developers have invested in building their own payment processing infrastructure that offers better fraud protection, customer service, and integration with their existing business systems. Companies like Epic Games, Spotify, Netflix, and others have been forced to either use Apple's inferior IAP system or forgo in-app purchases entirely, despite having payment solutions that would provide better user experiences.

134. The exclusion of alternative distribution and payment platforms has created a developer ecosystem that is entirely dependent on Apple's services. This dependency makes it increasingly difficult for new competitors to enter the market because developers lack the expertise, infrastructure, and business relationships necessary to work with alternative platforms.

135. **European Alternative App Stores:** European companies that have developed alternative app distribution platforms in response to regulatory pressure have found their innovations limited to specific jurisdictions due to Apple's refusal to implement meaningful global changes. This geographic limitation reduces the viability of these competitors and prevents them from achieving the scale necessary to provide effective competition.

136. **Asian Super App Prevention:** Despite the success of super app platforms in Asian markets, Apple has systematically prevented the development of similar platforms in the United States through restrictive policies that prohibit the hosting of mini-programs and sub-applications. This has deprived U.S. consumers of innovative app distribution models that have proven successful elsewhere.

137. Apple maintains exclusive control over critical iOS application programming interfaces ("APIs") and system integration points that would be necessary for competing app distribution or payment processing services to function effectively. By refusing to provide competitors with access to these technical resources while using them for its own services, Apple has created insurmountable technical barriers to competition.

138. Apple's control over iOS security certificates and code signing processes provides it with the ability to disable competing services at will. It has used this power repeatedly to eliminate competitors and creates an ongoing threat that deters investment in alternative platforms.

AMENDED CONSOLIDATED
CLASS ACTION COMPLAINT

CASE NO. 3:25-cv-4438-YGR

139.    Apple's integration of app distribution and payment processing with iPhone hardware features (like Touch ID, Face ID, and secure enclave) provides its own services with technical advantages that are denied to competitors. This hardware-level exclusion makes it impossible for competitors to offer equivalent functionality even when they have superior software solutions.

140.    Apple's conduct has resulted in nearly 100% market foreclosure in both iOS App Distribution and iOS App Payment Processing. No meaningful competition exists in either market, demonstrating the complete effectiveness of Apple's exclusionary practices.

141.    The exclusion of competitors has prevented innovations in app discovery, distribution efficiency, payment security, user privacy, and user experience that could have benefited both developers and consumers. Markets with healthy competition in these areas show significantly more rapid innovation and lower prices than Apple's monopolized iOS markets.

142.    iOS users have been completely deprived of choice in both app distribution and payment processing, unlike users of other mobile platforms, who can select from multiple competing services. This elimination of choice represents a fundamental market failure caused by Apple's anticompetitive conduct.

143.    Apple's monopoly power in these markets is protected by high barriers to entry, including (a) the required investment to build and maintain an app store, (b) requisite software and algorithms for an app, (c) intellectual property licensing requirements, (d) the scale necessary to achieve cost efficiencies, and (e) Apple's exclusionary and anticompetitive conduct.

**B.    Apple Has Established and Maintained Its Monopolies Through a Long-Running Pattern of Anticompetitive Conduct.**

144.    Apple has used anticompetitive means to establish and maintain its monopolies in the iOS App Distribution and iOS App Payment Processing Markets, including as follows.

145.    First, Apple employs anticompetitive techniques (and, in the United States, leverages its substantial market power) to "lock in" iPhone users and make it extremely costly or impossible to switch out of the Apple ecosystem. Customers are generally unaware of the extent they will be "locked into" the Apple ecosystem at the time when it matters the most: when they purchase their

very first iPhone. This is true even if they owned other Apple products, such as an Apple computer, as the degree of "lock in" to the Apple ecosystem for an iPhone user far exceeds that of an Apple computer. Prior to actually experiencing them, consumers are often unaware of the lifecycle costs of buying into the Apple ecosystem, the restrictions on product choice and app choice, or the control which Apple exerts over app selection and updates—none of which are described in Apple's advertisements for the iPhone. As a result, competition in the Smartphone/Smartphone OS Market cannot discipline activity in iOS App Distribution and iOS App Payment Processing because, among other reasons, consumers cannot accurately price the lifecycle costs of "buying into" the Apple ecosystem before purchasing their first iPhone.

146.    Second, Apple requires iOS App developers to agree to adhesion contracts that have the intent and effect of foreclosing competition against Apple in the iOS App Distribution and iOS App Payment Processing Markets. If any app developer were to resist those terms, Apple would prevent them from distributing apps to iOS end-users, effectively locking them out of the market.

147.    Third, this Court found that Apple violated California's UCL by "act[ing] anticompetitively" in certain respects and "'threaten[ing] an incipient violation of an antitrust law' by preventing informed choice among users of the iOS platform." As a result, this Court enjoined Apple from enforcing its anti-steering provisions against app developers. Rather than comply with this Court's order, Apple intentionally violated the injunction and continued its anticompetitive conduct, further injuring app developers.

### 1.    Apple Uses Anticompetitive Techniques to "Lock In" iPhone Users and to Leverage Its Market Power in the U.S. Smartphone/Smartphone OS Markets.

148.    Many iPhone users would readily purchase non-Apple smartphones but often have little or no choice in the matter because they are locked into Apple's "ecosystem." After a customer has purchased their first iPhone, Apple makes it extremely difficult for that customer to ever exit the Apple "ecosystem" in the future by, e.g., switching to an Android device when their iPhone eventually becomes obsolete.

149.    This is by design. In 2010, in a company email, Steve Jobs announced Apple's strategy for 2011, dubbed "Year of the Cloud": Apple would "tie all of our products together, so we further

1    lock customers into our ecosystem." In 2013, executives at Apple suggested that "[g]etting customers

2    using our stores . . . is one of the best things we can do to get people hooked to the ecosystem. The

3    more people use our stores the more likely they are to buy additional Apple products and upgrade to

4    the latest versions. Who's going to buy a Samsung phone if they have apps, movies, etc already

5    purchased? They now need to spend hundreds more to get to where they are today."

6        150.    Apple's restraints have limited the flow of information to users, creating significant

7    information costs that prevent users from determining accurate lifecycle pricing of Apple's

8    ecosystem. Users also lack the ability to attribute costs to the platform versus the developer. Further,

9    consumers lack information regarding device repair costs, possible future needs of iOS Apps they are

10    not even aware of, much less downloaded or used, and the inevitable costs of replacing their iPhones

11    when they become obsolete.

12        151.    **Lack of knowledge.** Consumers are generally unaware of Apple's iOS App

13    distribution restrictions and iOS App payment processing restrictions when they initially purchase

14    iOS devices. Consumers purchasing iPhones are not party to the DPLA or App Guidelines. Rather,

15    the restrictions therein are enforced against app developers. Consumers are not informed of the terms

16    of the DPLA or App Guidelines before making their first iPhone purchase. Further, Apple's iOS App

17    distribution and payment processing restrictions are not described in Apple's advertising, are not

18    otherwise disclosed broadly by Apple to the consuming public, and are significantly more restrictive

19    than those on other smartphones, and even other Apple products, like Apple computers. Consumers

20    also are generally unaware of the efforts Apple has undertaken to ensure that they will be locked into

21    the Apple "ecosystem" after they purchase their first iPhone and are similarly unaware as a general

22    matter of the ways that Apple enforces its iOS app distribution and iOS App payment processing

23    restrictions against developers (and makes those enforcement efforts known to developers, but not

24    smartphone-buying consumers). In addition, the vast majority of consumers in the

25    Smartphone/Smartphone OS Market are unsophisticated individual buyers rather than sophisticated

26    enterprises and thus are unlikely to conduct extensive research regarding Apple's restrictive policies

27    before purchasing their first iPhone. Even if some consumers are aware that the App Store comes

28

predownloaded on the iPhone and is generally used to download apps before they buy their first iPhone, consumers are not generally aware that they will be precluded from using alternative sources for app distribution and payment services. Indeed, other apps such as Apple Maps and Apple Mail come pre-downloaded, but users can still download alternative options. In addition, as discussed below, Apple uses several tactics to steer consumers away from using alternative payment processing means and to block the ability of developers to communicate the existence of alternative payment processing options to consumers. Consumers thus are likely misled into thinking their ability to use alternative payment processing means is not being restricted.

152.    **Information costs.** At the time they purchase their first iPhone (and any subsequent iPhones), consumers face significant information costs preventing them from accurately accounting for the increased lifecycle costs attributable to Apple's monopoly power in the iOS App Distribution and iOS App Payment Processing Markets. To accurately measure lifecycle price, consumers would need to compile extensive pricing data regarding Apple's apps and app payment services and be able to estimate which and how many apps, app subscriptions, and in-app products or services they intend to purchase. Even if consumers were able to accurately assess these costs, significant time and effort is required to engage in such a pricing analysis, making it unlikely consumers do so, particularly considering the vast majority of consumers purchasing smartphones are unsophisticated individuals. Moreover, when a user purchases an iOS App or makes an in-app purchase, Apple displays the "all-in" price to the consumer without a "breakdown" showing the commission it is charging for that transaction. That makes it even more difficult for consumers to account for the increased lifecycle costs resulting from Apple's monopoly power.

153.    **Switching costs.** There are significant monetary and non-monetary switching costs associated with moving from the Apple ecosystem to another platform, including loss of data such as contacts, pictures, and apps; financial costs; opportunity costs of using iOS; social costs, particularly with young adults; procedural costs; and psychological costs. For example, consumers wanting to switch from the iPhone to another smartphone would have to learn a new operating system, which takes time and effort. Apple uses a variety of anticompetitive techniques to lock its customers into

the Apple "ecosystem" in this manner. Many of those techniques leverage network effects to increase the cost of switching.

154.    Additionally, as part of its "ecosystem," Apple makes it very easy for iPhone users to place their digital life on Apple servers but then difficult to remove it once there. For example, one's photos and videos, music collection, and message histories with loved ones, friends, and business connections are tied to Apple's servers—making it extraordinarily difficult (if not impossible) for iOS device users to take those digital items with them if they want to consider switching to a non-iPhone smartphone. These monetary and non-monetary switching costs make consumers less sensitive to Apple's supra-competitive prices in the markets for iOS App Distribution and iOS App Payment Processing. Data confirms that consumers are unlikely to switch their smartphone brand once they buy an iPhone. For example, one 2021 study found that over 90% of new iPhone purchases are made by consumers whose previous smartphone was an iPhone.

155.    **Purposeful compatibility issues.** Apple amplifies these anticompetitive lock-in effects by strictly controlling how third-party application developers can interact with Apple's products and services through Apple's APIs. Apple readily makes sure its own products (e.g., the iPhone) have full, unfettered access to other Apple services, like iCloud Photos. But when it comes to third-party developers, Apple imposes strict and arbitrary limits about which functionality those developers can access and on what terms. This conduct further increases switching costs for consumers, and further cements Apple's market power.

156.    Apple also closely integrates its own non-smartphone devices with iOS while making it difficult for many other device manufacturers' products to interact with iOS devices. And Apple specifically designs several of its own non-smartphone devices such that they do not work as well (or not at all) with non-Apple smartphones. For example, the Apple Watch requires an iPhone for initial setup. With each additional Apple product a consumer purchases, the switching costs of purchasing a non-iOS smartphone become greater.

157.    **Self-preferencing.** Apple also furthers and maintains its market power in the relevant markets by self-preferencing its own products and services. This conduct cements the stranglehold

Apple has in the iOS App Distribution Market, because Apple also artificially increases its share of the applications that are distributed within that market and makes it artificially difficult for users to switch away to applications that are competitive with Apple's first-party applications such as Apple Mail—even if those applications are inferior and low quality.

158.    For example, when a user purchases an iPhone, the user is steered to use Apple's default email product, Apple Mail. It is only through a complex labyrinth of settings that a user can change their default email application away from the Apple "Mail" application towards an alternative like Gmail (Google) or Proton Mail (Proton).

159.    At least for email, a user can in theory modify the default setting. On the calendar front the situation is even worse. A user's default calendar is Apple Calendar, and that default cannot be modified. And because calendar and email functionality are closely linked, this competitive harm among calendar applications has related effects in other application types, like email.

160.    Additionally, Apple allows its own first-party applications like Mail and iCloud Drive to engage in continuous background updating and monitoring. When a user takes a new photograph, that photograph might automatically be stored in iCloud Drive due to Apple's passive background monitoring. Third-party applications like Proton's cannot access this functionality, even if the user would like those third-party applications to engage in such monitoring. Again, this creates an uneven playing field and tilts the competitive landscape in Apple's direction.

161.    Finally, Apple grants access to certain functionality and features to its first-party applications that it denies to third-party applications. Apple's first-party password manager, Keychain can (1) autofill credit card information, (2) autofill contact information, (3) provide "hide my email" functionality when the user is about to provide their email address, (4) provide password generation when a website/app asks for a password, and (5) autosave logins. Proton's products have been denied such functionality, again artificially tilting the playing field in Apple's favor.

162.    At bottom, this self-preferencing conduct shores up Apple's monopoly power in distribution. A potential distribution rival would need to compete not only against Apple's App Store but also against inertia. The potential rival would be able to distribute rival applications for Apple's

services such as Proton Mail only by convincing the user to take affirmative technical steps to abandon the "default" applications on their device in favor of competitive options. And the rival would face further roadblocks because a rival application would need to not only compete on the merits against Apple's offering but also convince the user to take additional complex steps to enable the rival application.

163.    **Family plans.** Apple reinforces its lock-in through family plans and family sharing whereby family members can share subscriptions, track locations and finances, and more, when all family members are iPhone users.

164.    **Exclusion of super apps.** Apple has illegally reinforced its monopoly power via its battle against "super apps." A super app is an app that can serve as a platform for smaller "mini" programs developed using programming languages such as HTML5 and JavaScript. By using programming languages that are standard in most web pages, mini programs are cross-platform, meaning they work the same on any web browser and on any device. Developers therefore can write a single mini program that works whether users have an iPhone or another smartphone.

165.    For years, Apple denied its users access to super apps because it viewed them as "fundamentally disruptive" to "existing app distribution and development paradigms"—and ultimately Apple's monopoly power. Apple feared super apps because their popularity reduces demand for iPhones. So Apple used its control over app distribution and app creation to effectively prohibit developers from offering super apps instead of competing on the merits.

166.    Super apps can provide significant benefits to users. For example, a super app that incorporates a multitude of mini programs might allow users to easily discover and access a wide variety of content and services without setting up and logging into multiple apps, not unlike how Netflix and Hulu allow users to find and watch thousands of movies and television shows in a single app. As one Apple executive put it, "who doesn't want faster, easier to discover apps that do everything a full app does?"

167.    Super apps also reduce user dependence on the iPhone, including the iOS operating system and Apple's App Store. This is because a super app is a kind of middleware that can host apps,

1    services, and experiences without requiring developers to use the iPhone's APIs or code.

2        168.    As users interact with a super app, they rely less on the smartphone's proprietary

3    software and more on the app itself. Eventually, users become more willing to choose a different

4    smartphone because they can access the same interface, apps, and content they desire on any

5    smartphone where the super app also is present. Moreover, developers can write mini programs that

6    run on the super app without having to write separate apps for iPhones and other smartphones. This

7    lowers barriers to entry for smartphone rivals, decreases Apple's control over third-party developers,

8    and reduces switching costs.

9        169.    Apple recognizes that super apps with mini programs would threaten its monopoly.

10   As one Apple manager put it, allowing super apps to become "the main gateway where people play

11   games, book a car, make payments, etc." would "let the barbarians in at the gate." Why? Because

12   when a super app offers popular mini programs, "iOS stickiness goes down."

13       170.    Apple's fear of super apps is based on first-hand experience with enormously popular

14   super apps in Asia. Apple does not want U.S. companies or U.S. users to benefit from similar

15   innovations. For example, in a Board of Directors presentation, Apple highlighted the

16   "[u]ndifferentiated user experience on [a] super platform" as a "major headwind" to growing iPhone

17   sales in countries with popular super apps due to the "[l]ow stickiness" and "[l]ow switching cost."

18   For the same reasons, a super app created by a U.S. company would pose a similar threat to Apple's

19   smartphone dominance in the United States. Apple noted as a risk in 2017 that a potential super app

20   created by a specific U.S. company would "replace[] usage of native OS and apps resulting in

21   commoditization of smartphone hardware."

22       171.    Apple did not respond to the risk that super apps might disrupt its monopoly by

23   innovating. Instead, Apple exerted its control over app distribution to stifle others' innovation. Apple

24   created, strategically broadened, and aggressively enforced its App Store Guidelines to effectively

25   block apps from hosting mini programs. Apple's conduct disincentivized investments in mini

26   program development and caused U.S. companies to abandon or limit support for the technology in

27   the United States.

28

AMENDED CONSOLIDATED                                          CASE NO. 3:25-cv-4438-YGR
CLASS ACTION COMPLAINT

172.     In particular, part of what makes super apps valuable to consumers is that finding and using mini programs is easier than using an app store and navigating many separate apps, passwords, and set-up processes. Instead of making mini program discovery easy for users, however, Apple made it nearly impossible.

173.     Since at least 2017, Apple has arbitrarily imposed exclusionary requirements that unnecessarily and unjustifiably restrict mini programs and super apps. For example, Apple required apps in the United States to display mini programs using a flat, text-only list of mini programs. Apple banned displaying mini programs with icons or tiles, such as descriptive pictures of the content or service offered by the mini program. Apple also banned apps from categorizing mini programs, such as by displaying recently played games or more games by the same developer. These restrictions throttle the popularity of mini programs and ultimately make the iPhone worse because it discourages developers from creating apps and other content that would be attractive to iPhone users. Apple also selectively enforced its contractual rules with developers to prevent developers from monetizing mini programs, hurting both users and developers. For example, Apple blocked mini programs from accessing the APIs needed to implement Apple's IAP system—even if developers were willing to pay Apple's monopoly tax. Apple also blocked the ability of super app developers to use in-app payment methods other than IAP. For instance, super apps could create a virtual currency for consumers to use in mini programs, but Apple blocked this too. Apple, however, allows other, less-threatening apps to do so.

174.     **Exclusion of cloud streaming apps.** Much like the company's treatment of super apps, Apple blocked cloud streaming apps that would have given users access to desirable apps and content without needing to pay for expensive Apple hardware because such apps would threaten its monopoly power. In Apple's own words, it feared a world where "all that matters is who has the cheapest hardware" and consumers could "buy[] a[n] [expletive] Android for 25 bux at a garage sale and . . . have a solid cloud computing device" that "works fine."

175.     Cloud streaming apps let users run a computationally intensive program without having to process or store the program on the smartphone itself. Instead, a user's smartphone

leverages the computing power of a remote server, which runs the program and streams the result back to the phone. Cloud streaming allows developers to bring cutting-edge technologies and services to smartphone consumers—including gaming and interactive artificial intelligence services—even if their smartphone includes hardware that is less powerful than an iPhone.

176.    Apple's conduct made its own product worse because consumers missed out on apps and content. This conduct also cost Apple substantial revenues from third-party developers. At the same time, Apple also made other smartphones worse by stifling the growth of these cross-platform, cloud streaming apps on other smartphones. Importantly, Apple prevented the emergence of technologies that could lower the price that consumers pay for iPhones.

177.    Cloud streaming has significant benefits for users. For example, Apple has promoted the iPhone 15 by promising that its hardware is powerful enough to enable "next-level performance and mobile gaming." But powerful hardware is unnecessary if games are played via cloud streaming apps. For a cloud game, the user experiences and plays the game on the smartphone, but the game is run by hardware and software in remote computing centers ("the cloud"). Thus, cloud gaming apps deliver rich gaming experiences on smartphones without the need for users to purchase powerful, expensive hardware. As a result, users with access to cloud-streamed games may be more willing to switch from an iPhone to a smartphone with less powerful (and expensive) hardware because both smartphones can run desirable games equally well.

178.    Cloud streaming also has significant advantages for developers. For example, instead of re-writing the same game for multiple OSes, cloud platforms can act as middleware that allow developers to create a single app that works across iOS, Android, and other OSes. Cloud streaming provides more and simpler options for offering subscriptions, collecting payments, and distributing software updates as well. All of this helps game developers reach economies of scale and profitability they might not achieve without offering cloud gaming apps and reduces their dependence on iOS and Apple's App Store.

179.    Apple wields its power over app distribution to effectively prevent third-party developers from offering cloud gaming subscription services as a native app on the iPhone. Even today, none are currently available on the iPhone.

180.    For years, Apple imposed the onerous requirement that any cloud streaming game—or any update to a cloud streaming game—be submitted as a stand-alone app for approval by Apple. Having to submit individual cloud streaming games for review by Apple increased the cost of releasing games on the iPhone and limited the number of games a developer could make available to iPhone users. For example, the highest quality games, referred to as AAA games, typically require daily or even hourly updates across different platforms. If these updates need to be individually approved by Apple, developers must either delay their software updates across all platforms or only update their games on non-iOS platforms, potentially making the iOS version of the game incompatible with other versions on other platforms until Apple approves the update. Neither option is tenable for game players or developers.

181.    Until recently, Apple would have required users to download cloud streaming software separately for each individual game, install identical app updates for each game individually, and make repeated trips to Apple's App Store to find and download games. Apple's conduct made cloud streaming apps so unattractive to users that no developer designed one for the iPhone.

182.    Apple undermines cloud gaming apps in other ways too, such as by requiring cloud games to use Apple's proprietary payment system and necessitating game overhauls and payment redesigns specifically for the iPhone. Apple's rules and restrictions effectively force developers to create a separate iOS-specific version of their app instead of creating a single cloud-based version that is compatible with several OSes, including iOS. As a result, developers expend considerable time and resources re-engineering apps to bring cross-platform apps like multiplayer games to the iPhone. Broadly speaking, cloud streaming apps—not just cloud gaming apps—could force Apple to compete more vigorously against rivals. As one Apple manager recognized, cloud streaming eliminates "a big reason for high-performance local compute" and thus eliminates one of the iPhone's advantages over other smartphones because then "all that matters is who has the cheapest hardware." Accordingly,

cloud streaming reduces the need for users to buy expensive phones with advanced hardware. This problem does not "stop at high-end gaming" but applies to "a number of high-compute requirement applications."

183. **Limiting message functionality.** Apple limits the messaging functionality between an iPhone and non-iPhone user, such that special features one can use in iPhone-to-iPhone conversations are unavailable with non-iPhone users relegated to the stigmatizing "green bubble," which Apple applies to non-iPhone users in text message chains. Further, a single non-iPhone user in a group chat will render the entire experience extremely unwieldy and objectively worse, which many commentators note is by design, to prompt iPhone users to encourage their non-iPhone-owning friends and family to buy one.

184. Apple executives recognized that the use of the "green bubble" was an effective mechanism to lock customers into the Apple ecosystem. In 2016, when a former Apple employee commented that "the #1 most difficult [reason] to leave the Apple universe app is iMessage . . . iMessage amounts to serious lock-in" to the Apple ecosystem, Apple executive Phil Schiller commented that "moving iMessage to Android will hurt us more than help us, this email illustrates why."

### 2. *Apple Imposed Anticompetitive Contracts of Adhesion on Developers to Implement and Maintain its Monopoly.*

185. All iOS App developers must contract with Apple's U.S. entity, agree to Apple's DPLA, and agree to Apple's App Guidelines before they can make their iOS Apps available to Apple device users (i.e., consumers). As this Court recognized, the DPLA is a "contract of adhesion." Pursuant to the DPLA and the App Guidelines, Apple restricts iOS App developers from distributing and selling their iOS Apps using any app distribution or any IAPs that compete with Apple.

186. More specifically, Apple's DPLA required all iOS App developers to agree, *inter alia*, to create iOS Apps for distribution only through Apple's App Store.

187. Apple's DPLA and applicable schedules also required all iOS App developers to configure their iOS Apps to use only Apple's in-house iOS IAPs (if the developer wished to charge

AMENDED CONSOLIDATED
CLASS ACTION COMPLAINT

1    for its iOS Apps), and to pay a "commission" (i.e., a processing or transaction fee) to Apple for each

2    payment processed through Apple's in-house iOS IAPs.

3         188.    Apple's App Guidelines required iOS App developers to use Apple's in-house iOS

4    App payment processing services in order to "unlock features or functionality" within their iOS Apps.

5    Specifically, the App Guidelines provide as follows:

> *If you want to unlock features or functionality within your*
> *app . . . you must use in-app purchase*. Apps may not use their own
> mechanisms to unlock content or functionality . . . .

8         189.    Apple thus forced iOS App developers that used its iOS App distribution services to

9    also use its iOS IAPs to the exclusion of other potential iOS App payment processing services, thereby

10   linking the two services and locking iOS App developers into Apple's ecosystem. Although the

11   Second Injunction effectively directs Apple to disconnect these two services, Apple has appealed it

12   to the Ninth Circuit.

13        190.    Also, before the First Injunction was issued, Apple used contractual anti-steering

14   restrictions to block the ability of iOS App developers to communicate with Apple device users—

15   both within and outside of the developer's iOS App—about alternatives to Apple's iOS App

16   distribution and iOS App payment processing services. In so doing, Apple "enforced silence to control

17   information and actively impeded users from obtaining the knowledge to obtain digital goods on other

18   platforms."

19        191.    Specifically, Apple's App Guidelines provided, "Apps and their metadata may not

20   include buttons, external links, or other calls to action that direct customers to purchasing mechanisms

21   other than in-app purchase."

22        192.    Apple's App Guidelines also provided that iOS App developers could not, "either

23   through communications sent to points of contact obtained from account registration within the app

24   (like email or text)[,] encourage users to use a purchasing method other than an in-app purchase."

25        193.    Remarking on Apple's interference with the relationship between iOS App developers

26   and Apple device users, one iOS App developer noted as follows:

27

28

AMENDED CONSOLIDATED                      42                    CASE NO. 3:25-cv-4438-YGR
CLASS ACTION COMPLAINT

> Most people don't know what happens to your customer relationship when you're forced to accept In App Payments or offer subscriptions in Apple's App Store.
>
> 1. When someone signs up for your product in the App Store, they aren't technically your customer anymore - they are essentially Apple's customer. They pay Apple, and Apple then pays you. So that customer you've spent years of time, treasure, and reputation earning, is handed over to Apple. And you have to pay Apple 30% for the privilege of doing so!
>
> 2. You can no longer help the customer who's buying your product with the following requests: Refunds, credit card changes, discounts, trial extensions, hardship exceptions, comps, partial payments, non-profit discounts, educational discounts, downtime credits, tax exceptions, etc.

194.    This Court has already concluded that, in implementing and enforcing these anti-steering restrictions, Apple (a) "act[ed] anticompetitively" and for its own "unrestrained gain," (b) "violate[d] the 'policy [and] spirit' of the[] laws because anti-steering has the effect of preventing substitution among platforms for transactions," and (c) "'threaten[ed] an incipient violation of an antitrust law' by preventing informed choice among users of the iOS platform" in violation of California's UCL.

195.    This Court has already concluded that Apple's anti-steering provisions extended to all iOS Apps. Again, however, Apple has appealed this decision to the Ninth Circuit.

196.    In addition, before the First Injunction was issued, Apple imposed anticompetitive "commissions" (i.e., transaction or processing fees) on iOS App developers for iOS Apps sold through Apple's App Store.

197.    Section 3.4 of Schedule 2 of the DPLA provided that Apple earned a "commission" of 30% on every iOS App purchased using Apple's iOS App distribution and payment processing services (which, again, iOS App developers had no choice but to use).

198.    Apple instituted this 30% commission decades ago with the launch of the App Store.

199.    Apple determined to charge a 30% "commission" "without regard to or analysis of the costs to run the App Store," untethered from any economic or competitive factors that might normally drive commission rates.

200.    Apple's 30% commission created an "extraordinarily high" operating margin for Apple of more than 75%.

201.   This Court has already concluded that Apple's 30% "commission" was supra-competitive, and that "Apple's maintenance of its [supra-competitive] commission rate stem[med] from market power, not competition." Only recently has Apple changed its commission rate, applicable only to a subset of iOS App developers. Specifically, Apple dropped the "commission" rate from 30% to 15% in just three circumstances: (a) for participants in its Video Partner Program and News Partner Program; (b) with respect to subscriptions sold in-App, via Apple's IAPs, and that are in place for longer than a year; and (c) for sales by developers who qualify for its Small Business Program. Otherwise, the higher, supra-competitive "commission" rates apply.

202.   Notably, Apple CEO Tim Cook confirmed in testimony in Epic Games that these "commission" changes were not due to competition because Apple had none:

| | |
|---|---|
| **The Court**: | The issue with the $1 million Small Business Program, at least from what I've seen thus far: that really wasn't the result of competition. That seemed to be a result of the pressure that you're feeling from investigations, from lawsuits, not competition. |
| **Mr. Cook**: | It was the result of feeling like we should do something from a COVID point of view, and then electing to instead of doing something very temporary, to do something permanent. And of course we had the lawsuits and all the rest of the stuff in the back of our head, but the thing that triggered it was, we were very worried about small business. |
| **The Court**: | Okay, but it wasn't competition. |
| **Mr. Cook**: | It was competition after we did ours to 15, it was competition that made Google drop theirs to 15. |
| **The Court**: | I understand perhaps that when Google changed its price, but your action wasn't the result of competition. |
| **Mr. Cook**: | It was the result of feeling like we should do something for small business, which in our . . . vernacular is small developer. |

203.    Indeed, the Epic Games court put it succinctly: "[T]he 30 percent number has been there since the inception . . . [a]nd if there was real competition, that number would move, and it hasn't."

### 3.    *Apple's Intentional Violation of the Epic Games Injunction.*

204.    Following the bench trial in Epic Games, the Court found that Apple violated California's UCL via its anti-steering provisions and entered an injunction enjoining Apple from enforcing its anti-steering restrictions against developers.

205.    Specifically, on September 10, 2021, the Court issued the First Injunction, which barred Apple from "prohibiting developers from (i) including in their apps and their metadata buttons, external links, or other calls to action that direct customers to purchasing mechanisms, in addition to In-App Purchasing and (ii) communicating with customers through points of contact obtained voluntarily from customers through account registration within the app."

206.    The Court rejected Apple's argument that the Injunction should only apply to Epic and its affiliates, reasoning that the First Injunction prohibits "Apple's [anti-]steering provision as to all iOS developers because doing so was necessary to fully remedy the harm that Epic suffers in its role as a competing games distributor."

207.    On April 24, 2023, the Ninth Circuit affirmed the Court's First Injunction, and on January 16, 2024, the United States Supreme Court denied Apple's petition for certiorari.

208.    That same day, Apple filed its notice of compliance with the First Injunction with this Court. In relevant part, that notice states that Apple's changes apply to "developers with apps on the iOS or iPadOS App Store U.S. storefronts."

209.    Apple's purported "compliance" program was anything but. It introduced entirely new anticompetitive practices, such as a 27% commission fee, link design and placement restrictions, and new warning screens to deter user utilization of linked purchases. These new anticompetitive restrictions violated not only the Injunction but the Sherman Act, California's UCL, and Korean law.

### a. *Apple's Violations of the First Injunction and Continued Anticompetitive Conduct.*

210.    On March 13, 2024, Epic Games moved to hold Apple in contempt and to enforce the Injunction, arguing that Apple violated the Injunction by, *inter alia*: (1) imposing new fees when using alternative in-app payment methods; (2) enacting design restrictions on the format of the links and where links can be provided in the app; and (3) introducing scare screens informing users of security concerns with link use and noting that users are responsible for any resulting damage.

211.    On April 23, 2024, the Court scheduled an evidentiary hearing, noting that Epic had made a preliminary showing that "Apple's practice changes undermine the spirit of the injunction by limiting competition, impeding the free flow of information, and constraining user choice."

212.    On April 30, 2025, following an evidentiary hearing that spanned multiple days in May 2024 and February 2025, as described above, the Court issued its Second Injunction, held Apple in civil contempt, and referred Apple and its Vice President of Finance to the U.S. Attorney for the Northern District of California for evaluation of criminal contempt.

213.    The Court found that Apple chose to "comply" with the First Injunction with a new suite of anticompetitive conduct. Apple imposed "(A) a 27% commission on link-out purchases, (B) new external purchase link placement and design restrictions, (C) requirements that induce purchase-flow friction, (D) limitations on developers' ability to use calls to action, and (E) exclusion[s] of certain programs utilized by large developers from the Link Entitlement."

214.    As set forth in greater detail below, the evidence adduced in the evidentiary hearing showcased Apple's unlawful maintenance of its monopoly in the iOS App Distribution Market and the iOS App Payment Processing Market.

### b. *Apple's Anticompetitive 27% Commission on Linked Purchases.*

215.    In response to the First Injunction, Apple instituted a policy of demanding 27% commission on both (a) iOS App transactions taking place via an external website immediately after exiting the iOS ecosystem, and (b) iOS App transactions taking place on the external website within seven days of the iOS user exiting Apple's "ecosystem."

216.    For example, in a May 18, 2023 meeting, Apple's executives discussed at least two options for compliance with the First Injunction: (1) including no commissions but restricting the placement and appearance of links in the purchase flow, or (2) allowing placement of links anywhere, but imposing a 27% commission on linked purchases.

217.    In considering these proposals, Carson Oliver, Apple's Senior Director of Business Management for the App Store, recognized that a no-commission model would "be very attractive to developers," "cause a lot of developers to adopt the link[-]out options" and "would create competitive pressure on IAP," which "would drive . . . spend outside of the app."

218.    Thus, under a no-commission model, Apple believed that "most large developers and potentially many medium and small developers would offer link-out purchases to their users," causing an estimated revenue impact of hundreds of millions to billions. In contrast, Apple anticipated that implementing a 27% commission on linked purchases "at most, may only be attractive to the largest developers" with a potential revenue impact of tens of millions.

219.    The evidence shows that Apple ultimately chose "the most anticompetitive option: a link entitlement program that included both the placement restrictions of Proposal 1 and the 27% commission . . . ." As the Court noted, "Apple estimated . . . that as of May 2023 the revenue impact of a no-commission option with placement restrictions (Proposal 1) posed a significantly larger hit to Apple than the impact of a 27% commission option without placement restrictions (Proposal 2)."

220.    As a further example, Apple's internal studies recognized that the external cost of payment processing for linked purchases would exceed the 3% discount from its standard 30% rate. One Apple presentation noted that "we believe there would be very little developer adoption of link-out, assuming a scenario where we would give a cost of payments discount at 3%." Another presentation explained that "[d]evelopers will claim that a small discount will not provide enough margin to compete on price."

221.    Kunnal Vij, Apple's Senior Manager of Finance at Apple Services, testified that based on Apple's analysis, the 27% fee rendered every linked transaction more expensive than if a developer

1  were to use Apple's payment system and pay its standard 30% rate, a rate the Ninth Circuit previously

2  determined to be anticompetitive.

3      222.    This new, post-Injunction practice illegally restrained competition in the markets for

4  iOS App Distribution and iOS App Payment Processing. As the Court concluded, Apple had the

5  "knowledge and expectation that the restrictions would effectively dissuade any real developer

6  participation, to Apple's economic advantage."

7          ***c.  Apple's Anticompetitive Link Design & Placement Requirements.***

8      223.    Also in response to the First Injunction, Apple instituted new policies that limited iOS

9  App developers' placement and design of links that would direct would-be consumers to non-Apple

10 distribution and payment processing services.

11     224.    Specifically, Apple implemented a "Link Entitlement" program that dictated that an

12 external link may "[n]ot be displayed on any page that is part of an in-app flow to merchandise or

13 initiate a purchase using in-app purchase."

14     225.    Despite Apple's knowledge that the First Injunction required it to provide iOS App

15 developers with the ability to use prompts (e.g., buttons or other calls to action), Apple's "Link

16 Entitlement" program prohibited such buttons and calls to action. Instead, Apple's guidelines allowed

17 only "Plain Button style," which "may not be enclosed in a shape that uses a contrasting background

18 fill," but rather the "background surrounding text must match the background of [the] app's page."

19     226.    A button, on the other hand, is more visually prominent and easier to use. Apple's own

20 witness testified that he could not think of a reason to require developers to use plain-link-style other

21 than to stifle competition.

22     227.    The purpose and effect of Apple's new "Link Entitlement" program was to restrain

23 competition in the iOS App Distribution and iOS App Payment Processing Markets. Specifically, the

24 evidence shows that Apple implemented this policy for the purpose of dissuading users from linked

25 purchases. As Apple put it, "[i]f you want to charge a commission, you have to give them better

26 placement," but "[i]f you don't charge a commission, you need to lock it down to a plain URL link

27 and internet style 'button.'"

28

228.    Indeed, Epic's witness, App developer Ben Simon, testified that the inability to place a link on the same page as Apple's payment method "very much inhibit[ed] our ability to give users a choice in how to subscribe" and was "also likely to lead to user confusion, as it suggest[ed] that the two options are unrelated offerings."

229.    Put differently, Apple recognized that if it did not implement a commission on linked purchases, it needed to implement placement restrictions that would curb competition and protect Apple's supra-competitive profits on iOS App distribution and iOS App payment processing services. Apple's Philip Schiller, an Apple "Fellow," acknowledged that the more restrictions Apple places on the placement, format, and language of the links, the less likely the links would be seen and used. Similarly, the evidence shows that the more restrictions on the format of the links, the lower the revenue impact on Apple would be.

230.    This new, post-First Injunction practice illegally restrained competition in the iOS App Distribution and iOS App Payment Processing Markets. As the Court concluded, this "restriction presents serious problems for developers' ability to compete with Apple's IAP and Apple knew it."

231.    As of the May 2024 hearing in Epic Games, only 34 out of the 136,000 iOS App developers had applied for the Link Entitlement program.

### d. Apple's Anticompetitive Flow Friction Policies.

232.    Also in response to the First Injunction, Apple instituted a new scare screen and a policy to allow iOS App developers to use only static links. Both were done to create "flow friction" for consumers engaged in the iOS App purchase process using a third-party iOS App distribution and/or iOS App payment processing service.

233.    As to the warning screen requirement, Apple, for the first time, demanded that iOS App developers attempting to sell iOS Apps outside the Apple ecosystem display an "[i]n-app system disclosure sheet" when a user linked to a third-party payment provider. This "disclosure sheet" is shown in the below graphic:



234.    The purpose and effect of Apple's new warning screen policy was to restrain competition in the iOS App Distribution and iOS App Payment Processing Markets.

235.    The evidence introduced at the Epic Games evidentiary hearings shows that Apple knew that the more friction it could create in the iOS App purchase flow, the more breakage it would create (i.e., the more likely a user would abandon the linked purchases buy-flow due to it being a less seamless experience than Apple's payment method).

236.    To accomplish its high breakage objective, Apple modeled the specific tipping points at which external links would cease to be advantageous because of friction in the purchase flow and evaluated whether to implement: (1) a link that simply takes a user to the external site; (2) a dialogue screen that generates a small pop-up communicating that the user is leaving the app; and (3) a full sheet screen taking over the entire screen after the user clicks on the external link. Apple chose the most anticompetitive option: the third (full-screen) warning.

237.    Apple also fine-tuned the language in the scare screen to ensure that it would sound "scary." This "scary" language Apple chose included: (a) using the developer's name rather than the App name in the warning screen; (b) using language stating that the user was no longer transacting with Apple; and (c) stating, "Apple is not responsible for the privacy or security of purchases made on the web." Remarking on Apple's use of the "privacy and security" language, Apple's Schiller wrote that it was included because it "tells ppl its dangerous and they are leaving the app store."

238.    And as to the static link requirement, Apple instituted a policy requiring iOS App developers to use only "static" URLs when linking outside of the Apple ecosystem.

239.    The purpose and effect of Apple's new warning screen policy was to restrain competition in the iOS App Distribution and iOS App Payment Processing Markets.

240.    Apple recognized that a static URL introduces friction in the purchase flow (whereas dynamic URLs do not) because, for example, whereas a dynamic URL can identify the user and log that user into their account automatically after clicking the link, a static URL requires a user to log into their account before making the purchase. In addition, static URLs can create user confusion and could cause users to log into, and purchase the product for, a wrong account.

241.    As one Apple User Experience employee explained, "I think personally that is why I wouldn't bother"—"more steps, have to find my card, type it all out. and then giving another company my details."

242.    This new, post-First Injunction practice illegally restrained competition in the iOS App Distribution and iOS App Payment Processing Markets. As the Court explained, "[i]f a developer wanted to compete on price not by offering lower prices but by offering other products or benefits on the web, there is no way to communicate that to a user in-app."

### e.    Apple's Anticompetitive Limitations on Calls to Action.

243.    Also, in response to the First Injunction, Apple instituted a call to action "template" that dictated the precise language iOS App developers could use when advertising cheaper prices for iOS Apps outside the Apple ecosystem.

244.    Specifically, Apple instituted a policy dictating that iOS App developers "must match the [below] template language" in any calls to action:

## Templates

Use the templates that best fits your use case. Aside from the price, percentage off, and your website URL, the language used in your app must match the template language. Don't modify or use the template in a manner that misleads customers.

**Purchase template:**
Purchase from the website at www.example.com ⧉

**Special offer template:**
For special offers, go to www.example.com ⧉
For a special offer, go to www.example.com ⧉

**Lower price template:**
Lower prices offered on www.example.com ⧉
Lower price offered on www.example.com ⧉

**Percent off template:**
To get XX% off, go to www.example.com ⧉

**Specific price template:**
Buy for $X.XX at www.example.com ⧉

245.    The purpose and effect of Apple's new call to action template language was to restrain competition in the iOS App Distribution and iOS App Payment Processing Markets. The evidence introduced at the Epic Games evidentiary hearings established Apple knew "that unlinked and unrestricted calls to action could foster competition against Apple's IAP by causing customer migration to developer websites."

246.    This new, post-First Injunction practice illegally restrained competition in the iOS App Distribution and iOS App Payment Processing Markets. As the Court explained, "[i]f a developer wanted to compete on price not by offering lower prices but by offering other products or benefits on the web, there is no way to communicate that to a user in-app."

### f.    Apple's Anticompetitive Program Exclusions.

247.    Finally, and also in response to the First Injunction, Apple made the reduced commission charged to its Video Partner Program ("VPP") and News Partner Program ("NPP") (15% instead of Apple's usual 30% commission) contingent on these iOS App developers opting not to use

Apple's "Link Entitlement" program. That is, iOS App developers who participated in VPP or NPP and opted to use external purchase links were subject to Apple's standard (supra-competitive) 30% commission.

248.    The purpose and effect of this new exception to the VPP and NPP programs was to restrain competition in the iOS App Distribution and iOS App Payment Processing Markets.

249.    Indeed, Apple internally projected that it would lose more revenue if iOS App developers participating in VPP and NPP were eligible for the Link Entitlement program and that these programs "serve[d] as a tool for retaining developers exclusively on Apple IAP" because losing the programs' benefits and the lower commission rate makes providing external purchase links more costly.

250.    This new, post-First Injunction practice illegally restrained competition in the iOS App Distribution and iOS App Payment Processing Markets. As the Court explained, "Apple knew it was choosing a course which would fail to stimulate any meaningful competition to Apple's IAP and thereby maintain its revenue stream."

### 4.    The Second Injunction.

251.    Finding that Apple's new policies were anticompetitive, the Court, prohibited Apple from (1) "[i]mposing any commission or any fee on purchases that consumers make outside an app, and as a consequence thereof, no reason exists to audit, monitor, track or require developers to report purchases or any other activity that consumers make outside an app"; (2) "[r]estricting or conditioning developers' style, language, formatting, quantity, flow or placement of links for purchases outside an app"; (3) "[p]rohibiting or limiting the use of buttons or other calls to action, or otherwise conditioning the content, style, language, formatting, flow or placement of these devices for purchases outside an app"; (4) "[e]xcluding certain categories of apps and developers from obtaining link access"; (5) "[i]nterfering with consumers' choice to proceed in or out of an app by using anything other than a neutral message apprising users that they are going to a third-party site"; or (6) "[r]estricting a developer's use of dynamic links that bring consumers to a specific product page in a logged-in state

AMENDED CONSOLIDATED
CLASS ACTION COMPLAINT
CASE NO. 3:25-cv-4438-YGR

rather than to a statically defined page, including restricting apps from passing on product details, user details or other information that refers to the user intending to make a purchase."

252.    This order became effective on April 30, 2025.

**C.    The Small App Developer Settlement.**

253.    On June 4, 2019, a putative class action lawsuit was filed in this Court seeking to recover damages arising from Apple's anticompetitive conduct related to iOS on behalf of "[a]ll U.S. developers of any Apple iOS application or in-app product (including subscriptions) sold for a non-zero price via Apple's iOS App Store."

254.    A consolidated complaint was filed in that action on behalf of the same proposed class on September 30, 2019.

255.    On August 24, 2021, the Small App Developer Settlement was reached in that class action on behalf of a class defined, in relevant part, as follows:

> All former or current U.S. developers of any Apple IOS application or in-app product (including subscriptions) sold for a non-zero price via Apple's IOS App Store that earned, through all Associated Developer Accounts, proceeds equal to or less than $1,000,000 through the App Store U.S. storefront in every calendar year in which the U.S. developer had a developer account between June 4, 2015 to the date of the Agreement (August 24, 2021).

256.    Pursuant to that Small App Developer Settlement, members of the settlement class who did not opt-out agreed to release, in relevant part, Apple from the following:

> [A]ny and all past, present, and future claims, actions demands, causes of action, suits debts, obligations, damages, rights and liabilities that were brought, could have been brought, or arise from the same facts underlying the claims asserted in the Action, known or unknown, recognized now or hereafter, existing or preexisting, expected or unexpected, pursuant to any theory of recovery . . . for any type of relief that can be released as a matter of law . . . .

257.    By its plain language, the Small App Developer Settlement does not release (a) U.S.-based App developers who had App Store proceeds of $1,000,000.01 or more in a calendar year; (b) non-U.S. based App developers who received any App Store proceeds; (c) U.S.-based App developers and non-U.S. based App developers' sales through non-U.S. App Store storefronts; or (d) claims based on anticompetitive actions and events that occurred after August 24, 2021.

258.    None of the claims alleged herein, as constrained by the Class Definitions, are precluded or released by the Small App Developer Settlement.

**VII.    APPLE'S ANTICOMPETITIVE CONDUCT HARMS APP DEVELOPERS**

259.    In each of the above scenarios, iOS users are unable to constrain Apple's anticompetitive activities in the iOS App Distribution and iOS App Payment Processing Markets (or aftermarkets) because (a) much of Apple's behavior is behind the scenes and invisible to them; (b) they have little ability to learn about Apple's behavior before they make an iPhone or other iOS device purchase; (c) they become locked into their smartphone or other mobile device purchase at the time of purchase due to the cost, investment, and longevity of the purchase and associated service contract; and (d) they even become more locked into iOS over time, for the reasons previously discussed. Similarly, iOS App developers are unable to constrain Apple's anticompetitive activities because, if they do not accede to its demands, they are unable to sell into the iOS App market at all. Accordingly, Apple's power has only grown over each of the iOS App Distribution and iOS App Payment Processing Markets over time, and both iOS users and developers are less and less able to act as a brake on Apple's power and anticompetitive activities.

260.    Unfortunately, iOS users' and iOS App developers' inabilities to discipline Apple's misbehavior means that Apple can harm them and competitors in myriad, all-too-inevitable ways. As noted above, Apple excludes competitors in the iOS App Distribution and iOS App Payment Processing Markets, which has the effect, first and foremost, of removing constraints on its pricing behavior. This has led to higher prices for both iOS App Distribution and iOS App Payment Processing, including the 30% commission Apple historically charged for all iOS App-related revenues the App Store generates and which it continues to charge for any successful app developer today.[5] Apple's conduct also has reduced market output, reduced market innovation, and plainly

---

[5] Apple's November 18, 2020, reduction to the commission for developers that generate less than $1 million in proceeds annually does not undercut this fact. Such developers represent only 5% of the App Store's annual revenues, and they become subject to the higher 30% commission if they are lucky enough to grow. They cannot escape either commission, and cannot use competition to push back against the prices Apple charges. Put in its simplest terms, the recent commission reduction was a public relations move made in response to ever-increasing regulatory scrutiny and a growing recognition that Apple has acted anticompetitively for years. It does not remedy the fundamental problems created by Apple's continuing and historic illegal, monopolistic conduct.

reduced both iOS App developer and iOS user choice, despite obvious demand for competition to both the App Store and Apple's iOS App payment processing services. These negative competitive effects impact developers and end users directly, because Apple can offer lower-quality products at supra-competitive prices with impunity and without fear that doing so will cause it to lose market share or power. These anticompetitive effects are discussed in further details below.

261.    As a result of its anticompetitive conduct, Apple also can pile on additional unnecessary fees, because iOS App developers cannot fight back. One example is a $99 annual fee Apple collects from all developers who wish to sell their products through the App Store. In June 2017, Apple introduced Rule 4.2.6 into the App Store guidelines which gave it the right to ban any apps that share a code base or template with another app. The rule was subsequently revised in December 2017 so that template apps could be submitted to the App Store again. In this context, Apple made an important change: to successfully submit apps, developers must create a new developer account for each client app—meaning each account required the developer to pay a separate $99 annual fee for each business. Had Apple not illegally restrained trade and/or monopolized the iOS App Distribution Market, developers would not have had to pay such an annual fee, or Apple would have had to compete on price for the fee with other competitors.

262.    Apple also dictates minimum and greater price points, which prevent developers from offering paid products at less than $0.99 or at price points ending in anything other than $0.99. This pricing mandate inhibits sales and output in app and in-app transactions. There is no lawful justification for this transaction-inhibiting restraint, and, again, faced with competition from alternative distribution channels, Apple would have had to compete to allow more flexibility in pricing for iOS Apps.

263.    Further underscoring that Apple's pricing for the App Store and its iOS App payment processing services have no legitimate procompetitive justifications, other mobile device ecosystem providers that also provide a marketplace for apps for their mobile OSes act in far less restrictive, yet equally effective, ways to attract developers to their mobile platforms. For example, Microsoft announced at its Build 2018 conference its new revenue sharing model for app sales in the Microsoft

Store where up to 95% of the revenue from consumer applications, including both individual applications and in-app purchases, would go to the developer. The Microsoft rates contrast with Apple's supra-competitive 30% rate levied on the vast majority of app and in-app purchases.

264.    Apple's unreasonable restraints on trade and monopolistic practices in the markets (or aftermarkets) for iOS App Distribution and iOS App Payment Processing eliminate competition and stifle innovation and choice. Further, Apple harms consumers, developers, and competition by depressing output. Evidence shows that consumers of app store products are price sensitive. Apple's overly expensive costs, fees, and pricing inhibit sales of products sold via the App Store. Developers and would-be developers, who can earn only 70% on the dollar on each paid app or product—in addition to paying $99 annually (or more for multiple apps) to gain entry to the App Store— undoubtedly think very hard about whether to spend the effort, time, and energy that is required to design and program an app or related product, bring it to market in the single store available, and hope to recoup costs and make a reasonable profit. For many, the calculus makes no economic sense. This process leads to less output in sales and distribution transactions for developers and thus less output in both the iOS App Distribution and iOS App Payment Processing Markets overall.

265.    Apple's anticompetitive behavior also stifles innovation in the market for iOS App Distribution. For example, Amazon.com devised an alternative way of distributing Android OS apps, Amazon Underground, where Amazon pays developers according to how much time consumers spend interacting with the apps. Yet Apple's contracts and practices do not allow iOS App developers to utilize such a model.

266.    As a result of Apple's anticompetitive behavior, iOS App developers must rely on Apple's iOS App Distribution and iOS App Payment Processing systems, which are of lesser quality than the systems of Apple's would-be competitors. For example, Apple's in-app payment solutions have a failure rate multiple times greater than the failure rate of Apple's competitors' payment systems, leading to fewer sales and to worse customer experiences. Further, Apple often withholds from iOS App developers their earned revenues for, on average, 30 to 50 days (and sometimes more than two months), whereas competitor payment platforms remit iOS App developers' revenues in

1   significantly less time (with some platforms, like Stripe, paying all earned revenue within seven days),

2   denying iOS App developers (sometimes) much-needed liquidity. As another example, whereas

3   Apple's in-app payment processing system does not facilitate standard retail payment functionality,

4   like dynamic pricing or multiple simultaneous purchases (e.g., shopping carts), Apple's competitors'

5   payment platforms permit such advanced practices. And though Apple's competitors attempt to

6   compete with Apple on quality by tracking individual customer transactions with detailed receipts,

7   leading to a superior customer experience and facilitating transaction-level reconciliation and

8   financial auditing, Apple avoids doing so through its anticompetitive conduct.

9          267.    Apple's abusive tactics also stifle innovation in iOS Apps themselves—another way

10  Apple hurts competition (and users and developers) generally. By largely excluding app store

11  competitors, and by taking an iron hand approach to what it views as "permissible" for the iPhone,

12  Apple reduces the number of locations app developers can feature their apps and prevents them from

13  innovating in any ways that Apple disfavors. Consumers, as well as developers and competition

14  generally, benefit from other venues that host iOS Apps and encourage the development of more and

15  better types of apps—including categories that break the mold in term of what "apps" can do. All of

16  these results would engender far more innovation and consumer choice but are stifled by Apple's

17  dominance over the iOS App Distribution Market.

18         268.    Apple also harms iOS App developers by denying them the opportunity to choose

19  other means to be compensated for their work. Apple's aggressive, anticompetitive behavior

20  diminishes the choice offered by other marketplaces or distribution channels. Finally, Apple depresses

21  output by being the sole avenue for the distribution of iOS Apps and in-app products. This leads to

22  fewer sales, which in turn leads to fewer distribution transactions and fees.

23         269.    But for Apple's restrictions, would-be competing app distributors could provide

24  consumers and developers choice beyond Apple's own App Store and inject healthy competition into

25  the market. These stores could compete on the basis of (among other things) price, service, and

26  innovation. Competitors could innovate by (among other things) curating the apps available on a

27  competing app store (such as offering selections of apps in particular categories of consumer interest,

28

like gaming, travel, or health), providing more reliable reviews and other information about the apps, showing or advertising apps in different ways, or offering different pricing schemes. For example, in the personal computer space (including Macs), software can be purchased through many different sellers, including online stores provided by an application developer.

270.    Apple's conduct also increases consumers' costs. Apple's market power permits it to impose a supra-competitive tax on the price of apps purchased through the App Store and payments made through iOS Apps—a rate that is far higher than what could be sustained under competitive conditions. Consumers bear some or all of that tax in the form of higher prices or reduced quantity or quality of apps.

## VIII.    STANDING

271.    Apple has compared its App Store to a mall, writing in a brief submitted to the Ninth Circuit Court of Appeals: ***"Apple sells software distribution services to developers, much in the way that a shopping mall leases physical space to various stores."***

272.    This distribution chain is shown in the below graphic, which was included in a brief Apple submitted to the United States Supreme Court:



273.    Thus, Proton, Scalisco, PangSky, OverX, and members of the Classes are direct purchasers of Apple's iOS App distribution services and iOS App payment processing services. Apple agrees.

274.    For example, in briefing to the Ninth Circuit, Apple stated: (a) "The software developers who are directly impacted by Apple's 30% commission absolutely would have antitrust standing to bring a monopolization case, if they wanted to . . . "; and (b) "App developers have standing under Illinois Brick to argue whatever they want because they are direct purchasers of distribution services from Apple, and if they want to argue, for example, that their consent [to Apple's fees] was coerced by Apple's market power, they can."

275.    Similarly, in briefing to the U.S. Supreme Court, Apple stated: (a) "The developer is also the first person to bear the alleged overcharge on the allegedly monopolized service, and by that definition also the 'direct purchaser'"; and (b) "[I]t is plainly the iOS developers—the direct purchasers and 'consumers' of the allegedly monopolized distribution services, and the group that meets all of the relevant 'efficient enforcer' criteria."

276.    KPA and KEPA have associational standing to sue on behalf of their iOS App developer members. As noted above, KPA and KEPA's iOS-developer members would undoubtedly have standing, the interests KPA and KEPA seek to protect are germane to their purpose, and their claims and relief sought do not require participation of their individual members. KPA and KEPA's iOS App developer members have suffered harm due to Apple's unlawful conduct as alleged herein. KPA and KEPA can therefore pursue their claims under Federal Rule of Civil Procedure 23(a) and 23(b)(2).

277.    KPA and KEPA members include iOS App developers. Those members distribute their iOS Apps and process payments associated with their iOS Apps through the Apple App Store storefront in the United States and elsewhere. KPA and KEPA have one or more members who are parties to Apple's Developer Program License Agreement and guidelines referenced in this Complaint. During the Class Periods, one or more members of KPA and KEPA paid supra-competitive commissions on purchases and payments related to the distribution of their iOS Apps. One or more members of KPA and KEPA have been injured by Apple's unlawful conduct as alleged herein.

## IX.     APPLE HAS CONTINUOUSLY VIOLATED THE ANTITRUST LAWS

278.    Apple has engaged in a continuous course of conduct to maintain its market power to charge supra-competitive monopoly rents. This course of conduct includes: (1) requiring app developers to pay a fee and renew their DPLAs every year; (2) imposing contractual anti-steering provisions on app developers; (3) implementing scare screens on user devices; (4) willfully evading court orders intended to open the market to competition; and (5) continuously enforcing its anticompetitive restrictions and other monopolistic practices to preserve its dominant market position and revenue streams.

279.    With every new iPhone model and iOS version—including those released within the past four years—Apple has consistently imposed ever-more-restrictive means aimed at snuffing out alternative app stores, for years effectively confining them to just a tiny segment of iPhone owners. To this end, Apple first attempted to argue it was illegal for iPhone owners to fully control their own devices, as they do on Apple's Mac devices, or to use distribution channels that users could obtain directly from the internet, as opposed to through Apple's App Store. Apple filed a 27-page argument with the U.S. Copyright Office stating that obtaining the sort of access necessary to implement alternative app stores would or should be illegal. However, Apple lost that battle decisively. The Copyright Office found that such activities were not illegal and, in fact, are supported by the copyright laws.

280.    Given this loss, Apple turned to contractual and technological restraints over alternative app stores' potential customers (iOS users and iOS App developers) to exclude those competitor iOS App distributors. Over the years (including in the four years leading up to this lawsuit, as described above), Apple has continuously modified its App Store policies to preclude iOS App developers from attempting to distribute their apps through any channel except the App Store and to shore up perceived holes in the terms that might permit developers to distribute their apps or process in-app payments through alternatives other than Apple's App Store and/or its IAP API. It has also imposed these regularly updated contractual terms on every new iPhone activation (i.e., a new contract for every new device purchase) and on every new model of the iPhone that Apple released,

including every new model released in the four years preceding the original complaint in this lawsuit as well as the models released since. *See Samsung Elecs. Co., Ltd. v. Panasonic Corp.*, 747 F.3d 1199, 1203–04 (9th Cir. 2014) (imposing an anticompetitive contract as to new device not covered by the original contract is a new overt act); id. at 1204 (imposing anticompetitive agreement, even if it was "merely a restatement of" an earlier anticompetitive agreement, on new party for the first time constitutes a new overt act); *Hennegan v. Pacifico Creative Serv., Inc.*, 787 F.2d 1299, 1301 (9th Cir. 1986) (actions to steer away customers from plaintiff's business within four years of the lawsuit each constituted a new overt act, even though the scheme to steer such customers away began more than four years earlier); *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 795–97 (N.D. Cal. 2022) (finding new overt acts and rejecting argument that they were not "new and independent" because they were a "reaffirmation of a previous strategy," and in particular noting that the defendant provided "no authority for its argument that an act is not 'new and independent' simply because the defendant has previously committed the same type of act as part of a unified anticompetitive strategy"); *PBTM LLC v. Football Nw., LLC*, 511 F. Supp. 3d 1158, 1182 (W.D. Wash. 2021) ("a claim alleging an unlawful tying arrangement, the cause of action first accrues when the arrangement was executed or became effective"); *Garnica v. HomeTeam Pest Def., Inc.*, No. 14-cv-05243, 2015 WL 3766514, at *2 (N.D. Cal. June 16, 2015) (denying statute of limitations motion to dismiss because allegations suggested new overt acts, including, *inter alia*, that the defendant "may well have altered the terms of its agreement" in an anticompetitive way within the limitations period).

281.    In the last four years, Apple has continuously enforced its anticompetitive policies with every initial app review and review of app updates. Apple has also selectively and arbitrarily enforced its policies to make it more difficult for all other iOS App distributors to compete. For example, in August 2017, Apple rejected a cloud gaming platform from LiquidSky because, according to Apple, that platform included a "sub app store" that allowed games to be purchased elsewhere to be run on their platform. And in March 2018, Apple did the same to Tribe, which Apple contended had "a store within our store."

282.     Similarly in June 2019, a store called AltStore, which would have allowed iPhone users to download apps without jailbreaking their phone, was made available for download directly from the internet outside of the App Store. Soon thereafter, Apple killed this new offering because of the competitive threat it represented, once again by changing its code specifically to prevent that alternative app store from working.

283.     Apple, thus, actively used its enforcement powers enabled by the contracts it forced on iOS App developers to exclude competition—thus constituting an example of new overt acts in support of its long-running scheme. *See Samsung*, 747 F.3d at 1203 (holding "that certain actions taken to enforce contracts made in violation of the antitrust laws were sufficient to restart the statute of limitations"); *Columbia Steel Casting Co., Inc. v. Portland Gen. Elec. Co.*, 111 F.3d 1427, 1444 (9th Cir. 1996) (enforcing an anticompetitive contract—even one that was entered into beyond the limitations period—constitutes a new overt act); *Eichman v. Fotomat Corp.*, 880 F.2d 149, 160 (9th Cir. 1989) ("[t]o restart the statute of limitations in a tying situation, [a plaintiff] must show that [a defendant] 'had the ability [to] and actually did enforce the tie during the limitations period'" (quoting *Airweld, Inc. v. Arco, Inc.*, 742 F.2d 1184, 1190 (9th Cir. 1984))).

284.     Apple has also continuously implemented ever more restrictive measures to prevent users from gaining access to their devices and installing alternative app stores. Its first efforts in this regard—which it has included on each new iPhone and every new iPhone model sold for nearly a decade (including the four years preceding this lawsuit), and in updates to iOS throughout that time—Apple created technical restrictions it built into iOS that largely prevent users from downloading and installing competing app stores or apps that are made available directly on websites. Apple placed technical restrictions on app installation through entitlements and code signing to prohibit competition in this way, a practice that first began in 2008 and occurred every six to nine months but then escalated with more permanently exclusionary restrictions beginning in 2018. Consequently, iOS App developers were (and continue to be) required to distribute apps through the App Store, and consumers must use the App Store to download these apps to their iOS devices.

285.    More specifically, Apple's 2018 and 2019 technical restrictions included introducing runtime code modification prevention, pointer authentication, physical-map codesigning, memory tagging extensions, and other control mechanisms that specifically target and prevent alternative app stores from competing with Apple because they effectively prevent users from using alternative app stores on iOS at all—even if they wish to obtain such alternatives through the internet (i.e., outside of the App Store) to modify their phone through lawful means. Apple's late 2018 change foreclosed competition on iPhone XS and later models (i.e., models released September 2018 and afterward), and its late 2019 changes made it so app store competitors could no longer operate on earlier models, meaning that, for the first time in 2019, Apple finally succeeded in excluding all competition on pre-September 2018 iPhone models. Apple did not merely rely on a policy it adopted in 2008 or 2009; instead, it actively took steps to suppress and ultimately cripple competition from alternatives.

286.    Apple also pre-installs the App Store app on the home screen of every iOS device it sells (including every new model of the iPhone it introduced for the first time in the four years preceding this lawsuit) and disables users' ability on every one of those devices to uninstall the App Store app or to make any other app marketplace or iOS App distribution channel their default. Apple does not permit any other app stores on iOS devices, both through the technical restrictions described above and through its contractual policies. It also prevents users from downloading apps through websites and punishes app developers that attempt to utilize such means. Apple deploys similar means to control and hinder application publishers through the iOS APIs, such as the API for in-app purchases.

287.    Apple has taken similar steps with respect to iOS App payment processing services. For example, Apple specifically revised its DPLA to prohibit iOS App developers from facilitating distribution of iOS Apps from any source other than the App Store, and it has become infamous in recent years for pausing or delaying iOS App approval on an ad-hoc basis if iOS App developers do not add more revenue-generating features for Apple, such as in-app purchases. News stories of this practice have abounded over the years. Examples include Apple insisting on such anticompetitive restraints for Spotify (2017), WordPress (2020), cloud gaming from Microsoft (which Apple insisted

involve an App Store application and review for every game made available so that it could control in-app purchases for each game rather than an overarching cloud gaming app) (2020), and, of course, Epic Games (2020). iOS App developers have no choice but to abide by these obligations if they wish to sell their apps in the iOS App market, and they agree when they become iOS App developers to adhere to every new iteration of the App Store policies, which Apple has imposed on them anew within the four years preceding this lawsuit (and thus, constituting a new overt act). *See Samsung*, 747 F.3d at 1203–04 (imposing an anticompetitive contract with respect to new device not in existence at time of the original contract is a new overt act); *id.* at 1204 (imposing anticompetitive agreement, even if it was "merely a restatement of" an earlier anticompetitive agreement, on new party for the first time constitutes a new overt act). Apple thus coerces them into only using the App Store (else face effective exclusion from iOS users) and into only using Apple's iOS App payment processing services.

288.    Apple uses its absolute control over App Store approval and distribution to enforce its payment processing monopoly. Apps that attempt to circumvent IAP requirements are rejected during the review process or removed from the App Store after publication. This enforcement mechanism is particularly powerful because developers have no alternative distribution channel and cannot reach iOS users without Apple's approval.

289.    Apple has systematically escalated its enforcement of payment processing restrictions over time, particularly within the four years preceding this lawsuit. Initially, some developers were able to work around Apple's restrictions through creative implementations or by directing users to external websites. Apple has progressively closed these loopholes through increasingly restrictive policy updates and more aggressive enforcement actions.

290.    With every new iPhone activation and every new iOS App developer account creation, Apple has imposed its payment processing restrictions through updated contractual terms. These agreements are non-negotiable and presented on a take-it-or-leave-it basis. Developers who refuse to agree to exclusive use of Apple's IAPs are denied access to the iOS market entirely, creating a coercive dynamic that no competitive market would sustain.

291.    Apple selectively enforces its payment processing requirements in ways that discriminate against services that compete with Apple's own offerings. For example, Apple has been more aggressive in enforcing IAP requirements against music streaming services like Spotify (which competes with Apple Music) while being more lenient with services that do not compete directly with its products.

292.    Apple created a narrow "reader app" exception that allows certain apps (like Netflix and Kindle) to avoid IAP requirements, but Apple has manipulated this exception to serve its competitive interests rather than consumer welfare. iOS Apps that qualify for this exception still cannot inform users about external payment options, and Apple has threatened to revoke the exception for iOS apps that become too competitive with Apple's services.

293.    When iOS App developers attempted to implement workarounds to Apple's payment processing restrictions, Apple responded with technological changes to iOS that make these alternatives non-functional. For example, Apple has modified iOS to prevent apps from detecting whether users have made purchases through external websites, making it impossible for developers to unlock premium features based on external transactions.

294.    Apple has continuously expanded the scope of its payment processing monopoly to cover new types of digital transactions. Initially focused on traditional app purchases, Apple has extended IAPs requirements to cover subscriptions, virtual currency, in-app advertising removal, and even tips or donations to content creators. This expansion demonstrates Apple's intent to capture an ever-growing share of the digital economy through its payment processing monopoly.

295.    When faced with regulatory pressure in various jurisdictions, Apple has made minimal cosmetic changes while preserving the core structure of its payment processing monopoly. For example, Apple's announcement of reduced commissions for small developers affected only a very small percentage of App Store revenue and maintained the fundamental requirement to use IAPs exclusively. These changes were designed to deflect regulatory and litigation scrutiny rather than restore competitive conditions.

296.    For example, in January 2022, Apple's purported compliance with the Telecommunications Business Act introduced new anticompetitive 26% payment processing commissions in Korea that effectively eliminated any possibility that alternative payment platforms would become widely adopted.

297.    And to circumvent the Court's First Injunction and continue reaping monopoly commissions, Apple recently implemented a suite of anticompetitive restrictions and new supra-competitive commissions with respect to iOS payment processing.

## X.    INTERSTATE TRADE AND COMMERCE

298.    Apple's conduct has taken place in and affected the continuous flow of interstate trade and commerce of the United States, or import trade or import commerce, in that, *inter alia*:

(a)    Apple has provided iOS App distribution and iOS App payment processing services throughout the United States;

(b)    Apple has used instrumentalities of interstate commerce to provide iOS App distribution and iOS App payment processing services throughout the United States;

(c)    In furtherance of the anticompetitive scheme alleged herein, Apple employees have traveled between states and have exchanged communications through interstate wire communications and via U.S. mail; and

(d)    The anticompetitive scheme alleged herein has affected billions of dollars of commerce. Apple has inflicted antitrust injury by artificially excluding competitors, raising prices paid by developers and consumers, and causing the other antitrust injuries described herein.

## XI.    CLAIMS FOR RELIEF

### COUNT ONE: UNREASONABLE RESTRAINTS OF TRADE
### Plaintiffs, on behalf of themselves and the App Developer Class

### (15 U.S.C. §§ 1 and 3)

299.    Plaintiffs incorporate by reference the allegations set forth above, in full, as if set forth fully herein.

300.    Plaintiffs Proton, PangSky, Scalisco, and OverX bring this claim for damages and injunctive relief on behalf of themselves and the App Developer Class as defined above.

301.    Plaintiffs KPA and KEPA bring this claim for injunctive relief on behalf of their iOS-developer members that have sold and/or intend to sell iOS Apps and in-app products through Apple's U.S. App Store storefront.

302.    For this Count, the relevant markets are the U.S. Smartphone/Smartphone OS Market and the U.S. Apple Storefront markets for iOS App Distribution and iOS App Payment Processing.

303.    Apple requires every iOS App developer to enter its standardized DPLA and applicable attachments, schedules, and exhibits to make their iOS Apps and in-app digital products available to end-users. The relevant provisions of these agreements, including Apple's restriction on any distribution method other than the Apple App Store and restriction on the use of any iOS App payment processing services other than Apple's IAP API, unreasonably restrain competition in the iOS App Distribution and iOS App Payment Processing Markets.

304.    Apple has conditioned the ability to develop and distribute apps to U.S. iPhone users on developers' agreement to use only its iOS App distribution service (the App Store).

305.    Apple has conditioned the operation of U.S. iPhones on the use of its iOS App distribution service (the App Store).

306.    Apple's contractual provisions affect a substantial volume of interstate commerce and/or import trade or import commerce.

307.    Apple has sufficient economic power in the U.S. Smartphone/Smartphone OS Market to enable it to restrain trade in the iOS App Distribution Market and iOS Payment Market.

308.    Plaintiffs and putative Class members have been harmed by Apple's contractual provisions in a manner that the antitrust laws were intended to prevent. They have suffered and continue to suffer damages and irreparable injury, including harm to their businesses, and such damages and injury will not abate unless an injunction is issued that will stop Apple's anticompetitive conduct. As a result of Apple's anticompetitive conduct, Plaintiffs and members of the Class have paid supra-competitive prices on commissions for iOS Distribution iOS Payment Processing.

309.    Apple's agreements, imposed as they are on various market participants, serve no sufficiently legitimate or procompetitive purpose. To the extent there are available non-pretextual procompetitive justifications for Apple's conduct, there exist less-restrictive alternatives to achieve the justifications posited. Moreover, Apple's behavior fails a balancing test between the anticompetitive harms and procompetitive benefits.

310.    Apple's agreements restrain trade unreasonably in several respects, including through, *inter alia*, exclusive dealing, tying (of smartphones/smartphone OSes to iOS App distribution services, and iOS App distribution services to iOS App payment processing services), as well as other unreasonable restraints.

## COUNT TWO: MONOPOLIZATION
### Plaintiffs, on behalf of themselves and the App Developer Class

### (15 U.S.C. §§ 2 and 3)

311.    Plaintiffs incorporate by reference the allegations set forth above, in full, as if set forth fully herein.

312.    Plaintiffs Proton, PangSky, Scalisco, and OverX bring this claim for damages and injunctive relief on behalf of themselves and the App Developer Class as defined above.

313.    Plaintiffs KPA and KEPA bring this claim for injunctive relief on behalf of their iOS-developer members that have sold and/or intend to sell iOS Apps and in-app products through Apple's U.S. App Store storefront.

314.    For this Count, the relevant markets are the U.S. Smartphone/Smartphone OS Market and the U.S. Apple Storefront markets for iOS App Distribution, and iOS App Payment Processing.

315.    Apple has gained and maintains monopoly power in the relevant markets by improper and unlawful means.

316.    More specifically, Apple has willfully acquired and maintained such power by its patently exclusionary conduct as set forth above.

317.    For the reasons stated herein, substantial barriers to entry and expansion exist in the relevant iOS App Distribution and iOS App Payment Processing Markets.

318.    Apple has the power to exclude competition in the relevant markets, and it has used that power, including by way of its unlawful practices in restraint of trade as described herein, to attain, maintain, and expand its monopoly power in iOS App Distribution and iOS App Payment Processing Markets.

319.    Apple's anticompetitive conduct constituted, *inter alia*, exclusive dealing, tying, monopoly leveraging, and in the alternative, aftermarket monopolization.

320.    Apple's conduct as described herein, including its unlawful practices in restraint of trade, is exclusionary vis-à-vis its actual and potential rivals in the relevant markets (which Apple has, in fact, excluded from the relevant markets through its exclusionary conduct described herein).

321.    Apple has behaved as alleged herein to maintain and grow its monopoly in the relevant markets, with the effects being that competition is foreclosed and that consumer choice, and the innovation that leads to consumer choice, is gravely diminished.

322.    Additionally, as a result of its anticompetitive conduct, Apple has abused its market power by charging supra-competitive transaction fees on Plaintiffs and members of the App Developer Class.

323.    There is no business necessity or other procompetitive justification for Apple's conduct. To the extent there are available non-pretextual procompetitive justifications for Apple's conduct, there exist less-restrictive alternatives to achieve the justifications posited. Moreover, Apple's behavior fails a balancing test between the anticompetitive harms and procompetitive benefits.

324.    Plaintiffs and the members of the App Developer Class have been injured, and will continue to be injured, in their businesses and property as a result of Apple's conduct.

## COUNT THREE: CALIFORNIA UNFAIR COMPETITION LAW
**Plaintiffs Proton, PangSky, Scalisco, and OverX on behalf of themselves and the App Developer Class**

**(Cal. Bus. & Prof. Code §§ 17200 *et seq.*)**

325.    Plaintiffs Proton, PangSky, Scalisco, and OverX incorporate by reference the allegations set forth above, in full, as if set forth fully herein.

326.    Plaintiffs Proton, PangSky, Scalisco, and OverX bring this claim for damages and injunctive relief on behalf of themselves and the App Developer Class as defined above.

327.    For this Count, the relevant markets are the U.S. Smartphone/Smartphone OS Market and the U.S. Apple Storefront markets for iOS App Distribution, and iOS App Payment Processing.

328.    California's UCL sets up three prongs—the unlawful, unfair, and fraudulent prongs—the violation of any of which constitutes a violation of the UCL.

329.    Apple has engaged in, and continues to engage in, acts of unfair competition as defined in California's UCL. More specifically, Apple, based upon the conduct alleged herein, has violated the unlawful and unfair prongs of the UCL.

330.    Not only is there a California choice-of-law provision in the pertinent developer contracts, but also, at all pertinent times, the conduct complained of took place in, and has emanated from, California, as alleged herein.

331.    iOS App developers are consumers of Apple's App Store services, including distribution and payment services, and pay Apple's supra-competitive fees.

332.    In sum, Apple's behavior affects iOS App developers such as Plaintiffs and members of the App Developer Class.

**Unlawful Prong**

333.    Apple's acts of unfair competition include its violations of the Sherman Act as alleged herein. Therefore, Apple has violated the unlawful prong of the UCL.

334.    Apple's conduct has harmed developers, competition, and even consumers of iOS Apps as alleged herein.

335.    iOS App developers have been overcharged by Apple for their distribution and sale of iOS Apps and IAPs due to Apple's actions as alleged herein.

336.    iOS App developers, like Plaintiffs and members of the App Developer Class, have no alternative but to distribute their apps through the App Store and to pay Apple's supra-competitive fees.

**Unfair Prong**

337.    Apple's acts of unfair competition include its violations of the Sherman Act and the policies underlying it, as alleged herein.

338.    More specifically, the acts or practices alleged in this complaint violate the unfair prong of the UCL because the injuries complained of herein are substantial, including in their financial impact on developers as consumers of Apple's iOS App distribution services.

339.    There are no countervailing benefits to consumers or competition from Apple's unjustified, supra-competitive pricing. Neither iOS App developers (as consumers of Apple's iOS Apps) nor other consumers of iOS Apps could reasonably avoid the injuries inflicted upon them by Apple.

340.    Apple mandates these harmful practices, which it is able to do thanks to its market power, as alleged herein.

341.    Apple's behavior is also unfair because it offends the nation's antitrust policies as alleged herein.

342.    Additionally, Apple's supra-competitive pricing for iOS App distribution and payment processing services is substantially injurious to iOS App developers and other consumers as alleged herein. Apple's pricing is immoral, unethical, oppressive, and unscrupulous because it is a function of the abuse of Apple's market power as alleged herein.

343.    Apple's behavior is also unfair because it violates public policy that is tethered to this country's statutory antitrust regulation, as expressed in part in the Sherman Act.

344.    In sum, for all or any of these reasons, Apple has violated the unfair prong of the UCL.

345.    Apple's conduct has harmed iOS App developers, competition, and other consumers of iOS Apps as alleged herein. iOS App developers have been overcharged due to Apple's actions as alleged herein. iOS App developers have no alternative but to distribute their wares through the App Store and to pay Apple's supra-competitive payment fees. Apple exploits its monopolistic position to the detriment of iOS App developers, as well as iOS consumers (which include App developers).

**UCL Relief**

346.    Plaintiffs and putative Class members are entitled to recover restitution in at least the amount of the difference between the supra-competitive iOS App fees they have paid Apple on the one hand and what the fees would have been and should be but for Apple's unlawful, inequitable, and unjustified behavior, including abuses of its market power, on the other. See, e.g., Cal. Bus. & Prof. Code § 17203.

### COUNT FOUR: KOREAN MONOPOLY REGULATION & FAIR TRADE ACT
#### Plaintiffs PangSky, KPA, and KEPA, on behalf of themselves and the Korean App Developer Class

347.    Plaintiffs PangSky, KPA, and KEPA incorporate by reference the allegations set forth above, in full, as if set forth fully herein.

348.    Plaintiff PangSky brings this claim on behalf of itself and the Korean App Developer Class defined above. Plaintiffs KPA and KEPA bring this claim on behalf of their iOS-developer members that have sold and/or intend to sell iOS Apps and the Korean App Developer Class defined above.

349.    The MRFTA is Korea's primary antitrust statute.

350.    The MRFTA states, in relevant part, as follows: "The purpose of this Act is to prevent the abuse of market dominance by business entities and excessive concentration of economic power and to promote fair and free competition by regulating illegal cartel conduct and unfair trade practices, thereby encouraging creative business activities, protecting consumers, and promoting the balanced development of the national economy."

351.    The MRFTA applies worldwide to conduct that injures Korean-based companies.

352.    Apple's conduct has injured, and continues to injure, KPA's and KEPA's iOS-developer members, PangSky, and members of the Korean App Developer Class because Apple's conduct deprived them of revenue that they would have received if Apple had not abused its market dominance in violation of the MRFTA.

353.    Under the MRFTA, Apple is presumed to be a market-dominant business entity because its annual revenues exceed the statutory minimum and its share exceeds 50% globally in the iOS App Distribution and iOS App Payment Processing Markets. Alternatively, Apple is presumed to be a market-dominant business entity in smartphone app distribution services because Apple's App Store and Google's Play Store have a combined global market share of over 99% and Apple's App Store's 27.5% global market share exceeds the 10% minimum. Apple is also presumed to be a market-dominant business entity for in-app purchases because Apple's App Store and Google's Play Store have a combined global market share of 96% and Apple's App Store's 57.6% global market share exceeds the 10% minimum. Similarly, Apple is presumed to be a market-dominant business entity in smartphones/smartphone OSes because iPhone/iOS and Android have a combined global market share of over 99% and iPhone/iOS's 27.9% global market share exceeds the 10% minimum.

354.    Apple's conduct, as alleged herein, violates the MRFTA's prohibition of abuse of market-dominant position and constitutes unfair trade practices in violation of the MRFTA because, among other things, Apple's conduct violates the spirit and intent of the MRFTA. Additionally, Apple's conduct is abusive and constitutes unfair trade practices; (1) because it allows Apple to unfairly exclude competition, (2) because it unfairly takes advantage of Apple's bargaining position, and (3) because it unfairly restricts the business activities of PangSky and members of the Korean App Developer Class.

355.    For example, Apple abused its market-dominant position by, *inter alia*, unfairly determining, charging, and maintaining high commission rates for iOS App distribution and payment processing services; unfairly controlling the provision of iOS App distribution and payment processing services; unfairly interfering with the business activities of third-party payment processing providers; unfairly interfering with the ability of other entities seeking to provide app distribution and

1    payment processing services to iOS App developers; and mandating restrictive agreements that allow

2    it to maintain control over prices and exclude competition in the iOS App Distribution and iOS App

3    Payment Processing Markets, to the detriment of app developers, consumers, and competition.

4    356.    Further, Apple has engaged in unfair trade practices including, *inter alia*, unfairly

5    excluding competitors in the relevant markets; unfairly taking advantage of its bargaining position in

6    its agreements with iOS App developers; forcing iOS App developers to enter into restrictive

7    agreements that limit competition and restrict iOS App developers' ability to contract with other

8    entities for the distribution and sale of iOS Apps; abusing its dominant position by requiring restrictive

9    mandates for the distribution and sale of mobile iOS Apps, and demanding supra-competitive

10   commission rates; and demanding supra-competitive commission fees even when it allowed iOS App

11   developers to distribute and sell mobile iOS Apps outside of the Apple "ecosystem."

12   357.    The product markets definition proposed here is consistent with Korean precedent.

13   The Korean Fair Trade Commission ("KFTC") has previously defined an Android-based app market,

14   excluding China, in a corrective order issued to Google as a result of its finding that Google violated

15   the MRFTA. Similarly, there is a separate iOS App market that is relevant to the claims made here.

16   358.    In 2021, South Korea's legislature amended its Telecommunications Business Act to

17   permit developers of iOS Apps to use alternative payment service providers for in-app products

18   purchased through Apple's South Korea App Store storefront. Apple responded in January 2022 by

19   imposing upon iOS App developers a "commission" of 26% on the price paid by the user through the

20   alternative payment service provider. Apple's abusive and unfair 2022 Korean policy is substantially

21   the same as its U.S. commission policy that it unlawfully imposed in violation of the Injunction, as

22   set forth in greater detail above.

23   359.    The Korea Communications Commission ("KCC") noted in 2023 its plan to impose a

24   20.5 billion won fine (~$14 million) on Apple due to its violation of the Telecommunications

25   Business Act by forcing Korean developers to use Apple's in-app billing system and unfairly

26   postponing evaluation of apps. The KCC found that imposing the new 26% fees on Korean developers

27   constitutes a discriminatory act.

28

360. On April 11, 2025, the KCC and the Korea Internet and Security Agency ("KISA") announced the "2024 App Market Survey Result" under Article 22, Paragraph 9 (Obligations of App Market Business Operators and Fact-Finding Surveys) of the Telecommunications Business Act.

361. The KCC and KISA found that the key unfair practices Korean app developers experience from app market operators like Apple are "app review delays and registration rejections, while the biggest problem with in-app purchases they perceive is excessive commission fees."

362. According to 70.4% of Korean developers, the biggest problem with in-app purchases was excessive commission fees, followed by unclear payments, including refunds and limited payment options.

363. Other issues cited by developers that occurred during the initial app registration process include unclear review standards and delayed feedback on inquiries.

364. PangSky, the iOS App developer members of KPA and KEPA, and members of the Korean App Developer Class have been injured, and will continue to be injured, in their businesses and property as a result of Apple's conduct, including because Apple charges a supra-competitive commission for the distribution and sale of mobile iOS Apps that it would not otherwise receive in a competitive market. As such, PangSky and members of the Korean App Developer Class are entitled to damages as well as an injunction to prevent Apple from continuing to engage in abusive and unfair trade practices as alleged herein. KPA and KEPA are similarly entitled to an injunction to prevent Apple from continuing to engage in abusive and unfair trade practices as alleged herein.

**COUNT FIVE: ACT ON PROHIBITION OF PRIVATE MONOPOLIZATION AND MAINTENANCE OF FAIR TRADE (Act No. 54 of April 14, 1947) AND THE MOBILE SOFTWARE COMPETITION ACT**
**Plaintiff OverX, on behalf of itself**
**and the Japanese Law Class**

365. Plaintiff OverX incorporates by reference the allegations set forth above, in full, as if set forth fully herein.

366. Plaintiff OverX brings this claim for injunctive relief on behalf of itself and the Japanese Law Class defined above.

367.    For this Count, the fields of trade are the markets for iOS App Distribution and iOS App Payment Processing.

368.    Non-iOS app distribution and payment processing services are incompatible with, and are not substitutes for, iOS App Distribution and iOS App Payment Processing. For the reasons stated herein, substantial barriers to entry and expansion exist in the markets for iOS App Distribution and iOS App Payment Processing.

369.    The Act on Prohibition of Private Monopolization and Maintenance of Fair Trade ("Antimonopoly Act" or "AMA") is Japan's primary antitrust statute.

> The purpose of this Act is to promote fair and free competition, stimulate the creative initiative of enterprise, encourage business activity, heighten the level of employment and actual national income, and thereby promote the democratic and wholesome development of the national economy as well as secure the interests of general consumers by prohibiting private monopolization, unreasonable restraint of trade and unfair trade practices, preventing excessive concentration of economic power and eliminating unreasonable restraints on production, sale, price, technology, etc. , and all other unjust restrictions on business activity through combinations, agreements, etc.

370.    Apple's conduct has injured, and continues to injure, OverX and members of the Japanese Law Class because Apple's conduct deprived them of revenue that they would have received, and competitive alternatives that would have been available, if Apple had not violated the AMA.

371.    Exclusionary private monopolization means "business activities, by which any enterprise, individually or by combination, in conspiracy with other enterprises, or by any other manner, excludes or controls the business activities of other enterprises, thereby causing, contrary to the public interest, a substantial restraint of competition in any particular field of trade."[6]

372.    Apple has engaged in exclusionary private monopolization in the iOS App Distribution and iOS App Payment Processing Markets. Apple has controlled and excluded the business activities of iOS App developers through its adhesive policies that limit app distribution on

---

[6] AMA, Art. 2(5), Art. 3 ("An enterprise must not effect private monopolization or unreasonable restraint of trade.").

iOS to the App Store, force iOS App developers to use Apple's IAPs, and demand supra-competitive commission fees.

373.    Apple has obtained and maintained 100% or nearly 100% market share in the iOS App Distribution and iOS App Payment Processing Markets in Japan. In addition, Apple has market power in the Smartphone/Smartphone OS market in Japan for reasons set forth herein and as further reflected in the following chart:



374.    Apple has also engaged in unfair trade practices in violation of the AMA.[7] Apple, *inter alia*, charges supra-competitive commissions for iOS App Distribution and iOS App Payment Processing, restricts iOS App developers' ability to distribute iOS Apps through methods other than the App Store, restricts iOS App developers' ability to utilize third-party payment processing services, and uses its superior bargaining position to unjustly demand high commissions and restrict competitive alternatives to the App Store and Apple's IAPs.

375.    Apple further violated the AMA by conditioning its provision of iOS App distribution services on developers' exclusive use of Apple's IAPs.

---

[7] AMA, Art. 2(9), Art. 19 ("An enterprise must not employ unfair trade practices.").

376.    Apple similarly violated the AMA by engaging in exclusive dealing arrangements dictating that Japanese iOS App developers distribute apps only through the App Store and only use Apple's IAPs to process payments, to the exclusion of competition.

377.    In 2023, the Japan Fair Trade Commission ("JFTC") conducted a study on mobile OS and mobile app distribution. It found that Apple's high commissions lead to higher-priced digital content and interfere with transactions between Apple's competitors and consumers, "causing a decrease in trade opportunities for the competitors or the exclusion of the competitors." It also took issue with Apple's superior bargaining position with app developers to unilaterally set excessively high commission rates that unjustly disadvantage app developers. The JFTC noted that Apple's conduct "would be a problem under the AMA (Private monopolization, Interference with a competitor's transactions, Abuse of a superior bargaining position, etc.)." And it explained that "there is not sufficient competitive pressure on the app distribution in the app stores provided by Google and Apple, so the level of app store commission cannot be expected to decline by market functions."

378.    As of July 29, 2025, Japan's Mobile Software Competition Act ("MSCA") clarifies that large providers of mobile device software, like Apple, may not restrict the installation of third-party app stores and they may not restrict the use of alternative payment methods for apps or in-app purchases. Further, large providers of mobile device software, including Apple, may not engage in conduct designed to hinder competition from third-party app stores, including through the use of licensing agreements, and other terms of use and/or technical specifications. And, large providers of mobile device software, including Apple, may not engage in conduct designed to hinder the use of alternative payment methods for apps or in-app purchases. Specifically, large providers of mobile device software, including Apple, are prohibited from imposing fees that hinder the use of alternative payment methods by users and developers. Apple has no "justifiable reasons" that would allow it to maintain its current restrictions concerning third-party app stores and alternative payment methods, which have violated the AMA and now violate the MSCA as well.

379.    The JFTC recognizes that violations of the MSCA are violations of the AMA.

380.    OverX and members of the Japanese Law Class have been injured, and will continue to be injured, in their businesses and property as a result of Apple's conduct, including because Apple charges a supra-competitive commission for the distribution and sale of mobile iOS Apps that it would not otherwise receive in a competitive market. As such, OverX and members of the Japanese Law Class are entitled to an injunction to prevent Apple from continuing its violations of the AMA and MSCA.

**COUNT SIX: JAPAN CIVIL CODE, ARTICLE 709 (Act No. 89 of April 27, 1896)**
**Plaintiff OverX, on behalf of itself**
**and the Japanese Law Class**

381.    Plaintiff OverX incorporates by reference the allegations set forth above, in full, as if set forth fully herein.

382.    Plaintiff OverX brings this claim for monetary relief on behalf of itself and the Japanese Law Class defined above.

383.    For this Count, the fields of trade are the markets for iOS App Distribution and iOS App Payment Processing.

384.    Pursuant to Japan's Civil Code, "[a] person that has intentionally or negligently infringed the rights or legally protected interests of another person is liable to compensate for damage resulting in consequence."

385.    Apple's violation of the AMA and the MSCA constitutes a violation of Japan's Civil Code as its conduct infringed the rights or legally protected interests of Japanese iOS App developers as explained herein.

386.    Apple has intentionally or negligently restricted iOS App developers' ability to distribute iOS Apps through distribution methods other than the App Store and extracted supra-competitive commissions. Apple has also intentionally or negligently restricted iOS App developers' ability to utilize payment processing methods other than Apple's IAPs.

387.    Apple's conduct as alleged herein caused harm to iOS App developers' interests, including paying supra-competitive commissions, causing lower sales, and reducing choice and innovation.

388.    OverX and members of the Japanese Law Class have been injured, and will continue to be injured, in their businesses and property as a result of Apple's conduct, including because Apple charges a supra-competitive commission for the distribution and sale of mobile iOS Apps that it would not otherwise receive in a competitive market. As such, OverX and members of the Japanese Law Class are entitled to damages stemming from Apple's violations.

## XII.    REQUESTED INJUNCTIVE RELIEF

To remedy Apple's unlawful unreasonable restraints of trade, monopolization, and unfair competition, Plaintiffs request that the Court enter injunctive relief, including but not limited to the following:

A.    Enjoin Apple from conditioning any payment, revenue share, or access to any Apple product or service on an agreement by an app developer not to launch a version of the app with enhanced or differentiated features on a third-party iOS App distribution platform or store;

B.    Enjoin Apple from conditioning any payment, revenue share, or access to any Apple product or service on an agreement by an app developer to launch an app first or exclusively on the Apple App Store;

C.    Enjoin Apple from conditioning any payment, revenue share, or access to any Apple product or service on an agreement with an Original Equipment Manufacturer (OEM) or carrier not to preinstall an iOS App distribution platform or store other than the Apple App Store;

D.    Require Apple to provide rival iOS App stores with access to the App Store catalog to ensure interoperability and to facilitate consumer choice;

E.    Require Apple to permit the distribution of rival iOS App stores through the Apple App Store on fair, reasonable, and non-discriminatory terms;

F.    Enjoin Apple from requiring developers to use Apple's IAPs system as a condition of offering subscriptions, digital goods, or other IAPs;

G.   Require that third-party application developers be given functionality and access to iOS App programming interfaces on terms no worse than the terms Apple allows for its first-party applications;

H.   Require Apple to allow developers to fully disable Apple's IAPs system;

I.   Require Apple to permit developers to communicate freely and directly with users—within the app, in App Store descriptions, and via external channels such as email or developer websites—regarding pricing, promotions, and alternative purchasing and payment options;

J.   Enjoin Apple from prohibiting developers from disclosing or advertising within the app or through other communications the availability and pricing of non-IAPs payment methods;

K.   Require Apple to allow developers to offer and implement alternative payment systems, including but not limited to PayPal and direct credit card processing, without penalty or discrimination, and without being compelled to use Apple's IAPs;

L.   Require Apple to permit developers to implement tiered pricing structures that reflect the cost differentials between Apple's IAPs and alternative payment methods (*e.g.*, higher prices for users paying through IAPs versus lower prices for users paying via credit card or other third-party processors);

M.   Enjoin Apple from imposing any punitive or coercive fee structures on developers for using or steering users to alternative IAPs methods, including the imposition of blanket percentage-based surcharges or "core technology fees";

N.   Require Apple to disclose to the Court and developers the costs associated with operating the App Store and permit Apple to charge developers only such fees as are demonstrably and proportionally related to those actual operating costs;

O.   Require Apple, at the initial setup stage of a new iOS device, to present users with a choice screen offering the opportunity to select among available app stores, including third-party iOS App distribution platforms;

P.    Require Apple to allow users to manage subscriptions purchased outside the App Store—such as those made via developer websites—through the user's iOS device, including cancellation, plan changes, and upgrades;

Q.    Require Apple to allow users to manage subscriptions purchased via iOS in-app purchases from other devices, including cancellation, plan changes, and upgrades; and

R.    Require Apple to permit developers to make their iOS Apps available for direct download via web browsers, including Safari, consistent with the download functionality permitted under macOS, and permit these apps to be automatically updated by the developer.

## XIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter judgment on their behalf and on behalf of the Classes defined herein, by adjudging and decreeing as follows:

A.    This action may proceed as a class action, with Plaintiffs Proton, PangSky, Scalisco, and OverX serving as the representatives of the App Developer Class; PangSky, KPA, and KEPA serving as the representatives of the Korean App Developer Class; and OverX serving as the representative of Japanese Law Class; and their respective counsel serving as Class Counsel for each of the Classes;

B.    Defendant has engaged in anticompetitive conduct in violation of Sections 1, 2, and 3 of the Sherman Act (15 U.S.C. §§ 1–3), and that Plaintiffs and the members of the Classes have been injured in their business and property as a result of Defendant's violations;

C.    Plaintiffs and the members of the Classes recover damages and/or restitution as provided by the federal antitrust laws, California's UCL, Korea's MRFTA, and that a judgment in favor of Plaintiffs and the Classes be entered against Defendant in an amount to be trebled to the extent such trebling is permitted pursuant to such laws;

D.    Plaintiffs and the members of the Classes recover restitutionary relief to the extent

such relief is afforded by any of the aforementioned laws;

E.    Defendant, its subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the anticompetitive conduct alleged herein;

F.    Plaintiffs and members of the Classes be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

G.    Plaintiffs and members of the Classes recover their costs of this suit, including reasonable attorneys' fees as provided by law;

H.    Plaintiffs and members of the Classes are entitled to injunctive relief as set forth above;

I.    Defendant is to be responsible financially for the costs and expenses of a Court-approved notice program through post and media designed to give immediate notification of this action and their rights to the Class members;

J.    Plaintiffs and members of the Classes receive such other or further relief as may be just and proper.

## XIV.    JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all claims asserted in this Complaint that are so triable.

DATED: August 8, 2025                      Respectfully submitted,

HAUSFELD LLP

By:    _/s/ Christopher L. Lebsock_

Christopher L. Lebsock (SBN 184546)
Michael P. Lehmann (SBN 77152)

Samuel Maida (SBN 333835)
HAUSFELD LLP
580 California Street, 12th Floor
San Francisco, CA 94111
Telephone: (415) 633-1908
Facsimile: (415) 358-4980
clebsock@hausfeld.com
mlehmann@hausfeld.com
smaida@hausfeld.com

Mindee J. Reuben (*pro hac vice*)
Katie R. Beran (*pro hac vice*)
Daniel P. Margolskee (*pro hac vice*)
HAUSFELD LLP
325 Chestnut Street, Unit 900
Philadelphia, PA 19106
Telephone: (215) 985-3270
Facsimile: (215) 985-3271
mreuben@hausfeld.com
kberan@hausfeld.com
dmargolskee@hausfeld.com

Scott Martin (*pro hac vice*)
Gisela Rosa (*pro hac vice*)
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322
smartin@hausfeld.com
zrosa@hausfeld.com

*Counsel for Plaintiffs Korean Publishers Association Korea Electronic Publishing Association, Scalisco LLC, Dan Scalisco, PangSky Co., Ltd., OverX Co., Ltd., and the putative Classes*

YoungKi Rhee (*pro hac vice forthcoming*)
WE THE PEOPLE LAW GROUP
Chinyang Building, 7/F
47 Kyonggidae-ro, Seodaemun-gu
Seoul, South Korea 03752
Telephone: 82-2-2285-0062
ykrhee@wethepeople.co.kr

*Counsel for Plaintiff PangSky Co., Ltd. and the putative Classes*

Byung-Joo Lee (SBN 225384)
JIHYANG LAW FIRM
Seohee Tower, 7/F
2583 Nambusunhwan-ro
Seoul, Korea 06735
Telephone: 82-2-3476-6002
Facsimile: 82-2-3476-6607
bjlee@jihyanglaw.com

*Counsel for Plaintiffs Korean Publishers Association Korea Electronic Publishing Association, OverX Co., Ltd. and the putative Classes*

Michael B. Eisenkraft (*pro hac vice*)
Benjamin F. Jackson (*pro hac vice*)
Cohen Milstein Sellers & Toll PLLC
88 Pine Street,14th Floor
New York, NY 10005
212-838-7797
meisenkraft@cohenmilstein.com
bjackson@cohenmilstein.com

Grace Ann Brew (*pro hac vice forthcoming*)
Cohen Milstein Sellers & Toll PLLC
100 N. 18th Street, Suite 1820
Philadelphia, PA 19103
267-479-5700
gbrew@cohenmilstein.com

Nathaniel D. Regenold (*pro hac vice forthcoming*)
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue NW, Suite 800
Washington, DC 20005
202-408-4600
nregenold@cohenmilstein.com

Steig D. Olson (*pro hac vice*)
David Du LeRay (*pro hac vice*)
Nicolas Vernon Siebert (*pro hac vice*)
Quinn Emanuel Urquhart & Sullivan LLP
295 5th Avenue
New York, NY 10016
212-849-7152
steigolson@quinnemanuel.com
davidleray@quinnemanuel.com

nicolassiebert@quinnemanuel.com

Adam B. Wolfson (SBN 262125)
Sam Stephen Stake (SBN 257916)
Emma Barton (SBN 347777)
Quinn Emanuel Urquhart & Sullivan, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
415-875-6600
415-875-6700 (fax)
adamwolfson@quinnemanuel.com
samstake@quinnemanuel.com
emmabarton@quinnemanuel.com

*Counsel for Plaintiff Proton AG and the putative Classes*