DANIEL G. SWANSON, SBN 116556
  dswanson@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone:    213.229.7000
Facsimile:    213.229.7520

JULIAN W. KLEINBRODT, SBN 302085
  jkleinbrodt@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Telephone:    415.393.8200
Facsimile:    415.393.8306

CYNTHIA E. RICHMAN (*pro hac vice*)
  crichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036
Telephone:    202.955.8500
Facsimile:    202.467.0539

*Attorneys for Defendant Apple Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

Korean Publishers Association, Korea Electronic Publishing Association, Scalisco LLC, Dan Scalise, PangSky Co., Ltd., and OverX Co., Ltd., on behalf of themselves and all others similarly situated,

                Plaintiffs,

    v.

APPLE INC.,

                Defendant.

Proton AG, on behalf of itself and all others similarly situated,

                Plaintiff,

    v.

APPLE INC.,

                Defendant.

Case No. 4:25-cv-4438-YGR

**DEFENDANT APPLE INC.'S NOTICE OF MOTION AND MOTION TO DISMISS AMENDED CONSOLIDATED CLASS ACTION COMPLAINT OR STAY PROCEEDINGS**

**<u>Hearing:</u>**
Date:     November 18, 2025
Time:     2:00 p.m.
Place:    Courtroom 1
Judge:    Hon. Yvonne Gonzalez Rogers

Case No. 4:25-cv-5450-YGR

Gibson, Dunn &
Crutcher LLP

1  **NOTICE OF MOTION AND MOTION TO DISMISS AMENDED CONSOLIDATED CLASS**

2  **ACTION COMPLAINT**

3          **PLEASE TAKE NOTICE THAT** on November 18, 2025, at 2:00 PM, in Courtroom 1, Fourth

4  Floor, before the Honorable Yvonne Gonzalez Rogers, Defendant Apple Inc., by and through its

5  counsel of record, will and hereby does move under Federal Rules of Civil Procedure 12(b)(1) and

6  12(b)(6) to dismiss Plaintiffs' amended consolidated class action complaint, or in the alternative to stay

7  proceedings pending issuance of the mandate in *Epic Games, Inc. v. Apple Inc.*, No. 25-2935 (9th Cir.).

8  This Motion is supported by this Notice of Motion and Motion; the accompanying Memorandum of

9  Points and Authorities, supporting Declaration of Julian W. Kleinbrodt and attached exhibits, and

10 supporting Declarations of Jae Hun Jeong, Nobuaki Mukai, and Junya Naito; all documents on file in

11 this action; argument of counsel; and such other matters as the Court may consider.

12

13

14 Dated:  September 5, 2025                                    GIBSON, DUNN & CRUTCHER LLP

15

16                                                                      */s/ Cynthia E. Richman*
                                                                         Cynthia E. Richman
17

18

19

20

21

22

23

24

25

26

27

28

**STATEMENT OF ISSUES TO BE DECIDED**

I.      Whether the Consolidated Amended Complaint should be dismissed under Federal Rule of Civil Procedure 12 because:

    A.  The Complaint fails for the threshold reasons that (i) Plaintiffs Korean Publishers Association and Korea Electronic Publishing Association lack standing (Counts I, II, and IV); (ii) Plaintiffs Dan Scalise and Scalisco LLC lack standing (Counts I–III); and (iii) Scalise's and Scalisco LLC's claims are barred by the settlement agreement in *Cameron v. Apple Inc.*, No. 4:19-cv-03074 (N.D. Cal.) (Counts I–III).

    B.  Plaintiffs' Sherman Act and California Unfair Competition Law (UCL) claims are barred by the applicable statutes of limitations (Counts I–III).

    C.  Plaintiffs' wholesale reliance on this Court's decision in *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898 (N.D. Cal. 2021), fatally undermines the Sherman Act claims (Counts I–II); and Plaintiffs fail to plausibly allege facts necessary to support a claim for restitution under the UCL, including (i) that they lack an adequate remedy at law; and (ii) that they seek restitution rather than damages (Count III).

    D.  Either (i) Plaintiffs' Korean- and Japanese-law claims are precluded by the parties' choice-of-law provision; or (ii) principles of international comity warrant those claims' dismissal so that they may be adjudicated in Plaintiffs' home courts (Counts IV–VI).

II.     Whether this case should be stayed in light of Apple's pending appeal in *Epic Games, Inc. v. Apple Inc.*, No. 25-2935 (9th Cir.).

**TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ........................................................................................................ 1

II.  BACKGROUND ......................................................................................................... 2

III.  LEGAL STANDARD .................................................................................................. 5

IV.  ARGUMENT ............................................................................................................... 5

    A.  Plaintiffs' Claims Have Multiple Threshold Defects. ...................................... 5

        1.  KPA and KEPA Lack Standing. ........................................................... 6

        2.  Scalise and Scalisco LLC Lack Standing. ........................................... 7

        3.  The *Cameron* Settlement Bars Scalise's and Scalisco LLC's Claims. ............. 8

    B.  Plaintiffs' Sherman Act and UCL Claims Are Time-Barred. ..................................... 10

    C.  Plaintiffs Fail to State a Claim. ........................................................................ 14

        1.  Plaintiffs Cannot State Sherman Act Claims by Cherry-Picking Portions of *Epic* (Counts I & II). ............................................................. 14

        2.  The UCL Claim Fails (Count III). ....................................................... 16

    D.  The Foreign Law Claims Should Be Dismissed or Stayed (Counts IV–VI)................ 18

        1.  The DPLA's Choice-of-Law Provision Bars the Foreign-Law Claims. ......... 18

        2.  International Comity Warrants Dismissal of the Foreign-Law Claims. ......... 19

        3.  Alternatively, the Foreign-Law Claims Should Be Bifurcated and Stayed. ............................................................................................... 23

    E.  Any Remaining Claims Should Be Stayed Pending Resolution of the *Epic* Appeal. ............................................................................................................ 24

V.  CONCLUSION .......................................................................................................... 25

DEFENDANT APPLE INC.'S MOTION TO DISMISS CLASS ACTION COMPLAINT
CASE NO. 4:25-cv-4438-YGR

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Wells Fargo Bank, N.A.*,
    2015 WL 1434599 (N.D. Cal. Mar. 30, 2015) ................................................................10

*Apple Inc. v. Pepper*,
    587 U.S. 273 (2019) ......................................................................................................18

*Associated Gen. Contractors of Am. v. Cal. Dep't of Transp.*,
    713 F.3d 1187 (9th Cir. 2013) ........................................................................................6

*Aurora Enters. v. NBC*,
    688 F.2d 689 (9th Cir. 1982) ........................................................................................13

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ..................................................................................................5, 12

*Brodsky v. Apple Inc.*,
    445 F. Supp. 3d 110 (N.D. Cal. 2020) ..........................................................................11

*Carney v. Adams*,
    592 U.S. 53 (2020) ........................................................................................................7

*Carrico v. City of S.F.*,
    656 F.3d 1002 (9th Cir. 2011) ........................................................................................6

*Cedar Park Assembly of God v. Kreidler*,
    130 F.4th 757 (9th Cir. 2025) ........................................................................................7

*Coal. for ICANN Transparency Inc. v. VeriSign, Inc.*,
    452 F. Supp. 2d 924 (N.D. Cal. 2006) ............................................................................6

*Cooper v. Tokyo Elec. Power Co. Holdings, Inc.*,
    960 F.3d 549 (9th Cir. 2020) ......................................................................19, 20, 21, 22

*Crowder v. LinkedIn Corp.*,
    2023 WL 2405335 (N.D. Cal. Mar. 8, 2023) ................................................................14

*de Fontbrune v. Wofsy*,
    838 F.3d 992 (9th Cir. 2016) ........................................................................................20

*DeNicolo v. Viking Client Servs., Inc.*,
    2022 WL 22913839 (N.D. Cal. Apr. 1, 2022) ................................................................7

*Dreamstime.com, LLC v. Google LLC*,
    54 F.4th 1130 (9th Cir. 2022) ......................................................................................14

*Eichman v. Fotomat Corp.*,
    880 F.2d 149 (9th Cir. 1989) ..................................................................................13, 14

*Epic Games, Inc. v. Apple Inc.*,
    559 F. Supp. 3d 898 (N.D. Cal. 2021) ..............................................................3, 15, 16

Gibson, Dunn &
Crutcher LLP

DEFENDANT APPLE INC.'S MOTION TO DISMISS CLASS ACTION COMPLAINT
CASE NO. 4:25-cv-4438-YGR

# TABLE OF AUTHORITIES

**Page(s)**

*Epic Games, Inc. v. Apple Inc.*,
   67 F.4th 946 (9th Cir. 2023) ...................................................................................2, 3, 15, 16

*Epic Games, Inc. v. Apple Inc.*,
   2025 WL 1260190 (N.D. Cal. Apr. 30, 2025) ..........................................................................3

*EVOX Prods., LLC v. Verizon Media Inc.*,
   2021 WL 3260609 (C.D. Cal. May 5, 2021) ......................................................................15, 16

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*,
   542 U.S. 155 (2004) ................................................................................................................19

*Fin. & Sec. Prods. Ass'n v. Diebold, Inc.*,
   2005 WL 1629813 (N.D. Cal. July 8, 2005) ............................................................................6

*FTC v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) ..................................................................................................15

*Gamboa v. Apple Inc.*,
   2025 WL 1684890 (N.D. Cal. June 16, 2025) ........................................................................14

*Garcia v. Cnty. of Napa*,
   2022 WL 110650 (N.D. Cal. Jan. 12, 2022) .............................................................................7

*Gonzalez v. Planned Parenthood of L.A.*,
   759 F.3d 1112 (9th Cir. 2014) ................................................................................................15

*In re Google Play Store Antitrust Litig.*,
   --- F.4th ----, 2025 WL 2167402 (9th Cir. July 31, 2025) ....................................................16

*Groves v. Kaiser Found. Health Plan Inc.*,
   32 F. Supp. 3d 1074 (N.D. Cal. 2014) ...................................................................................16

*Guzman v. Polaris Indus. Inc.*,
   49 F.4th 1308 (9th Cir. 2022) .................................................................................................17

*Hirst v. Gertzen*,
   676 F.2d 1252 (9th Cir. 1982) ................................................................................................24

*Howard v. Am. Online Inc.*,
   208 F.3d 741 (9th Cir. 2000) ....................................................................................................9

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ..................................................................................................15

*Korea Supply Co. v. Lockheed Martin Corp.*,
   63 P.3d 937 (Cal. 2003) ..........................................................................................................18

*Landis v. N. Am. Co.*,
   299 U.S. 248 (1936) ................................................................................................................24

*Lee v. Luxottica Retail N. Am., Inc.*,
   280 Cal. Rptr. 3d 230 (Cal. Ct. App. 2021) ...........................................................................18

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

**Page(s)**

*In re Lithium Ion Batteries Antitrust Litig.*,
  2020 WL 7264559 (N.D. Cal. Dec. 10, 2020) ...................................................................9

*Maya v. Centex Corp.*,
  658 F.3d 1060 (9th Cir. 2011) ............................................................................................5

*Melito v. Experian Mktg. Sols., Inc.*,
  923 F.3d 85 (2d Cir. 2019) .................................................................................................9

*Mont. Env't Info. Ctr. v. Stone-Manning*,
  766 F.3d 1184 (9th Cir. 2014) ............................................................................................6

*Mujica v. AirScan Inc.*,
  771 F.3d 580 (9th Cir. 2014) .....................................................................................19, 22

*In re Multidistrict Vehicle Air Pollution*,
  591 F.2d 68 (9th Cir. 1979) .........................................................................................11, 12

*Murthy v. Missouri*,
  603 U.S. 43 (2024) ..............................................................................................................7

*Nexon Korea Corp. v. Ironmace Co. Ltd.*,
  2023 WL 5305996 (W.D. Wash. Aug. 17, 2023) .............................................................22

*O'Shea v. Littleton*,
  414 U.S. 488 (1974) ..........................................................................................................17

*Pace Indus., Inc. v. Three Phoenix Co.*,
  813 F.2d 234 (9th Cir. 1987) ............................................................................................11

*Perkins v. City of San Francisco*,
  2017 WL 1540736 (N.D. Cal. Apr. 28, 2017) ..................................................................24

*Phan v. Transamerica Premier Life Ins. Co.*,
  2023 WL 7597464 (N.D. Cal. Nov. 13, 2023) ...........................................................24, 25

*PhantomALERT v. Apple Inc.*,
  762 F. Supp. 3d 8 (D.D.C. 2025) ......................................................................................17

*Phany Poeng v. United States*,
  167 F. Supp. 2d 1136 (S.D. Cal. 2001) ..............................................................................6

*In re RH Shareholder Deriv. Litig.*,
  2019 WL 580668 (N.D. Cal. Jan. 23, 2019) .....................................................................25

*Richards v. Lloyd's of London*,
  135 F.3d 1289 (9th Cir. 1998) ..........................................................................................18

*Robinson v. Dignity Health*,
  2016 WL 7102832 (N.D. Cal. Dec. 6, 2016) ....................................................................24

*Robledo v. Randstad US, LP*,
  2017 WL 4934205 (N.D. Cal. Nov. 1, 2017) ....................................................................25

Gibson, Dunn & Crutcher LLP

v

# TABLE OF AUTHORITIES

**Page(s)**

*Roe v. San Jose Unified Sch. Dist. Bd.*,
   2021 WL 292035 (N.D. Cal. Jan. 28, 2021) ...................................................................6

*Ruiz v. Bradford Exch., Ltd.*,
   --- F.4th ----, 2025 WL 2473007 (9th Cir. Aug. 28, 2025) ...........................................17

*Ryan v. Microsoft Corp.*,
   147 F. Supp. 3d 868 (N.D. Cal. 2015) ...........................................................................12

*Sainez v. Venables*,
   588 F.3d 713 (9th Cir. 2009)...........................................................................................19

*Samsung Electronics Co. v. Panasonic Corp.*,
   747 F.3d 1199 (9th Cir. 2014) ........................................................................................13

*Satanic Temple v. Labrador*,
   --- F.4th ----, 2025 WL 2524437 (9th Cir. Sept. 2, 2025) ..............................................6

*SaurikIT, LLC v. Apple Inc.*,
   2022 WL 1768845 (N.D. Cal. May 26, 2022) ...................................1, 10, 11, 12, 13, 14

*Shell Petroleum, N.V. v. Graves*,
   709 F.2d 593 (9th Cir. 1983)............................................................................................7

*Société Du Figaro, SAS v. Apple Inc.*,
   No. 4:22-cv-04437 (N.D. Cal. Sept. 13, 2023), ECF No. 84 ....................................18, 19

*Sonner v. Premier Nutrition Corp.*,
   971 F.3d 834 (9th Cir. 2020)..........................................................................................17

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ..........................................................................................................5

*Sprewell v. Golden State Warriors*,
   266 F.3d 979 (9th Cir. 2001)....................................................................................15, 16

*SST Millenium LLC v. Mission St. Dev. LLC*,
   2019 WL 2342277 (N.D. Cal. June 3, 2019) ..................................................................25

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
   2010 WL 3521979 (E.D. Cal. Sept. 3, 2010)..................................................................13

*Stein v. United Artists Corp.*,
   691 F.2d 885 (9th Cir. 1982)............................................................................................8

*Taylor v. Sturgell*,
   553 U.S. 880 (2008) ..................................................................................................10, 16

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) ..........................................................................................................7

*Tritz v. U.S. Postal Serv.*,
   721 F.3d 1133 (9th Cir. 2013)..........................................................................................9

Gibson, Dunn &
Crutcher LLP

vi

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

*Trump v. CASA, Inc.*,
    145 S. Ct. 2540 (2025) ...................................................................................................16

4

*United States v. Ritchie*,
    342 F.3d 903 (9th Cir. 2003) ..........................................................................................15

5

6

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) .......................................................................................................21

7

*Webb v. Trader Joe's Co.*,
    999 F.3d 1196 (9th Cir. 2021) ..........................................................................................2

8

9

*Williams v. Gen. Elec. Cap. Auto Lease, Inc.*,
    159 F.3d 266 (7th Cir. 1998) ............................................................................................9

10

*Woods View II, LLC v. Kitsap Cnty.*,
    484 F. App'x 160 (9th Cir. 2012) .....................................................................................8

11

12

*World Ass'n of Icehockey Players Unions N. Am. Div. v. Nat'l Hockey League*,
    No. 2:24-cv-02135 (W.D. Wash. May 23, 2025), ECF No. 169 .............................22, 23

13

*Zivkovic v. S. Cal. Edison Co.*,
    302 F.3d 1080 (9th Cir. 2002) ........................................................................................24

14

**Statutes**

15

15 U.S.C. § 15b ............................................................................................................................10

16

15 U.S.C. § 26 ................................................................................................................................6

17

Cal. Bus. & Prof. Code § 17208 .................................................................................................10

18

**Regulations**

19

75 Fed. Reg. 43,825 (July 27, 2010) ...........................................................................................12

20

**Rules**

21

Fed. R. Civ. P. 12(b) ......................................................................................................................1

22

N.D. Cal. Civ. L.R. 3-12(a)(1) .......................................................................................................9

23

**Other Authorities**

24

Am. Bar Ass'n, *Competition Laws Outside the United States*, ch. 20, C-3(a) (3d ed.
    2020), https://tinyurl.com/3x6r57m5 (Lexis).................................................20, 21, 22

25

26

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
    Principles and Their Application* ¶ 320c (4th ed. 2021)................................................14

27

28

DEFENDANT APPLE INC.'S MOTION TO DISMISS CLASS ACTION COMPLAINT
CASE NO. 4:25-cv-4438-YGR

# I.     INTRODUCTION

Plaintiffs—four foreign entities, one U.S.-based app developer, and that U.S. developer's LLC—bring a kitchen-sink complaint, retreading old allegations that have been raised in many other lawsuits under a laundry list of supposed theories.  But the Court need not dive deep into the merits.  To start, an assortment of threshold problems plague Plaintiffs' claims, from standing to the statute of limitations.  Those problems aside, the Complaint's allegations are self-defeating: Plaintiffs draw heavily from cherry-picked excerpts of *Epic*, but they ignore the Ninth Circuit's holding in that case that Apple's practices are procompetitive on balance.  The foreign Plaintiffs also invoke the parties' forum-selection clause to justify bringing claims under Korean and Japanese law in this Court, but they ignore that the same clause requires the exclusive application of U.S. law, not foreign law.  Principles of comity counsel against gerrymandering foreign-law claims into the case in this way.  The Court should dismiss Plaintiffs' claims for lack of standing or for failure to state a claim.  *See* Fed. R. Civ. P. 12(b).

*First*, standing and settlement release require dismissal of Plaintiffs Korean Publishers Association (KPA), Korea Electronic Publishing Association (KEPA), Dan Scalise and Scalisco LLC.  Associational Plaintiffs KPA and KEPA lack standing because they have not identified a member who requires the injunctive relief they seek and because they are not authorized to sue for that relief under U.S. law.  Plaintiff Scalise and his company, Plaintiff Scalisco LLC, cannot both have standing, and the Court is not required to guess which one does based on impermissibly intermingled allegations.  In any event, the claims they now assert were released as part of the class settlement this Court approved in *Cameron v. Apple Inc.*, No. 4:19-cv-03074 (N.D. Cal.).

*Second*, Plaintiffs' U.S. claims outside the scope of the settlement are time-barred.  Plaintiffs bring this case to challenge Apple's longstanding policies governing the App Store—policies they acknowledge have existed since the App Store's launch in 2008 and in-app payment's launch in 2009.  This Court found similar claims time-barred in *SaurikIT, LLC v. Apple Inc.*, 2022 WL 1768845 (N.D. Cal. May 26, 2022), *aff'd*, 2023 WL 8946200 (9th Cir. Dec. 28, 2023), and it should do so again here.

*Third*, Plaintiffs' claims fail on the merits.  The antitrust claims fail because Plaintiffs' extensive reliance on the *Epic* decisions prevents Plaintiffs from demanding a different outcome here.  The claim for restitution under California's Unfair Competition Law, an equitable remedy, fails because Plaintiffs

have not established the absence of an adequate remedy at law.  Nor should Plaintiffs' foreign-law claims go forward in this Court: The parties' choice-of-law agreement selects U.S. law and thereby bars the Korean- and Japanese-law claims; and if not barred, those claims should be decided in Korean and Japanese courts with strong national interests in adjudicating Korean- and (novel) Japanese-law claims brought by the Korean and Japanese Plaintiffs concerning alleged competitive harms in those foreign marketplaces.

*Finally*, whatever is left of the case (if anything) should be stayed pending the Ninth Circuit's review of the *Epic* contempt ruling.

## II.    BACKGROUND

"In 2007, Apple entered, and revolutionized, the smartphone market with the iPhone—offering consumers, through a then-novel multi-touch interface, access to email, the internet, and several prein-stalled 'native' apps that Apple had developed itself." *Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946, 966 (9th Cir. 2023); *see* Am. Compl. ¶ 108.  The following year, Apple opened its platform to third party apps through its App Store.  *Epic*, 67 F.4th at 966; *see* Am. Compl. ¶ 108.

The Developer Program License Agreement (DPLA) governs the relationship between a developer and Apple, and the App Store Guidelines reflect Apple's policies for evaluating apps developed and offered for download on the App Store.  Exs. 1–2; *see* Am. Compl. ¶¶ 44, 111.[1]  "The guiding principle of the App Store" is "to provide a safe experience for users to get apps and a great opportunity for all developers to be successful."  Ex. 2 (Guidelines) at 4.  To that end, app developers can offer native iOS apps for download on the App Store only after Apple has reviewed them to ensure they meet certain security, privacy, content, and reliability requirements.  *See* Am. Compl. ¶¶ 49–50, 111, 288.  Developers also must handle "in-app purchases of digital content" through "Apple's in-app payment processing services ('IAPs')."  *Id.* ¶¶ 1, 50, 117.

Apple's centralized model sets it apart from other platforms and allows it to deliver significant

[1] The DPLA and the Guidelines, attached as Exhibits 1–2, are incorporated by reference in the Complaint, *see, e.g.*, Am. Compl. ¶¶ 111 n.4, 151, 185–87, 197, 287, 303, and are therefore appropriate to consider at the Rule 12 stage, *see Webb v. Trader Joe's Co.*, 999 F.3d 1196, 1201 (9th Cir. 2021). Alternatively, the Court may take judicial notice of them because their contents are not subject to reasonable dispute.  *See id.*  Except where otherwise indicated, all exhibit citations are to the Declaration of Julian W. Kleinbrodt.

DEFENDANT APPLE INC.'S MOTION TO DISMISS CLASS ACTION COMPLAINT
CASE NO. 4:25-cv-4438-YGR

security and privacy benefits to consumers. *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 977 (N.D. Cal. 2021). Apple does not restrict developers' abilities to offer their apps on other platforms, such as Android app stores or the web. *See* Ex. 1 (DPLA), Purpose (restrictions apply only to "[a]pplications developed under this Agreement for iOS" or other Apple operating systems). Originally, Apple charged a "30% commission on sales of iOS apps" for a positive price "through the App Store" as well as on "in-app purchases of digital content." Am. Compl. ¶¶ 116–17. Apple has reduced those commissions for certain kinds of transactions over time. *Id.* ¶ 120; *see Epic*, 559 F. Supp. 3d at 947–48.

In 2020, Epic Games, Inc., challenged Apple's App Store distribution and IAP requirements under federal and California law. *See Epic*, 67 F.4th at 966. After a bench trial, this Court rejected all of Epic's federal and state antitrust claims. *Epic*, 559 F. Supp. 3d at 1007. The Court found "the relevant product market [was] that of mobile gaming transactions," rejecting as out of step with "marketplace realities" Epic's proposed markets "for the distribution of iOS apps" and "for payment processing for iOS apps." *Id.* at 954–55, 1027. The Court also found Epic failed to prove Apple had "monopoly power." *Id.* at 1032. The Court concluded that Apple's restrictions on app distribution and in-app payment did not violate the Sherman Act given Apple's procompetitive "security," "interbrand competition," and "intellectual property" justifications. *Id.* at 1038–44. But as to Epic's claim under the UCL, the Court held that former Guidelines 3.1.1 and 3.1.3—which prohibited apps from directing customers to purchasing mechanisms other than in-app purchases—were "unfair." *Id.* at 1056. The Court enjoined Apple from enforcing Guidelines 3.1.1 and 3.1.3. *Epic Games, Inc. v. Apple Inc.*, No. 4:20-cv-5640 (N.D. Cal. Sept. 10, 2021), ECF No. 813 (the Injunction).

In response to the Injunction, Apple created a "[L]ink [E]ntitlement program," through which developers could apply to implement linked-out payments subject to a reduced commission rate relative to IAP payments. *Epic Games, Inc. v. Apple Inc.*, 2025 WL 1260190, at *9, *11 (N.D. Cal. Apr. 30, 2025). Epic moved to enforce the Injunction in March 2024, asserting that Apple's changes were insufficient to comply with the Injunction. *See id.* at *7–27. Agreeing with Epic, this Court held Apple in civil contempt and ordered Apple to stop enforcing its Link Entitlement program. *Id.* at *1. Apple immediately complied with the Court's order and appealed that ruling. *See* Am. Compl. ¶ 195. The Ninth Circuit has expedited review. *Epic Games, Inc. v. Apple Inc.*, No. 25-2935 (9th Cir. May 19,

2025) (order expediting appeal).

Plaintiffs sued on the heels of the Court's contempt order in *Epic*.  Dkts. 1, 44.  According to the Amended Complaint, KPA and KEPA are Korean associations, some of whose (unidentified) "members distributed iOS Apps and processed payments associated with those apps, including for paid apps and apps offering in-app purchases, through the Apple App Store."  Am. Compl. ¶¶ 30, 35.  Plaintiffs PangSky, a Korean company; OverX, a Japanese company; and Dan Scalise, a U.S.-based individual who owns and operates Plaintiff Scalisco LLC, develop gaming apps offered through the App Store.  *Id.* ¶¶ 40, 42–43, 47.  Plaintiff Proton, a Swiss company, develops various apps, including Proton Mail.  *Id.* ¶ 21.  The individual developers say that some of the purchasers of their iOS apps or in-app products are "in the United States."  *Id.* ¶¶ 29, 41, 45, 48.

Plaintiffs rest many of their allegations on evidence, testimony, or conclusions reached by the Court in *Epic*.  *E.g.*, Am. Compl. ¶¶ 4–8, 106, 116, 202–52.  But Plaintiffs ultimately allege a case at odds with *Epic*'s outcome.  They assert that the relevant product markets include single-brand aftermarkets for "iOS App Distribution" and "iOS App Payment Processing"—a theory rejected in *Epic*.  *Id.* ¶¶ 75, 86.  And in the main, Plaintiffs appear to allege that Apple's commissions, restrictions on app distribution, restrictions on IAP, and past restrictions on steering for app purchases are anti-competitive—even though the Ninth Circuit in *Epic* upheld all these practices under the Sherman Act as procompetitive.  *See id.* ¶¶ 1, 303.  Nevertheless, and unwilling to commit themselves to any particular route for establishing antitrust liability, Plaintiffs say the practices involved "*inter alia*," "exclusive dealing," "monopoly leveraging, and in the alternative, aftermarket monopolization," "as well as other unreasonable restraints"—all of which rests on a market definition rejected in *Epic*.  *Id.* ¶¶ 310, 319.[2]

Plaintiffs, who seek to represent three classes, bring six claims.  *First*, Plaintiffs claim Apple engaged in unreasonable restraints of trade prohibited by Sections 1 and 3 of the Sherman Act, for which they seek injunctive relief and, excluding KPA and KEPA, damages as well.  Am. Compl. ¶¶ 299–310.  *Second*, Plaintiffs claim Apple engaged in unlawful monopolization under Sections 2 and

---

[2] Plaintiffs also splice in other, seemingly irrelevant allegations.  *See, e.g.*, Am. Compl. ¶¶ 163, 183 (complaining about Apple's "family plans" and "the stigmatizing 'green bubble,' which Apple applies to non-iPhone users in text message chains"); *id.* ¶¶ 129, 136, 164–73 (remonstrating about Apple's supposed "battle against 'super apps'" even though no Plaintiff alleges it develops such apps).

Gibson, Dunn &
Crutcher LLP

3 of the Sherman Act, for which they seek the same relief. *Id.* ¶¶ 311–24. *Third*, Scalise, Scalisco LLC, PangSky, Proton, and OverX claim Apple violated the UCL, and they seek restitution of part of the commissions they paid. *Id.* ¶¶ 325–46. *Fourth*, PangSky, KPA, and KEPA seek injunctive relief for alleged violations of the Korean Monopoly Regulation & Fair Trade Act (MRFTA); PangSky also requests damages. *Id.* ¶¶ 347–64. *Fifth*, OverX seeks injunctive relief under the Japanese Antimonopoly Act and Japan's newly enacted Mobile Software Competition Act, the substantive provisions of which are not yet in force. *Id.* ¶¶ 365–80. *Sixth*, OverX seeks damages for an alleged violation of Article 709 of the Japan Civil Code. *Id.* ¶¶ 381–88.

### III.    LEGAL STANDARD

"At the pleading stage, the plaintiff must 'clearly allege facts demonstrating' each element" of standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (alteration adopted). Under Federal Rule of Civil Procedure 12(b)(1), courts must dismiss claims over which they lack subject-matter jurisdiction. *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011). And a complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

### IV.    ARGUMENT

The Complaint should be dismissed for multiple threshold reasons. KPA, KEPA, Scalise, and Scalisco LLC lack standing, and Scalise's and Scalisco LLC's claims also are precluded by the *Cameron* settlement (§ IV.A). Plaintiffs' U.S. claims are also time-barred because they challenge 17- and 16-year-old Apple policies (§ IV.B). The Sherman Act claims should be dismissed because the claims are inconsistent with *Epic*, on which the Complaint's allegations largely rely; and the UCL claims should be dismissed because Plaintiffs have not alleged an inadequate remedy at law, and because their requested damages are not recoverable as UCL restitution (§ IV.C). The foreign-law claims should be dismissed, either as precluded by the parties' choice-of-law agreement or on international-comity grounds (§ IV.D). And because Plaintiffs' claims rest in significant part on the *Epic* Injunction, whatever remains should be stayed pending issuance of the mandate in *Epic* (§ IV.E).

#### A.    Plaintiffs' Claims Have Multiple Threshold Defects.

The Court should dismiss KPA's, KEPA's, Scalise's, and Scalisco LLC's claims on threshold

grounds.  Each lacks standing.  Scalise's and Scalisco LLC's claims are also precluded by the *Cameron* settlement.

### 1.    KPA and KEPA Lack Standing.

KPA and KEPA fail to establish "associational standing to sue on behalf of their . . . members" for injunctive relief.  Am. Compl. ¶ 276.  An association must plausibly allege that "its members would otherwise have standing to sue in their own right," *Mont. Env't Info. Ctr. v. Stone-Manning*, 766 F.3d 1184, 1188 (9th Cir. 2014), with "specific allegations establishing that at least one *identified member* . . . would suffer harm."  *Roe v. San Jose Unified Sch. Dist. Bd.*, 2021 WL 292035, at *11 (N.D. Cal. Jan. 28, 2021) (quoting *Associated Gen. Contractors of Am. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013)).  But "[d]espite the general requirement to name affected members," KPA and KEPA "name[] no member . . . who would have standing to sue."  *Satanic Temple v. Labrador*, --- F.4th ----, 2025 WL 2524437, at *3 (9th Cir. Sept. 2, 2025) (affirming dismissal for lack of standing).[3]

To the contrary, the Complaint offers only abstract assertions that KPA and KEPA "have one or more members" who are parties to the DPLA, "paid supra-competitive commissions," and "have been injured."  Am. Compl. ¶¶ 276–77.  But "identify[ing] only vague categories of members that might suffer harm" is insufficient.  *Coal. for ICANN Transparency Inc. v. VeriSign, Inc.*, 452 F. Supp. 2d 924, 934 (N.D. Cal. 2006).  As the Ninth Circuit recently held, associational standing fails in the absence of "clear, rather than merely speculative, [allegations] that one or more members have been or will be adversely affected by" the challenged conduct.  *Satanic Temple*, 2025 WL 2524437, at *3; *accord Roe*, 2021 WL 292035, at *12; *Carrico v. City of S.F.*, 656 F.3d 1002, 1005–08 (9th Cir. 2011).

Even if KPA and KEPA have associational standing, they lack standing to seek injunctive relief under U.S. law.  Section 16 of the Clayton Act authorizes injunctive relief subject to the standard applicable in "courts of equity."  15 U.S.C. § 26.  Under this "traditional irreparable injury standard," the question is "the possibility of injury to *Plaintiff[s]* and not [to] third parties."  *Phany Poeng v. United States*, 167 F. Supp. 2d 1136, 1142 (S.D. Cal. 2001).  Neither KPA nor KEPA alleges injuries they might imminently suffer, instead alleging harms only to their (unidentified) members.  The associations therefore may not pursue claims for injunctive relief under section 16.  *See Fin. & Sec. Prods. Ass'n v.*

---

[3] PangSky is a Korean developer, Am. Compl. ¶ 40, but KPA and KEPA do not claim it as a member.

6

Gibson, Dunn &
Crutcher LLP

*Diebold, Inc.*, 2005 WL 1629813, at *3 (N.D. Cal. July 8, 2005) (associational plaintiff alleging injury only to its members lacked "standing under § 16").

### 2.    Scalise and Scalisco LLC Lack Standing.

Plaintiffs "must demonstrate standing" under Article III "for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).  To do so, they must allege "an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Cedar Park Assembly of God v. Kreidler*, 130 F.4th 757, 764–65 (9th Cir. 2025).  "[A]n abstract and generalized" "grievance" will not do.  *Carney v. Adams*, 592 U.S. 53, 58 (2020).  Scalise and Scalisco LLC have two related—but independently dispositive—standing problems.

*First*, the Complaint groups the two together as "Scalisco" and equivocates as to which has allegedly been harmed and how.  Am. Compl. ¶ 43 ("Collectively, Scalisco LLC and Dan Scalise are referred to herein as 'Scalisco.'").  To establish past harm, for example, Plaintiffs allege that "Scalisco"—that is, the artificial amalgamation of Scalise and his LLC—"sold iOS Apps to U.S.-based customers" and "paid Apple supra-competitive commissions" on those sales, causing "Scalisco" to be "directly impacted" by Apple's conduct.  *Id.* ¶¶ 45, 49, 273–74.  But "standing is not dispensed in gross," and Plaintiffs cannot "lump[] [their] claims together" to manufacture standing.  *DeNicolo v. Viking Client Servs., Inc.*, 2022 WL 22913839, at *4 (N.D. Cal. Apr. 1, 2022) (Gonzalez Rogers, J.); *see Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (court "erred by treating the defendants, plaintiffs, and platforms each as a unified whole").  Because Plaintiffs have chosen to hide the ball, neither Scalise nor his LLC alleges that it is the injured party and so neither has standing.  *See Garcia v. Cnty. of Napa*, 2022 WL 110650, at *6 (N.D. Cal. Jan. 12, 2022) ("vague and insufficiently detailed" standing allegations do not suffice), *aff'd*, 2024 WL 1734125 (9th Cir. Apr. 23, 2024).

*Second*, neither Plaintiff's allegations suffice to establish standing in any event.  According to the Complaint, Scalisco LLC "distributes [apps] through the iOS App Store," but Scalise, not the LLC, is the developer of record (and party to the DPLA) for the apps at issue.  Am. Compl. ¶¶ 42, 44.  That means Scalisco LLC cannot be the right party to assert developer claims based on the terms in the DPLA—which is the core of the Complaint.  *See Shell Petroleum, N.V. v. Graves*, 709 F.2d 593, 595–96 (9th Cir. 1983) ("To have standing . . . the injury complained of" must be "direct [and] individual").

As for Scalise, he alleges that he is the party to the DPLA but that he is just the "owne[r] and operat[or]" of Scalisco LLC, the alleged entity distributing apps. Am. Compl. ¶¶ 42–44. That means the DPLA's restrictions do not affect him directly—as he is not the one distributing apps—and, absent more, an injury to a company does not amount to an actionable injury to its members, officers, shareholders, or employees. *See Stein v. United Artists Corp.*, 691 F.2d 885, 896 (9th Cir. 1982); *Woods View II, LLC v. Kitsap Cnty.*, 484 F. App'x 160, 161 (9th Cir. 2012). Thus, Plaintiffs' tangled allegations deprive Scalise and Scalisco LLC of standing.

### 3. The *Cameron* Settlement Bars Scalise's and Scalisco LLC's Claims.

Scalise's and Scalisco LLC's claims are also barred for a separate reason: They were released and are precluded by Scalise's participation in the class-action settlement in *Cameron*. There, app developers alleged Apple's App Store and IAP restrictions—including its refusal to allow "anyone else to distribute apps and related digital products" to iOS users—"allowed [Apple] to charge developers a supracompetitive 30% commission on the sale of paid apps and in-app products." Ex. 3 ¶¶ 2–3, 43.

As part of the settlement, approved by the Court in June 2022, the developers "settle[d] the case in its entirety with respect to all potential claims arising out of the same facts," and "forever releas[ed]" "any and all past, present, and future claims," "known or unknown," "recognized now or hereafter," that "were brought, could have been brought, or arise from the same facts underlying the claims as-serted in the [*Cameron*] Action." Ex. 4 § 10.1. The release covered "any theory of recovery" and "any type of relief," including "claims for monetary relief" and "restitution, or equitable relief." *Id.* As a non-exclusive "example," the settlement "expressly release[d]" claims alleging that "commissions charged by Apple on paid downloads or in-app purchases of digital content (including subscriptions) through the App Store are supracompetitive, inflated, or otherwise set at unlawful amounts." *Id.* To make the settlement's preclusive effect on any future litigation crystal clear, the developers further "expressly agree[d] to the appropriateness of Apple's commission structure"; "covenant[ed] not to sue Apple on any claim that was or could have been asserted in the Action"; and accepted that the settle-ment "may be pleaded as a full and complete defense to, and may be used as the basis for an injunction against, any action, suit, or other proceeding which may be instituted, prosecuted, or attempted for claims, causes of action, and/or theories of relief covered by the covenant not to sue and/or the releases

in this Settlement Agreement." *Id.* §§ 5.2, 11.3.

The broad release in the *Cameron* settlement bars Scalise's claims. Scalise was a member of the *Cameron* settlement class. *See* Am. Compl. ¶ 46. Yet he attempts to bring "future claim[s]" "for monetary relief," "restitution," and "equitable relief" "aris[ing] from the same facts underlying the claims asserted in the [*Cameron*] Action," Ex. § ¶ 10.1: that Apple's App Store and IAP restrictions— including its refusal to allow "anyone else to distribute apps and related digital products" to iOS users— "allowed it to charge developers a supracompetitive 30% commission on the sale of paid apps and in-app products," Ex. 3 ¶¶ 2–3, 43; *see* Am. Compl. ¶¶ 1, 13, 322, 331, 336, 342, 345–46. Were there any doubt about the overlap, Scalise related this case with *Epic*, which in turn is related to *Cameron*, meaning *Cameron* and this case necessarily "concern substantially the same parties, property, transaction, or event." L.R. 3-12(a)(1). Thus, Scalise has "covenant[ed] not to sue Apple" on the claims he raises here, and the settlement is "a full and complete defense to" his claims. Ex. 4 §§ 5.2, 11.3.

It does not matter that Scalise insists that he seeks relief "only to the extent [his] claims have not been released" and that his claims are "based on . . . events that occurred after" the date of the settlement. Am. Compl. ¶¶ 46, 257. Again, Scalise agreed to release "any and all . . . future claims," "known or unknown," "recognized now or hereafter," that "arise from the same facts" as in *Cameron*. Ex. 4 § 10.1. And it is beyond debate that a settlement "may release" claims "'based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented *and might not have been presentable in the class action*.'" *Howard v. Am. Online Inc.*, 208 F.3d 741, 747 (9th Cir. 2000); *see also*, *e.g.*, *Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 95 (2d Cir. 2019) (explaining that settlements may "release liability for claims accruing after the class period"); *Williams v. Gen. Elec. Cap. Auto Lease, Inc.*, 159 F.3d 266, 273 (7th Cir. 1998) (similar). Indeed, it would fundamentally undermine the "global peace" that is a key "incentive to class action settlements" if plaintiffs could settle their claims and then sue again the very next day based on continuing in-app transactions, generating a never-ending stream of litigation. *In re Lithium Ion Batteries Antitrust Litig.*, 2020 WL 7264559, at *13 (N.D. Cal. Dec. 10, 2020) (Gonzalez Rogers, J.), *aff'd*, 2022 WL 16959377 (9th Cir. Nov. 16, 2022). It also would fundamentally undermine the finality conveyed by the "res judicata effect" of a "[c]ourt-approved settlement agreement." *Tritz v. U.S. Postal Serv.*,

721 F.3d 1133, 1141 (9th Cir. 2013); *see, e.g.*, *Adams v. Wells Fargo Bank, N.A.*, 2015 WL 1434599, at \*3 (N.D. Cal. Mar. 30, 2015) (Gonzalez Rogers, J.) (dismissing complaint with prejudice on res judicata grounds because of previous settlement).

The same principles require dismissal of Scalisco LLC's claims as well. Scalise allegedly "applied for a developer account in his own name for the benefit of Scalisco LLC." Am. Compl. ¶ 44. Scalise and Scalisco LLC nowhere allege that they suffered distinct injuries or have independent relationships with Apple. *See supra* § IV.A.2. Their claims are thus one and the same, so Scalise, both as a matter of law and under the settlement's terms, "may not avoid [the *Cameron* settlement's] preclusive force by relitigating through a proxy." *Taylor v. Sturgell*, 553 U.S. 880, 895 (2008); *see* Ex. Y at 26 (barring claims by class members "and their respective heirs, executors, administrators, representatives, agents, partners, successors, and assigns"). Scalisco LLC's claims are therefore barred too.

### B.    Plaintiffs' Sherman Act and UCL Claims Are Time-Barred.

Plaintiffs' Sherman Act and UCL claims are barred by those statutes' four-year limitations periods. *See* 15 U.S.C. § 15b; Cal. Bus. & Prof. Code § 17208. Plaintiffs filed this lawsuit on May 23, 2025. *See* Dkt. 1. Proton (which filed its own suit on June 30, 2025), Scalisco LLC, and OverX were added as plaintiffs in the consolidated amended complaint on August 8, 2025. *See* Dkts. 1, 44. But Plaintiffs' own allegations make clear their claims accrued far earlier than May 2021. Their claims for retrospective relief are therefore time-barred, and, because "'the Ninth Circuit looks to'" the limitations period to determine whether "equitable relief" is barred by laches, their requests for injunctive relief fail, too. *SaurikIT*, 2022 WL 1768845, at \*2.

By their express admission, Plaintiffs base their claims on Apple's allegedly "longstanding" "policies and practices"—in place "[f]or more than a decade," "since the launch of the App Store." Am. Compl. ¶¶ 1, 8, 78, 115, 117, 144, 198, 284. Apple's requirement that apps be distributed to iOS users through the App Store was introduced "[i]n 2008, when Apple first launched the App Store." *Id.* ¶ 116; *accord id.* ¶¶ 186, 284. And Plaintiffs allege Apple's challenged IAP requirements, including associated rules against "steering consumers to alternative app distribution or payment processing options," came about "in 2009" when "Apple imposed the requirement that in-app purchases of digital content be handled through IAP, subject to Apple's 30% commission." *Id.* ¶¶ 1, 117. The Complaint

thus alleges that, "[s]ince the launch of the App Store, Apple has had complete control over the commission it charges developers." *Id.* ¶ 115. Accordingly, Plaintiffs' claims accrued no later than 2009, and Plaintiffs were required to sue by 2013.

Plaintiffs' claims do not fall within the Sherman Act's "exception" for "continuing violations." *SaurikIT*, 2022 WL 1768845, at *2; *see also Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 136–38 (N.D. Cal. 2020) (describing the UCL's exceptions, which are similar to but narrower than those in the Sherman Act). This exception requires an "alleg[ation] that the defendant completed an overt act during the limitations period." *SaurikIT*, 2022 WL 1768845, at *2. An overt act is a "new and independent" act that "inflict[s] new and accumulating injury to the plaintiff" and "that is not merely a reaffirmation of a previous act." *Id.*; *see Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 238 (9th Cir. 1987). No overt act is alleged here: There are no allegations suggesting Apple has changed its conduct to impose "ever-more restrictive requirements," *SaurikIT*, 2022 WL 1768845, at *3, and the mere passage of "each day" while subject to the original decision about the App Store's design has never "constituted a new cause of action," *In re Multidistrict Vehicle Air Pollution*, 591 F.2d 68, 71 (9th Cir. 1979).

This Court's decision in *SaurikIT* is instructive. There, a would-be app store developer brought antitrust claims complaining that "Apple ha[d] created a system where its App Store is the only app store that is available for downloading and purchasing apps on the iPhone, and its in-app purchasing system is the only system for payment processing." *SaurikIT*, 2022 WL 1768845, at *1. And there too, the claims were untimely on their face. *See id.* at *2. The developer asserted that its claims were timely on a continuing-violation theory because it had alleged "'millions' of overt acts within the statute of limitations period," including "technological updates" and "tying and/or exclusive dealing by requiring developers to agree to Apple's Developer Agreement." *Id.*; *see* First Am. Compl. ¶ 83, *SaurikIT, LLC v. Apple Inc.*, No. 4:20-cv-08733 (N.D. Cal. Jan. 19, 2022), ECF No. 72 (alleging "updated terms" in developer contracts and "enforcing [Apple's] exclusionary terms" as recurring overt acts).

Unconvinced, this Court held that the bulk of the "complaint fail[ed] to allege sufficiently how the alleged acts within the statutory period differ[ed] from what Apple is alleged to have done starting in 2008 and 2009." *SaurikIT*, 2022 WL 1768845, at *2. For example, "the complaint generally allege[d] that Apple 'updated its contracts (including within the four years preceding the original

1    complaint in this lawsuit) to include ever-more restrictive requirements that shored up perceived

2    "holes" in app developers' ability to use alternative iOS app distribution services.'" *Id.* at *3 (alteration

3    adopted).  Because the plaintiff did "not explain how the terms of these contracts differed from the

4    contracts outside the statutory period," it "fail[ed] to explain how those acts [were] not mere reaffirma-

5    tions of Apple's 'seminal decisions in 2008 and 2009.'"  *Id.* at *2–3; *see Ryan v. Microsoft Corp.*, 147

6    F. Supp. 3d 868, 885 (N.D. Cal. 2015) ("Maintaining and reaffirming prior agreements do not suffice

7    to show an overt act.").

8         The allegations in this case about Apple's "continuous course of conduct," Am. Compl. ¶ 278,

9    track those rejected in *SaurikIT*, often word-for-word, *compare id.* ¶¶ 279–86, *with SaurikIT*, No. 4:20-

10   cv-08733 (N.D. Cal. Jan. 19, 2022), ECF No. 72 ¶¶ 67–77.  Plaintiffs assert that "Apple has consistently

11   imposed ever-more-restrictive means aimed at snuffing out alternative app stores."  Am. Compl. ¶ 279.

12   But beyond mentioning an irrelevant petition the U.S. Copyright Office resolved in 2010, *see id.*, "[t]he

13   complaint lacks the factual allegations" to support this assertion, *SaurikIT*, 2022 WL 1768845, at *3;

14   *see also* 75 Fed. Reg. 43825, 43828–30 (July 27, 2010).  Next, Plaintiffs say developers renew their

15   agreements with Apple "every year" and that Apple continues to enforce the DPLA and Guidelines.

16   Am. Compl. ¶¶ 278–80, 287.  But as in *SaurikIT*, Plaintiffs have "not alleged that Apple's conduct with

17   respect to the . . . Developer Agreements, and other contractual enforcement has changed, nor how they

18   have changed, within the last four years."  2022 WL 1768845, at *3.  Indeed, Plaintiffs effectively

19   admit the lack of changes here when they allege that, in recent years, "Apple has made minimal cos-

20   metic changes while preserving the core structure of its payment processing monopoly."  Am. Compl.

21   ¶ 295.  And while Plaintiffs mention as a last gasp "Apple's 2018 and 2019 updates" that allegedly

22   prevented unauthorized modifications to iOS, Am. Compl. ¶ 285—the only conduct deemed timely in

23   *SaurikIT*, 2022 WL 1768845, at *3—those updates are now outside the four-year limitations period as

24   well.  Plaintiffs' allegations thus describe "mere[]" "reaffirmation[s] of a previous act" and cannot

25   "qualify" as "new and independent" overt acts.  *Id.* at *2; *see also Air Pollution*, 591 F.2d at 72 ("una-

26   bated inertial consequences" of a long-standing decision do not restart the limitations period).

27         Nor can Plaintiffs circumvent the time bar by peppering their Complaint with quotations from

28   and citations to various cases.  *See Twombly*, 550 U.S. at 555 (courts need not accept "a legal conclusion

1    couched as a factual allegation").  The cases on which Plaintiffs seek to rely are inapposite in any event.

2    For example, *Samsung Electronics Co. v. Panasonic Corp.* involved a horizontal agreement in which

3    a group of memory card developers conspired to impose an anticompetitive licensing scheme on Sam-

4    sung and others via a 2003 license agreement.  747 F.3d 1199, 1201–02 (9th Cir. 2014).  When the

5    defendants later developed a new set of memory card technologies, defendants had a separate meeting

6    and adopted a new and different anticompetitive licensing scheme embodied in a new 2006 license.  *Id.*

7    The court held that under the circumstances of that case—where a new group met again to hatch an

8    entirely new licensing scheme involving different technology and potentially different licensees under

9    a different contract—the second contract was not a mere reaffirmation.  *Id.* at 1204.  Plaintiff does not

10   allege any new scheme or identify any new provision in or expansion of Apple's agreements within

11   the limitations period.  And the "[c]ontinual purchasing of the products is merely an affirmation of

12   defendants' prior conduct and does not inflict a 'new and accumulating' injury on plaintiff."  *Stanislaus*

13   *Food Prods. Co. v. USS-POSCO Indus.*, 2010 WL 3521979, at *16 (E.D. Cal. Sept. 3, 2010) (citing

14   *Aurora Enters. v. NBC*, 688 F.2d 689, 694 (9th Cir. 1982)).[4]

15         At any rate, it does not matter how many cases Plaintiffs cite for the proposition that "enforcing

16   an anticompetitive contract . . . constitutes a new overt act."  Am. Compl. ¶ 283; *see id.* ¶ 280.

17   "[A]ctive enforcement" restarts a limitation period only "[u]nder certain circumstances."  *Eichman v.*

18   *Fotomat Corp.*, 880 F.2d 149, 160 (9th Cir. 1989).  Supposed "enforcement" against third parties

19   here—such as the alleged rejection of apps by non-parties LiquidSky and Tribe; restrictions allegedly

20   imposed on non-parties Spotify, WordPress, and Microsoft; and the alleged enforcement of "IAP re-

21   quirements against [non-party] music streaming services," Am. Compl. ¶¶ 281–83, 287, 291—is not

22   alleged to have inflicted any "new . . . injury *to the plaintiff[s]*" and thus cannot count as overt acts,

23   *SaurikIT*, 2022 WL 1768845, at *2 (emphasis added).  As this Court has explained, holding that the

24

---

25   [4] What's more, the *Samsung* court added that the adoption of a new license "was a 'new and independ-
26   ent act'" because the license covered a new "technological development[]" not covered by the previous
     license.  747 F.3d at 1203–04; *see id.* at 1204 (previous license did not "cover expansion to future
27   technological developments").  But the same isn't true here because the DPLA expressly covers future
     versions of iOS.  Ex. 1 (DPLA) § 1.2 ("'iOS' means the iOS operating system software provided by
28   Apple for use by You . . . *including any successor versions thereof*" (emphasis added)); *id.* § 3.2(g)
     (distribution restriction applies to "Applications for iOS," with no version restriction).

DEFENDANT APPLE INC.'S MOTION TO DISMISS CLASS ACTION COMPLAINT
CASE NO. 4:25-cv-4438-YGR

limitations period restarts "every time Apple . . . operate[s] its business on a daily basis" "is not supported by the case law" and would "effectively swallow[] the statute of limitations rule." *Id.* at *3 (rejecting allegations involving "a third-party's new product").

Nor does it matter for limitations purposes that Plaintiffs themselves might have paid Apple commissions they believe to be "supra-competitive." Am. Compl. ¶ 278. For one, "mere charging of monopoly prices is not unlawful" and therefore does not "give[] rise to a continuing violation." *Crowder v. LinkedIn Corp.*, 2023 WL 2405335, at *3 (N.D. Cal. Mar. 8, 2023); *see Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1137 (9th Cir. 2022) ("charging of monopoly prices, is . . . not unlawful"); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 320c (4th ed. 2021) ("If the mere charging of a monopoly price constitutes a 'continuing violation' . . . , then we have indefinitely lengthened the statute of limitation on claims of successful monopolization."). For another, "the passive receipt of profits from [even] an illegal contract by an antitrust defendant is not an overt act of enforcement which will restart the statute of limitations." *Eichman*, 880 F.2d at 160. Because Plaintiffs' Sherman Act and UCL claims are untimely and no exception applies, the Court should dismiss those claims with prejudice.[5]

**C.      Plaintiffs Fail to State a Claim.**

All of Plaintiffs' claims are deficiently pleaded. The Sherman Act claims fail because Plaintiffs' approach to the corresponding allegations—cherry-picking portions of the *Epic* decisions—is an impermissible pleading practice (§ IV.C.1). The UCL claim for restitution, an equitable remedy, fails because Plaintiffs have not alleged that they lack an adequate remedy at law and because the damages they seek are not recoverable as restitution (§ IV.C.2). The Korean MRFTA claim and Japanese claims should be dismissed on choice-of-law or international-comity grounds (§ IV.C.3).

**1.      Plaintiffs Cannot State Sherman Act Claims by Cherry-Picking Portions of *Epic* (Counts I & II).**

The Complaint relies extensively on this Court's findings and conclusions in the *Epic* litigation,

---

[5] Plaintiffs do not specifically allege when they first paid supposedly inflated rates. But that is irrelevant because the statute of limitations turns on when a defendant's properly alleged overt acts occurred, not when a Plaintiff "first purchased [a product] at a supracompetitive price." *Gamboa v. Apple Inc.*, 2025 WL 1684890, at *5 (N.D. Cal. June 16, 2025). Otherwise, "[Plaintiffs] would be allowed to sue Apple [fifteen] years later if Apple still reaps [alleged] monopoly profits from its [2008 and 2009] decision[s]"—"disserv[ing] the goal of incentivizing prompt enforcement of the antitrust laws." *Id.*

1   but this approach is self-defeating. "'[I]f the plaintiff refers extensively to [a] document,'" that docu-

2   ment is incorporated by reference and "treat[ed] as though" it is "part of the complaint itself." *Khoja*

3   *v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). The doctrine exists to "prevent[]

4   plaintiffs from selecting only portions of documents that support their claims, while omitting portions

5   of those very documents that weaken—or doom—their claims." *Id.* For that reason, courts must "as-

6   sume as true contents of documents incorporated by reference," *EVOX Prods., LLC v. Verizon Media*

7   *Inc.*, 2021 WL 3260609, at *1 (C.D. Cal. May 5, 2021), and, where the contents of those documents

8   "'conflict with allegations in the complaint,'" courts "need not accept those allegations as true," *Gon-*

9   *zalez v. Planned Parenthood of L.A.*, 759 F.3d 1112, 1115 (9th Cir. 2014); *accord United States v.*

10  *Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). In other words, a plaintiff may "plead himself out of a

11  claim" by relying on documents—including adjudicatory decisions—"that fatally undermine[]" that

12  claim. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988–89 (9th Cir. 2001) (dismissing complaint

13  that relied on arbitration award findings that contradicted the plaintiff's allegations).

14       That's precisely what Plaintiffs have done here. Consider the allegations about market defini-

15  tion, "[a] threshold step in any antitrust case." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir.

16  2020). To substantiate Plaintiffs' worldwide-minus-China "geographic market for iOS App Distribu-

17  tion and iOS App Payment Processing," Am. Compl. ¶ 105, the only factual allegations are the *Epic*

18  finding that Chinese "operating systems are, in fact, different," and this Court's observation there that

19  "[t]he parties agree that China is different," *Epic*, 559 F. Supp. 3d at 990–91; *see* Am. Compl. ¶ 106

20  (quoting this language). But these observations relate to the market for "mobile gaming transactions,"

21  *Epic*, 559 F. Supp. 3d at 987; as to Plaintiffs' supposed iOS app distribution market, the Court *rejected*

22  that market as contrary to "marketplace realities," *id.* at 955–96; *see* Am. Compl. ¶¶ 75, 86.

23       Or consider the assertion that Apple has monopoly power in the relevant markets, Am. Compl.

24  ¶¶ 112, 119, another prerequisite to Plaintiffs' Section 2 claim, *see Epic*, 67 F.4th at 972. Again, Plain-

25  tiffs' principal allegations are taken verbatim from *Epic*'s findings and conclusions about the compet-

26  itiveness of Apple's 30% commission, *see*, *e.g.*, Am. Compl. ¶ 116 (quoting *Epic*'s fact-findings); *id.*

27  ¶¶ 194, 201, 203 (relying on *Epic*'s legal conclusions). But, again, this language concerned the gaming-

28  transactions market—a market the Court settled on instead of *Epic*'s (and now Plaintiffs')

"fundamental[ly] . . . flaw[ed]" single-brand theory.  *Epic*, 559 F. Supp. 3d at 1021.  And the Court's findings came with the caveat that Apple did *not* have "monopoly power."  *Id.* at 1032.

As one final example, Plaintiffs aver "Apple's public-facing rationale" for its centralized model—"that its restrictions protect user privacy or security"—is "pretextual."  Am. Compl. ¶ 3.  This is a conclusory legal assertion, not a factual allegation.  And it gets Plaintiffs nowhere given that the Court must treat as true its own detailed findings, incorporated into the Complaint, "that centralized distribution through the App Store increases security" by "thwarting social engineering attacks" and by "allowing Apple to filter fraud, objectionable content, and piracy during app review while imposing heightened requirements for privacy."  *Epic*, 559 F. Supp. 3d at 1005, 1006–07; *see EVOX*, 2021 WL 3260609, at *1 (entirety of incorporated document deemed true on motion to dismiss); *Groves v. Kaiser Found. Health Plan Inc.*, 32 F. Supp. 3d 1074, 1079 n.4 (N.D. Cal. 2014) (Gonzalez Rogers, J.) ("Though a court generally is obligated to regard the well-pleaded facts of a complaint as true . . . , that principle gives way when the allegations contradict documents . . . incorporated by reference.").

In short, Plaintiffs' extensive reliance on *Epic* incorporates the decision by reference—including the findings and holdings that "fatally undermine[]" Plaintiffs' Sherman Act claims.  *Sprewell*, 266 F.3d at 988.  To be sure, Plaintiffs are certainly free to treat themselves as bound by the *Epic* judgment just as they would have been if, say, they had joined Epic as plaintiffs in that case.  *See Taylor*, 553 U.S. at 893.  But then they would have to take the bitter with the sweet: product markets that exclude Proton (which does not develop games), a holding that Apple does not possess monopoly power, and a judgment that Apple's centralized distribution model and IAP requirements do not violate the Sherman Act.  If, however, Plaintiffs wish to depart from the *Epic* judgment and press their own allegations, then they cannot seek to state a claim by reciting favored bits of *Epic*.  *See In re Google Play Store Antitrust Litig.*, --- F.4th ----, 2025 WL 2167402, at *5 (9th Cir. July 31, 2025) (given the different facts at issue, Google could not rely on the *Epic* judgment); *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2557 (2025) ("As a matter of law, [an] injunction's protection extends only to the suing plaintiff.").

## 2.     The UCL Claim Fails (Count III).

Proton, PangSky, Scalisco, and OverX seek restitution of some of the allegedly "supra-competitive iOS App fees they have paid Apple."  Am. Compl. ¶ 346.  Restitution "under the UCL" is an

"equitable" remedy, meaning that it is available in federal court only if a plaintiff "establish[es] that she lacks an adequate remedy at law" "for past harm." *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020). But Plaintiffs have not established that they lack such a remedy or that what they are seeking, properly understood, is restitution.

*First*, the "[C]omplaint does not allege that [Plaintiffs] lack[] an adequate legal remedy" or plead facts that would support that conclusion. *Id.* To the contrary, Plaintiffs advance the theory that they should receive damages based on the "supra-competitive prices" or "supra-competitive transaction fees" charged. Am. Compl. ¶¶ 308, 322. This is the same basis—overcharge based on "supra-com-petitive iOS App fees"—as their UCL-based restitution request. *Id.* ¶¶ 335, 345–46; *see id.* Prayer For Relief XIII(C) (requesting "damages and/or restitution"). That is fatal to their UCL claim. *See Sonner*, 971 F.3d at 844 (rejecting plaintiff's attempt to "seek[] the same sum in equitable restitution" as "she requested in damages to compensate her for the same past harm").

Failure to establish equitable jurisdiction requires dismissal even at this early stage of the litigation. *See PhantomALERT v. Apple Inc.*, 762 F. Supp. 3d 8, 23 (D.D.C. 2025) (dismissing UCL claim for failing to "plead[] the prerequisites to earn injunctive relief"). Before a court "'properly can reach the merits,'" it must first address "the question of equitable jurisdiction." *Guzman v. Polaris Indus. Inc.*, 49 F.4th 1308, 1314 (9th Cir. 2022). For that reason, courts have long dismissed cases at the Rule 12 stage for failure "to establish the basic requisites of the issuance of equitable relief," including "the inadequacy of remedies at law." *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974) (affirming dismissal of complaint). As the Ninth Circuit recently put it, "[w]hen a case is initially filed in federal court and the defendant demonstrates that equitable jurisdiction is lacking, a court must dismiss the case." *Ruiz v. Bradford Exch., Ltd.*, --- F.4th ----, 2025 WL 2473007, at *4 (9th Cir. Aug. 28, 2025). Additionally, because establishing entitlement to equitable relief must come before "a merits determination," a plain-tiff has an adequate remedy at law even if the legal claim turns out not to be meritorious. *Guzman*, 49 F.4th at 1314 ("district court lacked equitable jurisdiction" over UCL claim "because [plaintiff] had an adequate remedy at law in his time-barred CLRA claim").

*Second*, and for similar reasons, the UCL claim fails because the relief Plaintiffs seek is properly classed as damages (unavailable under the UCL), not restitution. The commission fees Plaintiffs

identify are not "money or property that was once in [their] possession," as they must be to count as UCL restitution.  *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 947 (Cal. 2003).  As the Supreme Court has held, app-developer plaintiffs at most have a claim for "lost profits that they could have earned in a competitive retail market."  *Apple Inc. v. Pepper*, 587 U.S. 273, 288 (2019).  But "[l]ost profits are damages, not restitution, and are unavailable in a private action under the UCL."  *Lee v. Luxottica Retail N. Am., Inc.*, 280 Cal. Rptr. 3d 230, 232 (Cal. Ct. App. 2021).

### D.     The Foreign Law Claims Should Be Dismissed or Stayed (Counts IV–VI).

Plaintiffs' claims under Korean and Japanese law should be dismissed or stayed.  The DPLA requires the exclusive application of U.S. law, precluding Plaintiffs' Korean- and Japanese-law claims—a proposition Plaintiffs appear to accept when it comes to the Korean MRFTA claim.  Alternatively, if the Korean Plaintiffs nevertheless maintain they can state a Korean-law claim about Korea-based harm, and Japanese Plaintiff OverX maintains it can state Japanese-law claims about Japan-based harm, then those claims should be adjudicated by Korean and Japanese courts, respectively.

#### 1.     The DPLA's Choice-of-Law Provision Bars the Foreign-Law Claims.

Justifying their decision to bring Korean- and Japanese-law claims in a U.S. court, Plaintiffs invoke a "forum selection" clause in the DPLA requiring litigation in this District.  Am. Compl. ¶¶ 19–20; *see* Ex. 1 § 14.10.  But the very same DPLA provision selects "the laws of the United States and the State of California" as governing this dispute.  Ex. 1 § 14.10.  Giving effect to that provision means that Plaintiffs' claims should rise and fall under the Sherman Act.  *See Richards v. Lloyd's of London*, 135 F.3d 1289, 1293 (9th Cir. 1998) ("courts should enforce choice of law . . . clauses").  And this Court has already held that foreign "plaintiffs' [Sherman Act] claims based on foreign sales are barred, without exception, under the FTAIA."  *Société Du Figaro, SAS v. Apple Inc.*, No. 4:22-cv-04437, at 8 (N.D. Cal. Sept. 13, 2023) ("*Figaro*") (Gonzalez Rogers, J.), ECF No. 84.[6]

Plaintiffs appear to agree about the effect of the choice-of-law clause, at least when it comes to their ability to maintain a claim under the MRFTA.  By Plaintiffs' telling, a Korean court would conclude that the DPLA's "choice of law clause[]" (requiring resort to "California law") bars the application of the MRFTA in a dispute between a Korean app developer and Apple.  Am. Compl. ¶ 19.  There's

---

[6] To the extent not barred by the FTAIA, those claims would fail for reasons already discussed.  *See supra* § IV.C.

good reason to think Plaintiffs' description of foreign law is incorrect. *See infra* § IV.D.2. But if Plaintiffs are right, then, "out of respect for [Korean] sovereignty," the Court should "giv[e] credence to [the] foreign proceedings" Plaintiffs describe and dismiss the MRFTA claim as displaced by the DPLA's choice-of-law provision. *Sainez v. Venables*, 588 F.3d 713, 717 (9th Cir. 2009). And Plaintiffs offer no allegations to suggest a different result for their claims under Japanese law either.

### 2. International Comity Warrants Dismissal of the Foreign-Law Claims.

If Plaintiffs argue and the Court agrees that Plaintiffs may escape their contractual commitment to pursue only U.S.-law claims, the Court should dismiss the foreign-law claims on international-comity grounds. Under "principles of customary international law," American courts must "avoid unreasonable interference with the sovereign authority of other nations." *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 164 (2004). The international-comity doctrine thus "counsels voluntary forbearance when a sovereign which has a legitimate claim to jurisdiction concludes that a second sovereign also has a legitimate claim to jurisdiction under principles of international law." *Mujica v. AirScan Inc.*, 771 F.3d 580, 598 (9th Cir. 2014). Simply put, a U.S. court may "decline to exercise jurisdiction in a case properly adjudicated in a foreign state." *Id.* at 599. To determine whether this kind of "'discretionary . . . deference'" is appropriate in any given case, "courts weigh 'several factors, including [1] the strength of the United States' interest in using a foreign forum, [2] the strength of the foreign governments' interests, and [3] the adequacy of the alternative forum.'" *Cooper v. Tokyo Elec. Power Co. Holdings, Inc.*, 960 F.3d 549, 566 (9th Cir. 2020). These considerations weigh heavily in favor of dismissing the Korean- and Japanese-law claims so that Plaintiffs may pursue them, if they choose, in Korean and Japanese courts.

*First*, the United States does not appear to have ever expressed any interest in domestic adjudication of Korean or Japanese entities' claims under Korean or Japanese competition laws. Indeed, "courts have afforded far less weight, for comity purposes, to U.S. . . . interests when the activity at issue occurred abroad" because "comity is most closely tied to the question of territoriality." *Mujica*, 771 F.3d at 604–05. And here, Plaintiffs base their foreign-law claims on in-app purchases and app downloads on foreign App Store storefronts, seeking relief on behalf of developers principally working abroad. *See* Am. Compl. ¶¶ 54–55, 364, 380, 388; *cf. Figaro* at 5, 7 (recognizing alleged

DEFENDANT APPLE INC.'S MOTION TO DISMISS CLASS ACTION COMPLAINT
CASE NO. 4:25-cv-4438-YGR

"anticompetitive injury" from Apple's operation of foreign storefronts had "foreign" effect). That diminishes any interest the United States might have over the adjudication of non-U.S. Plaintiffs' claims under non-U.S. law.

*Second*, the strength of the Korean and Japanese government's interests, by contrast, is considerable. Start with Korea. The MRFTA is "Korea's primary antitrust statute," Am. Compl. ¶ 349, and it is aimed at promoting, among other things, the "balanced development of the [Korean] economy," Jeong Decl. ¶ 5.[7] Accordingly, the MRFTA's enforcement implicates serious public-policy considerations. *Id.* ¶¶ 5–7. As the Complaint tells it, the Korean Fair Trade Commission, Korea Communications Commission, and Korea Internet and Security Agency have all taken a keen interest in regulating Korea-based app stores, even when operated by foreign entities. Am Compl. ¶¶ 357, 359–61. And the basic fact "that [Korean] law [allegedly] applies to the case"—brought by Korean nationals—is further reason to think Korea has a "strong interest in being the place where the [P]laintiffs' claims are litigated." *Cooper*, 960 F.3d at 567.

Although federal courts can and do resolve issues of foreign law on occasion, the difficulties that would attend resolution of the Korean-law claim confirm that Korea has a "strong interest in being the place where the plaintiffs' claims are litigated." *Cooper*, 960 F.3d at 567. The issues specific to the MRFTA claim are many. For example:

- Whether KPA and KEPA are proper MRFTA plaintiffs, given that Korean law does not permit associations to sue for harms suffered by others, Jeong Decl. ¶ 20–22; and given that the associations seek only injunctive relief, *see* Am. Compl. ¶ 364, even though the MRFTA does not permit injunctions, *see* Am. Bar Ass'n, *Competition Laws Outside the United States*, ch. 20, C-3(a) (3d ed. 2020) (*Competition Laws*), https://tinyurl.com/3x6r57m5 (Lexis).

- Whether the claim is time-barred given that Plaintiffs must sue within "three years from the date when the victim became aware of the injury and the identity of the tortfeasor," and in any event no more than "10 years from the date of the tort." *Id.* ch. 20, C-3(b)(3); Jeong Decl. ¶¶ 18–19.

- How the Korean Telecommunications Business Act interacts with the MRFTA. *See* Am. Compl.

---

[7] Under Rule 44.1, the Court can (and should) "consider foreign legal materials outside the pleadings in ruling on [the] motion to dismiss." *de Fontbrune v. Wofsy*, 838 F.3d 992, 996 (9th Cir. 2016).

Gibson, Dunn & Crutcher LLP

¶¶ 358–59 (alleging that this Act governs Apple's Korean operations); *cf. Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004) ("'[A]ntitrust analysis must sensitively recognize and reflect the distinctive economic and legal setting of the regulated industry to which it applies.'").

- Whether Korean Plaintiffs may obtain relief related to sales outside of Korea, *see* Am. Compl. ¶ 54, an especially difficult question given that the relevant extraterritoriality test "has yet to be applied or refined by any court including the [Korean] Supreme Court," and its "precise meaning" is uncertain, *Competition Laws*, ch. 20, D.

"Not only would the [Court] have to educate itself on th[is] law, but it would" also "need to understand how the [MRFTA] has been administered in the thousands of cases resolved in [Korea], lest the 'change of courtrooms' mean a change in result." *Cooper*, 960 F.3d at 567.

These considerations apply in equal measure to the Japanese interests in adjudicating the Japanese Plaintiff's claims under Japanese law. Japan similarly has an "interest in the applicability of its laws." *Cooper*, 960 F.3d at 567. Much like the MRFTA, a "stated purpose of the [Japanese] Antimonopoly Act is 'to promote the democratic and wholesome development of the national economy.'" *Competition Laws*, ch. 14, A-1(b)(2); *see* Mukai Decl. ¶ 7. As with Korea, Plaintiffs allege the issues this case presents are sufficiently important that Japanese officials have devoted resources to investigating "mobile OS and mobile app distribution." Am. Compl. ¶ 377. In fact, if this case were litigated in Japan, OverX's request for injunctive relief would trigger the court's obligation to "notify the [Japanese Fair Trade Commission (JFTC)] of such suit" so that the court may "request the JFTC's opinion regarding the application of the Antimonopoly Act to the case." *Competition Laws*, ch. 14, A-5(c). And OverX's Japanese nationality only further cements Japan's interests in hearing the Japanese claims. *Cooper*, 960 F.3d at 567.

What's more, grappling with "the nuances of Japanese civil law" would pose unprecedented challenges. *Id.* Both Japanese-law claims rest on purported violations of the Japanese Antimonopoly Act. *See* Am. Compl. ¶¶ 380, 385. And Plaintiffs say "Japan's Mobile Software Competition Act ('MSCA') clarifies" the obligations of "providers of mobile device software[] like Apple," such that "violations of the MSCA are violations of the" Antimonopoly Act. *Id.* ¶¶ 378–79. The problem is that

the MSCA is not expected to go into effect until December of this year.  Mukai Decl. ¶ 16.  *Contra* Am. Compl. ¶ 378 (suggesting the law is effective "[a]s of July 29, 2025").  When it *does* go into effect, it will not apply retroactively.  *Id.*  And although JFTC guidelines provide that violations of the MSCA "are *generally* categorized as antitrust violations," the Antimonopoly Act and MSCA remain distinct laws with distinct enforcement mechanisms, and no one yet knows in what circumstances violation of one will amount to a violation of the other.  *Id.* ¶¶ 17–20 (emphasis added).  *Contra* Am. Compl. ¶ 379 (implying that violations of the MSCA automatically violate the Antimonopoly Act).  Were resolution of these open and novel legal issues not enough, the Court would then have to apply an antitrust regime that is "significant[ly] differen[t]" from "U.S. antitrust laws" in some respects, including "a unique approach for evaluating exclusionary private monopolization" and an "important exemption" for "unilateral refusal to license" intellectual property.  *Competition Laws*, ch. 14, B-3(a)(2), B-3(f)(2), B-4(b).

   *Third* and finally, a Korean or Japanese forum would be adequate.  Plaintiffs allege no basis to conclude those countries' courts would not be "procedural[ly] fair[]."  *Mujica*, 771 F.3d at 608.  To the contrary, "legal authority from district courts in this Circuit and in other circuits support the proposition that Korea is an adequate forum."  *Nexon Korea Corp. v. Ironmace Co. Ltd.*, 2023 WL 5305996, at *6 (W.D. Wash. Aug. 17, 2023), *aff'd*, 2024 WL 3493002 (9th Cir. July 22, 2024) (collecting cases).  And the Ninth Circuit has rejected out of hand the notion that the Japanese legal system would be inadequate, holding in *Cooper* "that there was 'no doubt that Japan would provide an adequate alternative forum.'"  960 F.3d at 567.  Given that Plaintiffs' foreign-law claims *arise under* Korean and Japanese law, a different conclusion here would be unusual indeed.

   Similarly obvious foreign interests in adjudicating foreign claims brought by foreign plaintiffs led another court in this Circuit recently to dismiss "under the doctrine of international comity" the parts of a hockey-player antitrust suit that arose "from injury suffered in Canada by Players recruited from within the United States."  *World Ass'n of Icehockey Players Unions N. Am. Div. v. Nat'l Hockey League*, No. 2:24-cv-02135, at 68 (W.D. Wash. May 23, 2025), ECF No. 169.  Even though there was "no litigation seeking relief for antitrust injury" then "pending in Canadian courts," the court held that comity counseled in favor of refusing to adjudicate Canadian-law claims by Canadian plaintiffs because "the location of Plaintiffs' injuries" was in Canada; Canada had a "legitimate interest . . . in

1  regulating conduct that occurs within its borders," while the absence of alleged harm to U.S. commerce

2  from the foreign conduct and the "limited contacts with the United States" diminished the U.S. interest;

3  and any obstacle the plaintiffs would face suing in Canada did not stem from any "inadequacy of the

4  Canadian legal system." *Id.* at 57–68. The same considerations are present here—Plaintiffs seek to

5  use this Court to litigate foreign harms under foreign nations' laws, but these matters are best left for

6  those nations' courts. This Court should therefore dismiss the Korean and Japanese claims.

7          Without disputing that their claims are best adjudicated at home, Plaintiffs assert that Korean

8  and Japanese "courts have held that they cannot resolve" their claims in light of the DPLA's forum-

9  selection clause. Am. Compl. ¶¶ 19–20. That assertion reveals nothing about whether those courts

10 would agree to hear Korean- or Japanese-laws claims dismissed on international-comity grounds now

11 that Plaintiffs' *have* complied with the DPLA by filing in this Court. And there is every reason to think

12 those courts *would* do so. *See* Jeong Decl. ¶ 17; Naito Decl. ¶¶ 13–15. Plaintiffs' assertion is also

13 untested (at best). No Korean court has ever held that the DPLA bars those courts from adjudicating

14 an MRFTA claim. Jeong Decl. ¶ 14. And the decisions Plaintiffs cite, Am. Compl. ¶ 19 & n.1, are not

15 on point. For example, one involved Google, its contract, and a breach-of-contract claim where it was

16 "difficult to see" how the MRFTA applied at all. Jeong Decl. Ex. F at 14. By contrast, the MRFTA is

17 squarely at issue here, and Korean courts have refused to divest themselves of jurisdiction in cases

18 involving important issues of public law. *See* Jeong Decl. ¶ 13; *id.* Ex. C at 7. The same is true for

19 Japan: The Tokyo High Court decision Plaintiffs cite, *see* Am. Compl. ¶ 20 & n.2, involved a breach-

20 of-contract claim, not claims under Japanese antitrust laws, the latter of which implicate public policy

21 to a greater degree—such that the Japanese courts have a strong interest in adjudicating them. *See*

22 Mukai Decl. ¶¶ 5–12; Naito Decl. ¶ 12; *id.* Ex. B. The notion that Plaintiffs could not have begun this

23 case abroad is thus debatable at best and in any event irrelevant as Korean and Japanese courts would

24 agree to hear this dispute *now*.

25          **3.    Alternatively, the Foreign-Law Claims Should Be Bifurcated and Stayed.**

26          If the Court is inclined not to dismiss the Korean and Japanese claims outright, it should at

27 minimum bifurcate those claims from the U.S.-law claims and stay proceedings on them until Plaintiffs

28 have attempted to bring their claims in Korean and Japanese court. This Court has "broad authority"

1    under Rule 42(b) to order that certain issues or claims be tried separately "[f]or convenience, to avoid

2    prejudice, or to expedite and economize." *Perkins v. City of San Francisco*, 2017 WL 1540736, at *2

3    (N.D. Cal. Apr. 28, 2017) (citations omitted).  Staying the foreign-law claims while the Korean and

4    Japanese Plaintiffs seek relief in their nations' courts—and hearing those claims here only if the Korean

5    and Japanese courts find venue improper—would allow this Court to "defer[] costly and possibly un-

6    necessary proceedings pending resolution of potentially dispositive preliminary issues." *Zivkovic v. S.*

7    *Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002).

8         Bifurcation of the U.S. and foreign-law claims would also be warranted even if the Court did

9    not direct Plaintiffs to attempt to bring their foreign-law claims in Korea and Japan.  *See, e.g., Perkins*,

10   2017 WL 1540736, at *2 (bifurcating claims and staying some to be resolved later).  Without bifurca-

11   tion, the Court (and, eventually, possibly a jury) would have to juggle difficult questions of foreign law

12   alongside more familiar, yet still complex, issues of U.S. law.  *See supra* pp. 20–22.  By contrast,

13   resolving the Sherman Act and UCL claims first would result in findings and conclusions that could

14   drive—and potentially eliminate or narrow—foreign-law issues.  Bifurcation would therefore continue

15   to allow the Court to "defer[] costly and possibly unnecessary proceedings," *Zivkovic*, 302 F.3d at

16   1088, serve the interests of judicial economy, *Perkins* 2017 WL 1540736, at *2, and "simplif[y] the

17   issues for the jury," *Hirst v. Gertzen*, 676 F.2d 1252, 1261 (9th Cir. 1982).

18        **E.    Any Remaining Claims Should Be Stayed Pending Resolution of the *Epic* Appeal.**

19        The Court should stay further proceedings on whatever remains of Plaintiffs' claims until the

20   Ninth Circuit's mandate issues in the expedited appeal from the *Epic* contempt order.  A court has

21   broad discretion to "stay proceedings" where doing so would promote "economy of time and effort for

22   itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).  A court assesses

23   (1) "the possible damage" from granting a stay, (2) the "hardship or inequity" from denying a stay, and

24   (3) whether a stay would advance "the orderly course of justice" by "simplifying . . . issues, proof, and

25   questions of law." *Robinson v. Dignity Health*, 2016 WL 7102832, at *2 (N.D. Cal. Dec. 6, 2016)

26   (Gonzalez Rogers, J.).  Those factors strongly favor a stay here.[8]

27

28   [8] The standard for a stay pending decision in a separate action does not involve assessing the "likelihood
     of success" in *Epic*.  *Phan v. Transamerica Premier Life Ins. Co.*, 2023 WL 7597464, at *4 (N.D. Cal.
     Nov. 13, 2023).  And a stay here poses no risk of Apple's underlying conduct continuing.

Staying this case until *Epic* is resolved would "simplify issues, proof, and questions of law." *In re RH Shareholder Deriv. Litig.*, 2019 WL 580668, at *4 (N.D. Cal. Jan. 23, 2019) (Gonzalez Rogers, J.). Plaintiffs' claims are based at least in part on Apple's alleged failure to comply with the *Epic* injunction and on the interpretation of the Injunction's scope reflected in this Court's contempt order. *E.g.*, Am. Compl. ¶ 61(f) (asserting "[w]hether Apple's conduct . . . violate[d] the First Injunction" is a "question[] of law or fact common to" all Plaintiffs and the putative classes); *supra* § IV.C.1. The Ninth Circuit's decision about what the Injunction required and whether Apple violated it is highly likely to clarify—or foreclose—key parts of this case and may alter the framework for evaluating Apple's defenses. At a minimum, it will likely narrow the scope of discovery and the issues in dispute.

Requiring the parties to move forward now would also impose significant burdens. Class-certification briefing, discovery, and motions practice would require substantial time and expense by the parties and the Court, some of which could be "rendered moot and unnecessary" if the Ninth Circuit reverses or narrows the contempt ruling. *Phan*, 2023 WL 7597464, at *4. And any rulings in this case may need to be reconsidered if they turn out to "conflict[]" with the eventual decision in *Epic*. *Id.* It makes little sense to press onward, potentially "forc[ing] the parties to expend resources that could have been avoided." *Robledo v. Randstad US, LP*, 2017 WL 4934205, at *4 (N.D. Cal. Nov. 1, 2017).

Plaintiffs, by contrast, would suffer no material harm from a stay. This case remains at the pleading stage, before any discovery or class certification. And Plaintiffs have not sought any form of urgent relief. In any event, delay alone does not require denial of a stay. *See SST Millenium LLC v. Mission St. Dev. LLC*, 2019 WL 2342277, at *5 (N.D. Cal. June 3, 2019) (Gonzalez Rogers, J.) (harm from delay minimal where separate proceedings "likely will conclude within a reasonable time"). This Court should therefore exercise its discretion to stay all proceedings beyond the motion to dismiss, pending final resolution of the *Epic* appeal.

## V.     CONCLUSION

For these reasons, the Court should dismiss the Complaint without prejudice to the extent Plaintiffs' lack standing, with prejudice as to any claims for which Plaintiffs plausibly allege standing, and stay any remaining proceedings pending issuance of the mandate in *Epic*.

1    Dated:  September 5, 2025                    GIBSON, DUNN & CRUTCHER LLP

2

3                                                  */s/ Cynthia E. Richman*
                                                   Cynthia E. Richman

4                                                  *Attorney for Defendant, Apple Inc.*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

DEFENDANT APPLE INC.'S MOTION TO DISMISS CLASS ACTION COMPLAINT
CASE NO. 4:25-cv-4438-YGR